713 So.2d 869 (1997)
Ex parte Governor Fob JAMES, et al.
(In re ALABAMA COALITION FOR EQUITY, INC., an Alabama nonprofit corporation, et al.
v.
Fob JAMES, Jr., in his official capacity as Governor of the State of Alabama and as president of the State Board of Education, et al.).
Ex parte Governor Fob JAMES, et al.
(In re Mary HARPER, suing as next friend of Deion Harper; and Kerry Phillips, a minor, et al.
v.
Fob JAMES, Jr., in his official capacity as Governor of the State of Alabama and as president of the State Board of Education, et al.).
Fob JAMES, Jr., in his official capacity as Governor of the State of Alabama and as president of the State Board of Education, et al.
v.
ALABAMA COALITION FOR EQUITY, INC., et al.
Fob JAMES, Jr., in his official capacity as Governor of the State of Alabama and as president of the State Board of Education, et al.
v.
Mary HARPER, et al.
Joyce PINTO, et al.
v.
ALABAMA COALITION FOR EQUITY, et al.
Joyce PINTO, et al.
v.
ALABAMA COALITION FOR EQUITY, et al.
Ex parte Fob JAMES, Governor of Alabama, et al.
(In re ALABAMA COALITION FOR EQUITY, INC., an Alabama nonprofit corporation, et al.
v.
Fob JAMES, in his official capacity as Governor of Alabama, et al.).
1950030, 1950031, 1950240, 1950241, 1950408, 1950409 and 1950917.
Supreme Court of Alabama.
January 10, 1997.
Judgment Modified on Denial of Rehearing December 3, 1997.
*871 Jeff Sessions and Bill Pryor, attys. gen., and Brock B. Gordon, Mobile, for Attorney General Jeff Sessions; and M. Roland Nachman, Jr., and William P. Gray, Jr., Montgomery, for Governor Fob James and the state finance director.
Samuel Adams, Montgomery; and Kendrick E. Webb and Bart Harmon of Webb & Eley, P.C., Montgomery; and Thomas F. Parker IV, Montgomery, for the Pinto parties.
C. C. Torbert, Jr., of Maynard, Cooper, Frierson & Gale, P.C. [firm name later stated as Maynard, Cooper & Gale, P.C.], Montgomery; Michael D. Waters and Susan Russ Walker of Miller, Hamilton, Snider & Odom, Montgomery; and James G. Speake of Speake & Speake, Moulton, for Alabama Coalition for Equity, Inc.
Victoria Farr and Reuben Cook, Tuscaloosa, for Alabama Disabilities Advocacy Program and John Doe plaintiffs.
Robert D. Segall of Copeland, Franco, Screws & Gill, P.A., Montgomery; Chris Hansen, American Civil Liberties Union Foundation, New York City; and Martha I. Morgan, Tuscaloosa, for Harper plaintiffs.
Judgment Modified on Denial of Rehearing December 3, 1997. (See Opinion and Special Writings at 713 So.2d 935.)
COOK, Justice.
These cases offer us another opportunity to review trial court proceedings in what has come to be known as the "Public School Equity Funding Case." See Pinto v. Alabama Coalition for Equity, 662 So.2d 894 (Ala.1995); and Opinion of the Justices No. 333, 624 So.2d 107 (Ala.1993). Those two opinions adequately set forth the facts underlying this dispute, and we will not rehearse them unnecessarily in this opinion. The following pertinent events have transpired since we released Pinto:
In a motion filed on or about May 15, 1995, Governor Fob James, Jr., and Finance Director James Baker asked Judge Eugene Reese, of the Montgomery Circuit Court, to recuse from further proceedings in the case. The motion alternatively requested that *872 Judge Reese solicit an advisory opinion from the Judicial Inquiry Commission ("Commission") as to his qualification to preside further over the case. On August 18, 1995, the Commission issued an opinion holding that Judge Reese was "disqualified from continuing to sit in the case."
The Commission reached this conclusion on the basis of Canon 3(C)(1), Alabama Canons of Judicial Ethics, which states that "[a] judge should disqualify himself in a proceeding in which his ... impartiality might reasonably be questioned." Although it found no evidence of "actual bias," the Commission concluded that the totality of circumstances surrounding the case afforded "a reasonable basis for questioning the judge's impartiality." In particular, the Commission noted the manner in which the case had been discussed and debated by both candidates in the 1994 Democratic Primary campaign for the office of Associate Justice of the Alabama Supreme Court (Judge Reese was one of those two candidates). Also, the Commission noted that the "case [was] still pending," and that issues as to which Judge Reese had "publicly declared his leadership [would be] presented to him for reconsideration." Thereafter, on August 23, 1995, Judge Reese withdrew from the case and it was reassigned to Judge Sarah M. Greenhaw.
On September 15, 1995, Governor James, Finance Director Baker, and Attorney General Jeff Sessions ("State parties") jointly moved the trial court to vacate the orders relating to both the Liability Phase and the Remedy Plan, and to dismiss the action for lack of subject matter jurisdiction. A motion filed earlier by the Pinto intervenors sought similar action as to the Remedy Plan. On October 6, 1995, the trial court denied the motions. Also, pursuant to Ala. R. Civ. P. 54(b), it expressly determined "that there [was] no just reason for delay and ... direct[ed] the entry of final judgment as to the" Remedy Plan. At that time, Judge Greenhaw struck ¶ XI(F) of the Remedy Plan, which stated: "Retention of Jurisdiction The court hereby retains jurisdiction of this matter and will issue such further orders as may be required to secure the implementation of its orders."[1]
On October 12, 1995, the State parties petitioned this Court, pursuant to Ala. R. App. P. 5, for permission to appeal from the judgment entered on October 6, 1995, insofar as it overruled their motions to dismiss the action. The cases numbered 1950030 and 1950031 represent those petitions. On November 8, 1995, the State parties appealed from the judgment that had been certified under Rule 54(b) as final; that judgment consisted of the Remedy Plan. Cases 1950240 and 1950241 represent those appeals. Also, in cases 1950408 and 1950409, the Pinto intervenors appealed from the certified judgment.
On February 6, 1996, after these appeals were filed, the trial court, over the objections of the State parties, appointed "an independent monitor ... to oversee the implementation of the Remedy Plan." It also granted "attorneys for [the] plaintiffs ... leave to make application for an award of attorneys' fees," and set dates for the filing of "fee declarations requesting payment of attorney fees and expenses, with supporting documentation." On March 14, 1996, the State parties petitioned this Court for a writ of prohibition, or, alternatively, a writ of mandamus, directing the trial court to vacate its February 6 order and to stay the proceedings in the trial court pending the resolution of these appeals. Case 1950917 represents this petition. Cases 1950030, 1950031, 1950240, 1950241, 1950408, 1950409, and 1950917 have been consolidated for resolution on appeal. We shall address the issues peculiar to each of the seven cases, arranging the parts of this opinion according to the sequence in which the cases are numbered.

I. Cases 1950030 and 1950031Petitions for Permission to Appeal
The State parties seek permission, pursuant to Ala. R. App. P. 5, to appeal the denial of their motion to vacate all previous orders and to dismiss the action. Their petition challenges, primarily on constitutional grounds, the validity of the Liability Phasein addition to challenging the Remedy *873 Plan. More specifically, the State parties argue that the trial court's holdings as to both Phases of this action violate the separation of powers doctrine.
Ordinarily, we would, before reviewing issues pursuant to Rule 5, order briefs from opposing parties. In this case, however, the issues involved in cases 1950030 and 1950031 are the same issues presented in cases 1950240 and 1950241, and in those cases the issues have been fully briefed by the opposing parties. For this reason, and because the Remedy Plan is not yet final and appealable, we grant the petitions and review the issues pursuant to Rule 5. We shall explain the present procedural posture of the Remedy Plan before addressing the merits of the State parties' arguments.
Procedurally and substantively, the Remedy Plan differs from the Liability Phase. In the text of Pinto, we set forth several sections of the Remedy Plan as evidence that "the court intended to oversee and direct the processes of education `reform' for an indefinite period," that is, as evidence of its inherently interlocutory nature. 662 So.2d at 899 (emphasis added). After reproducing several exemplary excerpts from the Remedy Plan, we stated:
"These and numerous other provisions of the Remedy [Plan] [emphasis added] obviously contemplate perennial revision and reassessment [emphasis in Pinto] of the progress of the process, the purpose of which is to convert a system that failed to `offer equitable and adequate educational opportunities to the schoolchildren of the state,' Opinion of the Justices, No. 338, 624 So.2d 107, 110 (Ala.1993) (emphasis added [in Pinto]), into a system that succeeds in doing so."
662 So.2d at 899. We described this objective as an "ambitious" oneone that could not "be achieved without significantly impactingdirectly or indirectlyvirtually every Alabama citizen for years to come." Id. at 899-900.
Thus, it was not merely ¶ XI(F) of the Remedy Plan that rendered the Remedy Plan interlocutory.[2] Indeed, Judge Greenhaw, in her order of October 6, 1995, in an apparent attempt to facilitate appellate review of the Remedy Plan, stated:
"[I] In the Remedy Order the trial court specifically retained jurisdiction to issue further orders required to secure implementation. [II] Inasmuch as this court has made the Remedy and Remedy Approval Orders final, for purposes of the record Sec. XI(F) of the Remedy Order is set aside. [III] However, the court would note that it has inherent power to issue such orders as necessary to render its judgments effective...."
(Emphasis added.)
These three sentences succinctly illustrate the difficulties inherent in attempting to convert to a final judgment the Remedy Plan in toto. Essentially, sentence three replaced what sentence two purportedly removedthe power of the trial court to "revis[e] and reassess[] ... the process," Pinto, 662 So.2d at 899, in other words, to modify the Remedy Plan as necessary. As we explained in Pinto, the Remedy Plan is interlocutory by its very nature and will remain so until an educational system that complies with the constitution is in place. It was designed to remain modifiable in order to accommodate, among other things, legislative and executive action. Thus, unlike the Liability Phase, which "ascertained and declared the rights of the parties," Taylor v. Taylor, 398 So.2d 267, 269 (Ala.1981), by declaring the challenged system unconstitutional, and which became final on June 9, 1993, the Remedy Plan does not "ascertain[ ] and declare[ ] the rights of the parties and settle[ ] the equities" as to any party in this action. Such a disposition is a prerequisite for a Rule 54(b) certification of finality. See Tanner v. Alabama Power Co., 617 So.2d 656, 656 (Ala. 1993) (Rule 54(b) "confers appellate jurisdiction over an order of judgment only where the trial court `has completely disposed of one of a number of claims, or one of multiple parties'" (emphasis in Tanner)).
*874 In short, Rule 54(b) cannot make the Remedy Plan in toto a final and appealable judgment. Review of specific orders implementing specific provisions may be obtained, however, in a manner to be discussed more fully in Part III.C. of this opinion. That was the sense of this Court's order denying Governor James's petition for a writ of prohibition in Ex parte James (no. 1940679); that order stated: "[I]ssues regarding other orders may be raised on appeal in accordance with the Alabama Rules of Appellate Procedure when such orders become final." Pinto, 662 So.2d at 898 n. 2. That this statement has apparently been misunderstood by the parties and the trial court is one consideration that has prompted our decision to grant the Rule 5 petition at this time.
We turn now to the merits of the arguments. The State parties challenge the validity of the judgments on which both the Liability Phase and the Remedy Plan are based, on three grounds. First, they contend that these judgments violate the separation of powers doctrine. Second, they argue that this actionup to, and including, the time of the entry of the order setting forth the Remedy Planwas not sufficiently adversarial to render the action justiciable. Thus, they insist, the trial court lacked subject matter jurisdiction to enter any of the orders material to this action. Third, they insist that "campaign conduct of Judge Reese draws in question the impartiality of the entire judicial proceedings." Brief and Arguments of Appellants, at 27. For ease of discussion, we shall address these contentions in reverse order.

A. Campaign Conduct
In his unsuccessful bid for a seat on this Court in the 1994 election campaign, Judge Reese's campaign circulated literature categorizing him as "the judge for educational reform," and stating, among other things: "Gene Reese is a tough judge. Last year, he became famous for ruling Alabama's education system unconstitutional and telling a Governor and the Legislature to fix the problem.... Now, Gene Reese is running for Alabama Supreme Courtand he will be a tough Justice for change." Brief and Argument of Appellants (Cases 1950240 and 1950241), at App. A. This conduct, it is contended, created an atmosphere that could be perceived as judicial bias, and thus compromised the integrity of this action in toto.
"Due [p]rocess ... entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." Marshall v. Jerrico, Inc., 446 U.S. 238, 242, 100 S.Ct. 1610, 1613, 64 L.Ed.2d 182 (1980). Trial before such a tribunal "helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law." Id. In facilitating this principle, Canon 3(C)(1) prevents a judge from exercising discretion in a case where the demonstrated facts make it "reasonable for a party, for members of the public, or for counsel to question [his] impartiality." Bryars v. Bryars, 485 So.2d 1187, 1189 (Ala.Civ.App.1986) (recusal was required under such facts even without evidence of "actual bias").
Neither the State parties nor the Pinto intervenors contend that the Liability Phase, which was made final on March 31, 1993, or the Remedy Plan, which was entered on December 3, 1993, were accompanied by conduct evidencing actual bias. Judge Reese's 1994 campaign advertisements and activities transpired after the Liability Phase order was entered. Moreover, Judge Reese's recusal was not sought by any party in this action, as far as the record reveals, until May 1995, when the State parties moved for it. Thus, the contentions are, in effect, that the Commission's order of disqualification, which was based on the activities of the 1994 campaign, should be applied retroactively to nullify even the actions taken many months before any of the challenged campaign conduct occurred.
We disagree with these contentions. Other courts have held that "[o]rders entered prior to the recusal motion are unaffected by its disposition, absent a showing of actual bias." Liberty Lobby, Inc. v. Dow Jones & Co., 838 F.2d 1287, 1302 (D.C.Cir.) (emphasis added), cert. denied, 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). The United States Court of Appeals for the Seventh Circuit observed: "Our research has not turned *875 up any case involving mere appearance of impropriety in which the court has set aside decisions that had been taken by the district judge before any party asked for recusal." United States v. Murphy, 768 F.2d 1518 (7th Cir.1985), cert. denied, 475 U.S. 1012, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986). See also United States v. Widgery, 778 F.2d 325, 328 (7th Cir.1985) ("Disqualification for the appearance of impropriety runs prospectively only; even a successful motion does not vitiate acts taken before the motion was filed").
If orders entered by a trial judge before recusal is requested are valid, then, a fortiori, orders, such as those in this case, that were entered before the questionable conduct occurred are valid. Thus, we hold that where a party seeks the recusal or disqualification of a trial judge on the ground that "his impartiality might reasonably be questioned," that is, without evidence of actual bias, orders entered by that judge before the occurrence of the conduct for which recusal was sought are valid.
This holding does not, however, entirely resolve a contention, peculiar to the Pinto intervenors, regarding the Remedy Plan. Specifically, they state:
"Judge Reese called his judicial independence into question by appearing at an event to be publicly honored by a party to the pending litigation. In April 1993, prior to the Remedy Plan, Judge Reese attended the State [Parent Teachers Association (`PTA')] 1993 annual convention in Huntsville, Alabama. Dr. Wayne Teague, a party defendant/plaintiff/defendant and State Superintendent of Education, introduced Judge Reese, read excerpts from his Liability Order, and praised both to the standing ovation of the crowd. Birmingham News, April 17, 1993, p. 1A .... [The] Association actively campaigned for the proposed remedy plan to be implemented. This activity alone warrants disqualification."
Brief of Pinto Appellants, at 27-28 (emphasis added).
Unlike the Liability Phase, the Remedy Plan was entered after the PTA convention, but well before the motion for recusal or disqualification. We need not decide whether this distinction requires a different result, because, we conclude, this challenge by the Pinto intervenors to the Remedy Plan is due to be rejected pursuant to another rule. Specifically, "[i]t has been held that the subsequent approval or ratification by [a] qualified judge of the invalid acts of [a] disqualified judge has the effect of relieving the case of any objection to the proceedings based on the ground of the disqualification of the regular judge." 48A C.J.S. Judges § 157, at 865 (1981). Otherwise stated, "[a]n order of a judge made prior to his disqualification is in effect set aside by a similar order made by the new judge to whom the case is submitted after the original judge has stepped out of the case." Id. See Carpenter v. Pacific Mut. Life Ins. Co., 10 Cal.2d 307, 74 P.2d 761 (1937), aff'd, 305 U.S. 297, 59 S.Ct. 170, 83 L.Ed. 182 (1938); Garrison v. Marietta Trust & Banking Co., 155 Ga. 562, 118 S.E. 48 (1923).
After Judge Reese withdrew from this case on August 23, 1995, it was reassigned to Judge Greenhaw. In their motion filed on September 15, 1995, the State parties directly presented Judge Greenhaw with issues going to the merits of the Remedy Plan. They contended that the action must be dismissed, because (1) the circuit court had no power "to require the Governor and legislature of Alabama ... to take certain specific actions," and (2) the judgment was invalid because of the appearance of bias created by Judge Reese's campaign activities.
The question of the court's jurisdiction was, of course, identical to the question resolved by Judge Reese before he withdrew from the case. Judge Greenhaw reviewed the Remedy Plan de novo. Thus, Judge Greenhaw's October 6, 1995, judgment, which rejected the State parties' arguments and denied their motion, effectively superseded, or "set aside," the Remedy Plan entered by Judge Reese. The Remedy Plan is not, therefore, invalid simply because it was originally entered by Judge Reese before he withdrew from the case.

*876 B. Justiciability

The State parties, as well as the Pinto intervenors, contend that this action was not sufficiently adversarial to render the action justiciable. The essence of this argument is that from the time Governor Guy Hunt was removed from office as a result of a felony convictionto be replaced by operation of law by Governor Jim Folsomuntil Governor Fob James and Attorney General Jeff Sessions succeeded Governor Folsom and Attorney General James Evans as a result of the 1994 election, the action included no parties who truly represented opposing interests. These contentions are based, for the most part, on the fact that the State parties' predecessors alternately assumed the roles of plaintiffs and defendants throughout this litigation.
The sequence of these realignments was discussed in Pinto v. Alabama Coalition for Equity, 662 So.2d 894 (Ala.1995). The original defendants in the action were "Governor Guy Hunt, State Director of Finance Robin Swift, Lieutenant Governor James Folsom, Speaker of the House of Representatives James Clark, State Superintendent of Education Wayne Teague, and the members of the Alabama State Board of Education [`SBOE']." Id. at 895. However, Speaker Clark, Lieutenant Governor Folsom, Superintendent Teague, and all members of the SBOE were subsequently "realign[ed] as plaintiffs, indicating that they agreed with [the] plaintiffs' claims." Id. (Emphasis added.) After Governor Hunt was succeeded by Lieutenant Governor Folsom, another realignment occurred. Speaker Clark, Superintendent Teague, and members of the SBOE were "realigned as defendants in their official capacities." Id. at 897 (emphasis added). On June 9, 1993, Governor Folsomwho had already become a defendant by substitutionwas formally realigned as such. That same day, the "parties jointly moved the trial court to certify the liability phase order as a final judgment." Id. That judgment was not appealed.
It is contended that the multiple realignments of the state officials, their failure to appeal the Liability Phase, and their submission to the circuit court of the Remedy Plan, id.the essence of which was ultimately adoptedidentifies this action as, in the words of the Pinto intervenors in their principal brief in Pinto, "a sweetheart suit." Brief of Pinto Appellants, at 43 (1931030 and 1931031). In other words, it is insisted, from the time Governor Hunt was removed from office until the substitution of the current GovernorGovernor Jamesas a party defendant, this action lacked any party with an interest sufficiently adverse to confer subject-matter jurisdiction. See Brief and Argument of [State] Appellants, at 30 (1950240 and 1950241).
To be sure, "the circuit courts of this state do not have jurisdiction to issue advisory opinions when there is no case or controversy presented." Alabama Nursing Home Ass'n v. Alabama State Health Planning Agency, 554 So.2d 1032, 1033 (Ala.Civ. App.1989). "A `justiciable controversy' is a controversy in which a claim of right is asserted against one who has an interest in contesting it." Thompson v. Hartford Accident & Indem. Co., 460 So.2d 1264, 1266 (Ala.1984).
These rules, however, primarily ensure that resort to the judiciary will not be made for "advisory opinions," based on "hypothetical facts which are not certain to occur." Southern Methodist Univ. v. Times Herald Printing Co., 729 S.W.2d 129, 131 (Tex.App. 1987). They also ensure that courts will not "render legal opinions in ... situations [that] do not fulfill the judicial function of finally settling disputes." Id. Additionally, they ensure that the issues and facts in the dispute will be fully and fairly presented to the court.
In a more traditional litigation context, we might find the scenario of which the State parties and Pinto intervenors complain convincing. However, this case is sui generis in Alabama jurisprudence. It has involved elected representatives of both the executive branch and the legislative branch of government, including (1) the Governor, (2) the state finance director, (3) the speaker of the house of representatives, (4) the president pro tempore of the senate, and (5) the SBOE.
*877 By virtue of their offices, each official represented interests that were, in many contexts, inherently adverse to those of the others. We are presented with no evidence, or, even allegations, that these officers, or any one of them, breached the public trust vested in their respective offices. Indeed, it cannot be supposed that either the speaker of the house or the president pro tempore of the senate would collude in a scheme that would ultimately require legislation misallocating state funds or that would otherwise waste the resources of this state, unless they were, in fact, engaged in such a breach. The same observations apply with equal force to the state finance director, who has remained a party defendant throughout this action. Similar observations could be made as to the Governor and the SBOE. Suffice it to say, however, that the presence of officers of both the executive branch and the legislative branch of government tended to confer upon this action an institutionalized adversity, thus minimizing the potential for collusion. Thus, the fact that the present State parties may disagree more personally and fundamentally with some aspects of this case than did their predecessors does not deprive the court of jurisdiction.
Moreover, this case contravenes in no sense the rationale underlying the rules of justiciability discussed above. The dispute does not require the court to apply legal principles to "hypothetical facts which are not certain to occur." Southern Methodist Univ., 729 S.W.2d at 131. On the contrary, the trial court, in its Liability Phase, made extensive findings of fact and statistics, expressing in the starkest of terms the conditions then prevailing in Alabama's public schools. See Opinion of the Justices No. 338, 624 So.2d 107, 124-44 (Ala.1993). Also, this action has, from its inception, been so postured that the judgments entered would bind all the parties necessary finally to settle this dispute. Indeed, it is precisely this aspect of the case that the State parties challenge most vigorously.
But there are yet more cogent reasons why this action does not fail for lack of adversity. First, throughout the trial of the Liability Phase, former Governor Guy Hunt was, at all times, a party defendant, and he presented an aggressive defense. It cannot be, and, in fact, is not, contended that this action lacked adversity as long as Governor Hunt was involved. Also, the decision not to appeal the Liability Phase, although curious, Pinto v. Alabama Coalition for Equity, 662 So.2d 894, 902 (Ala.1995) (Houston, J., concurring specially), had already been made by Governor Hunt before he left office. "Hunt: No appeal of school ruling," Montgomery Advertiser, April 6, 1993, at 1A, included in Brief of Harper, ACE, ADAP, and John Doe Appellees (1950240 and 1950241) App. A. Instead, Governor Hunt promised to appoint with the aid of Speaker Clark and then Lieutenant Governor Jim Folsoma "task force to address the judge's order to overhaul the education system." Id. On October 1, 1993, the proposed Remedy Plan was submitted by, among others, Governor Folsom and Speaker Clark. Pinto, 662 So.2d at 897. In no manner that is apparent to us did the action proceed differently between the time Governor Hunt left office and the time the remedy proposal was submitted than it would have proceeded if Governor Hunt had continued in office. Thus, we fail to see how the court was deprived of jurisdiction because of insufficient adversity during this period.
On November 16, 1993, before the Remedy Plan was approved, "Walter Anderton and others purporting to represent `taxpayers and citizens' of Alabama" ("Anderton intervenors"), moved to intervene in the action. Pinto, 662 So.2d at 897. Within a month, the Pinto intervenors formally sought to join the action. In Pinto, of course, we held that the Pinto and Anderton intervenors were "entitled to intervene in the remedy phase of this unique litigation, as a matter of right, pursuant to Rule 24(a), [Ala. R. Civ. P.]." 662 So.2d at 900 (emphasis in original). Concurrently, we pointed out that "the [Remedy Phase] order entered on December 3, 1993, did not constitute a final judgment." Id. at 898.
In the interim between December 3, 1993, and October 6, 1995, this action included not only the present State parties, but also the Pinto and Anderton intervenors. Thus, although we conclude that this action suffered *878 no infirmity through an absence of adversity, any infirmity allegedly attaching after Governor Hunt left the case was assuredly cured by the participation of the present State parties and the intervenors. See City of Springfield v. Washington Public Power Supply, 752 F.2d 1423, 1427 (9th Cir.1985) ("any doubt" as to the existence of a justiciable controversy at the outset of the action was dispelled by the intervention of a party taking an adversarial position), cert. denied sub nom. DeFazio v. City of Springfield, 474 U.S. 1055, 106 S.Ct. 792, 88 L.Ed.2d 770 (1986); Associated General Contractors of America v. Laborers Int'l Union, 476 F.2d 1388, 1402-03 (Temp.Emer.Ct.App.1973); 13 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3530, at 319 (1984) ("a case conceived in cooperation may be saved by intervention of a genuine adversary").

C. Separation of Powers
The State parties challenge the validity of the judgments on which both the Liability Phase and the Remedy Plan are based, arguing that they violate the separation of powers doctrine as primarily expressed in Ala. Const. 1901, §§ 42 and 43:
"[Section 42] The powers of the government of the State of Alabama shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another.
"[Section 43] In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men."
This action is nonjusticable, it is contended, because it involves a political question one that is beyond the scope of the judiciary's constitutional role. In reality, this "political-question" argument is a composite of two separate inquiries. The first involves the power of the judiciary to review the constitutionality vel non of the school systemthe Liability Phase. The second involves the power of the judiciary to impose a remedy the Remedy Plan. In the following two subsections of this opinion, we shall address the issues implicated in each Phase.

(1) Liability Phase
On March 31, 1993, the trial court held that Alabama's public education system violated "`Ala. Const. art. I, §§ 1, 6, 13, and 22 [guaranteeing Alabama citizens equal protection of the laws] and art. XIV, § 256 [guaranteeing Alabama citizens access to a "liberal system of public schools"].'" Pinto, 662 So.2d at 896. The State parties and the Pinto intervenors challenge the court's exercise of jurisdiction in this phase of the actionthis time, on political-question grounds.
Because the Liability Phase was never appealed, we are here presented with no issue as to the correctness of that holding. The only issue that we may consider is whether the trial courtin addressing the merits of this disputeviolated the separation of powers doctrine of our constitution. If it did, then it had no subject matter jurisdiction and the judgment was void. See Brown v. State, 565 So.2d 585 (Ala.1990); Ex parte Dison, 469 So.2d 662 (Ala.1984); Greco v. Thyssen Mining Constr., Inc., 500 So.2d 1143 (Ala.Civ.App.1986). We may address this issue because "[t]he lack of subject matter jurisdiction is not waivable and may be raised at any time by the suggestion of a party or by a court ex mero motu." Id. at 1146. See also Stamps v. Jefferson County Bd. of Educ., 642 So.2d 941, 945 n. 2 (Ala. 1994). Judgments entered without subject-matter jurisdiction can "be set aside at any time as void, either on direct or on collateral attack." International Longshoremen's Ass'n v. Davis, 470 So.2d 1215, 1217 (Ala. 1985), aff'd, 476 U.S. 380, 106 S.Ct. 1904, 90 L.Ed.2d 389 (1986).
*879 This objection to the exercise of judicial review of the constitutionality of Alabama's public school system is tenuous at best. Long before Alabama acquired statehood, judicial decisions had recognized the poweras well as the dutyof the judiciary to review, and, if necessary, nullify, acts of the legislature it deemed to be inconsistent with the fundamental law of the land. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803) ("an act of the legislature, repugnant to the constitution is void" and it is the duty of the judiciary to declare it so); The Federalist No. 78 (A. Hamilton) ("The interpretation of the laws is the proper and peculiar province of the courts"); Simsbury Case, Kirby 444 (Conn.1784); Holmes v. Walton, (N.J.1780) (nullifying a legislative act reducing from 12 to 6 the number of jurors required in cases involving seizures of property allegedly being traded with English troops); see also Dr. Bonham's Case, 77 Eng. Rep. 646 (1610) ("when an Act of Parliament is against common right and reason, ... the Common Law will control it, and adjudge such Act to be void"); A.E. Dick Howard, The Road from Runnymede: Magna Carta and Constitutionalism in America 280 (1968) ("Well before Marbury v. Madison there were instances of state judges announcing the power of courts to annul unconstitutional legislation"); see generally Corwin, The Establishment of Judicial Review, 9 Mich. L. Rev. 102 (1910).
This duty not only requires the judiciary to construe the language of legislative acts and statutory schemes, but, occasionally, requires it to interpret in light of the constitution the legal and practical effects of legislative or executive actions. The judiciary is, therefore, charged with the responsibility to adjudicate disputes involving the other branches of government, even if the conclusions it reaches conflict with the conclusions of the other branches. See United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); Powell v. McCormack, 395 U.S. 486, 549, 89 S.Ct. 1944, 1978, 23 L.Ed.2d 491 (1969). "The alleged conflict that such an adjudication may cause cannot justify the courts' avoiding their constitutional responsibility." Powell, 395 U.S. at 549, 89 S.Ct. at 1978.
With respect to this particular controversy, a considerable number of state supreme courts have reviewed the public school funding schemes of their respective states, pursuant to challenges based on state constitutional provisions. See Note, State Constitutional Analysis of Public School Finance Reform Cases: Myth or Methodology, 45 Vand. L. Rev. 129, 130 n.6 (1992) (collecting cases); Note, To Render Them Safe: The Analysis of State Constitutional Provisions in Public School Finance Reform Litigation, 75 Va. L. Rev. 1639, 1639 n.4 (1989) (collecting cases). Several of these courts expressly addressed objections to the exercise of jurisdiction, based on political-question arguments similar to those presented here. See, e.g., Serrano v. Priest, 5 Cal.3d 584, 487 P.2d 1241, 96 Cal.Rptr. 601 (1971); McDaniel v. Thomas, 248 Ga. 632, 285 S.E.2d 156 (1981); Rose v. Council for Better Educ., Inc., 790 S.W.2d 186 (Ky.1989); Board of Educ., Levittown Union Free School Dist. v. Nyquist, 57 N.Y.2d 27, 453 N.Y.S.2d 643, 439 N.E.2d 359 (1982), appeal dismissed, 459 U.S. 1138, 103 S.Ct. 775, 74 L.Ed.2d 986 (1983); Board of Educ. of the City School Dist. of Cincinnati v. Walter, 58 Ohio St.2d 368, 390 N.E.2d 813 (1979), cert. denied, 444 U.S. 1015, 100 S.Ct. 665, 62 L.Ed.2d 644 (1980); City of Pawtucket v. Sundlun, 662 A.2d 40 (R.I.1995); Tennessee Small School Systems v. McWherter, 851 S.W.2d 139 (Tenn.1993); Edgewood Indep. School Dist. v. Kirby, 777 S.W.2d 391 (Tex.1989); Seattle School Dist. No. 1 v. State, 90 Wash.2d 476, 585 P.2d 71 (1978); State ex rel. Bd. of Educ. v. Manchin, 179 W.Va. 235, 366 S.E.2d 743 (1988); Kukor v. Grover, 148 Wis.2d 469, 436 N.W.2d 568 (1989); Washakie County School Dist. No. 1 v. Herschler, 606 P.2d 310 (Wyo.), cert. denied, 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980). In each case, however, the court rejected the argumentsimilar to the one made in this casethat the action involved a political question and was, consequently, nonjusticiable. We hold, therefore, that the trial court did not exceed its constitutional authority in considering on the merits whether Alabama's public education system violated provisions of the Constitution of 1901.

*880 (2) Remedy Plan

The State parties contend that the trial judge, in fashioning the Remedy Plan, "clearly and grossly usurped subject-matter jurisdiction over the establishment, administration and funding of the public school system of the State of Alabama ..., violat[ing], thereby, the cardinal principles of separation of powers." Brief and Argument of Appellants, at 27. They do not, however, contend that a different Remedy Plan is called for. They do not apprise us of what, if any remedy, the trial court would be authorized to order. In essence, if not in fact, they insist that the court possessed no authority to remedy the constitutional violation declared in this case. More specifically, they contend that the judiciary of this state cannot go further than did the Kentucky Supreme Court in Rose v. Council for Better Educ., Inc., 790 S.W.2d 186 (Ky.1989), which stated: "We have declared the system of common schools to be unconstitutional. It is now up to the General assembly to re-create ... a system of common schools within this state which will be in compliance with the Constitution." Id. at 214 (emphasis added). Because the State parties challenge the Remedy Plan as void in toto, the resolution of this issues turns on whether the judiciary had the power to order a remedy in this case.
Parties on both sides of this disputein addition to the trial courthave relied on Rose, which declared unconstitutional the entire statutory scheme upon which Kentucky's public education system was based. Id. That case, however, does not hold that a court has no power to order a remedy. On the contrary, the Kentucky court deferred the formulation of a remedy to the Kentucky legislature upon the express assumption that it would promptly and fully comply with the constitutional mandate, stating: "We have no doubt they will proceed with their duty." Rose, 790 S.W.2d at 214 (emphasis added).
Other courts have deferred to their legislatures, expressing in language similar to that used in Rose confidence that their legislatures would promptly act to remedy constitutional infirmities in their public educational systems. See, e.g., Seattle School Dist. No. 1 v. State, 90 Wash.2d 476, 585 P.2d 71, 104 (1978) ("We have great faith in the Legislature and its ability to define `basic education' and a basic program of education...."); Serrano v. Priest, 18 Cal.3d 728, 557 P.2d 929, 135 Cal.Rptr. 345 (1976) ("We are confident that the Legislature, aided by what we have said today ..., will be able to devise a public school financing system which achieves constitutional conformity...."), cert. denied, 432 U.S. 907, 97 S.Ct. 2951, 53 L.Ed.2d 1079 (1977). None of the cases we have found in our research, however, has held that the judiciary lacks the power to order a specific remedy if the legislature ultimately fails adequately to address the constitutional deficiency.
Particularly instructive in this regard are Washakie County School Dist. No. 1 v. Herschler, 606 P.2d 310 (Wyo.), cert. denied, 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980), and Campbell County School Dist. v. State, 907 P.2d 1238 (Wyo.1995). Herschler involved an action commenced by, among others, county school districts, seeking a judgment declaring Wyoming's statutory school financing scheme unconstitutional. 606 P.2d at 314. The trial court dismissed the complaint and the plaintiffs appealed. Id.
The Wyoming Supreme Court reversed the judgment. In doing so, it "examined `the entire system from organization of school districts through tax bases and levies and distribution of foundation funds,'" Campbell County School Dist., 907 P.2d at 1246, and held "the Wyoming system of school financing unconstitutional in that it fail[ed] to afford equal protection in violation of the Wyoming Constitution." Herschler, 606 P.2d at 315. It also remanded the action to the trial court with directions to "retain jurisdiction until a constitutional body of legislation [was] enacted," and to "tak[e] such action as... necessary to assure conformity." Id. at 337. (Emphasis added.)
In 1983, the Wyoming legislature responded to Herschler by creating a "transitional" education financing system. Campbell County School Dist., 907 P.2d at 1247. This temporary measure was intended to be "succeeded by a new system designed to more accurately measure costs of education." Id. Unfortunately, however, "[t]he legislature *881 never studied, enacted, or implemented a new ... system and the 1983 interim system became permanent." Id.
Consequently, in 1992, a number of school districts, including one that was a plaintiff in Herschler, filed another complaint seeking a judgment declaring certain aspects of the interim funding system unconstitutional. 907 P.2d at 1244. The trial court entered a judgment declaring some components of the system constitutional and invalidating others. Id. The Wyoming Supreme Court affirmed that portion of the judgment invalidating aspects of the system, but reversed that portion of the judgment upholding some aspects. Once again, the supreme court held "Wyoming's public school finance system [to be] unconstitutional." Id.
The court stated: "In [Herschler], this court, having examined the `entire system,' emphasized [that] the legislature's goal `is to arrive at financial parity.' ... We had confidence the legislature would meet the challenge of fulfilling its constitutional duties to `provide for the establishment and maintenance of a complete and uniform system of public instruction....'" 907 P.2d at 1246 (emphasis added). It concluded that since Herschler the legislature not only had failed to create a funding system that would eliminate the inequities of the system, but, through a lack of "participat[ion] in the substantive aspects of the educational system," had in fact impeded the efforts made by "local educators and communities." Id. at 1255. Consequently, the court ordered the legislature "to achieve constitutional compliance" and to achieve it "not later than July 1, 1997." Id. at 1280. Once again, the court remanded the cause to the trial court with directions to "retain jurisdiction until a constitutional body of legislation [was] enacted and in effect" and to "tak[e] such action as [should] be necessary to assure conformity" with the constitution. Id.
It has been suggested that the judiciary has the power to fashion specific remedies if action by the other branches of government is ineffective, where deference is made to the legislature with a caveat. McDuffy v. Secretary of the Exec. Office of Educ., 415 Mass. 545, 615 N.E.2d 516 (1993), for example, stated: "We have concluded the current state of affairs falls short of the constitutional mandate. We shall presume at this time that the Commonwealth will fulfil its responsibility with respect to defining the specifics and the appropriate means to provide the constitutionally-required education." 415 Mass. at 619 n.92, 615 N.E.2d at 554 n.92 (emphasis added).
Moreover, despite the American judiciary's understandable preference for restraint in this complex area of litigation, it routinely doesin addressing the constitutionality of state statutory schemesformulate guidelines of varying specificity within which it essentially requires the legislature to operate. Id. As stated in Abbott v. Burke, 119 N.J. 287, 388, 575 A.2d 359, 410 (1990): Judicial "power to require a thorough and efficient education is not limited to a money remedy. Cf. Southern Burlington County NAACP v. Mount Laurel Township (Mount Laurel II), 92 N.J. 158, 456 A.2d 390 (1983) (power to require municipalities to take affirmative action to satisfy their affordable housing obligations)."
For these reasons, we reject the proposition that the separation of powers principle, which applies in every jurisdiction that has considered the constitutionality of its public education system, prohibits the judiciary of this State from fashioning a remedy for constitutional violations of the nature involved in this case. For the following reasons, however, we have considered only the trial court's power to devise a remedy plan in general and not this Remedy Plan in particular.
First, as we have already stated, the State parties have not challenged the Remedy Plan provision by provision, preferring, instead, to challenge the trial court's power to devise any remedy. This broad-brush approach has not afforded their opponentsor the trial courtthe opportunity to address objections to specific provisions. The best approach, in litigation as complex and sensitive as this, is, as suggested by Harper in the context discussed in Part III.C., infra, "for the [State parties] to identify any particular section with which they disagree, for all parties to present evidence on that section, for the trial court to rule, and for [this Court to review *882 that ruling pursuant to the proper procedural device]." Brief of Harper, ACE, ADAP, and John Doe Appellees, at 17-18 [hereinafter Harper Brief] (emphasis added).[3] We reiterate that this case has not come to us postured in this manner.
Second, and even more fundamentally, it is the legislature that bears the "primary responsibility" for devising a constitutionally valid public school system. McDuffy v. Secretary of the Exec. Office of Educ., 415 Mass. 545, 619 n.92, 615 N.E.2d 516, 554 n.92 (1993) (quoting Edgewood Indep. School Dist. v. Kirby, 777 S.W.2d 391, 399 (Tex.1989)) (emphasis added). Although the judiciary is not without the power to enforce judgments designed to remedy constitutional defects in the educational system, the judiciary should exercise this power only in the event the legislature fails or refuses to take appropriate action.
Moreover, the judiciary should not presume at the outset of litigation of this nature that legislative and executive officials will be derelict in their duties. Indeed, it must assume the contrary. The best approach for the judiciary, having invalidated the present public education system, would be to stay further action in the casebut retaining jurisdictionfor a reasonable time, thus affording the legislative and executive officials the first opportunity to devise a constitutional public education system. In other words, the judiciary shouldupon its first encounter with this species of litigationforgo specific remedial action until the coordinate branches of government have had a reasonable opportunity to discharge their constitutional responsibilities consistent with its holding of liability. Ultimately, of course, the action, or inaction, of those branches "in this subject area, or in any area, is ... subject to the scrutiny of the" judiciary. Rose, 790 S.W.2d at 214 (emphasis added). We reiterate that the power inherent in this judicial scrutiny also includes the power to fashion a remedy and to require compliance therewith.
We hasten to add that we do not disapprove of the Remedy Plan challenged in this case, only of the timing of its attempted implementation. The implementation thereof was premature. Consequently, we vacate the October 6, 1995, judgment of the trial court to the extent that it concerns the implementation of the Remedy Plan. This cause is remanded with directions to stay the action while retaining jurisdictionfor one year from the date of this Court's certificate of judgment. If, at the end of that time, the coordinate branches of government have not formulated an educational system that complies with the Liability Phase, the trial court may enter an order implementing a remedy. This Court is prepared to consider any such remedy should it be called upon to do so under conditions consistent with those explained above.
We hold, therefore, not that the trial court lacked the power to implement the Remedy Plan, but that it abused its discretion in attempting to do so before providing the coordinate branches of government the opportunity to act unilaterally. The question is not one of power, but of expedience. We are certain that officials of both coordinate branches of government will hasten to discharge their duties to fashion a remedy consistent with the judgment in the Liability Phase.

II. Cases 1950240 and 1950241 The State Parties' Appeal
The issues raised in these appeals were thoroughly discussed and resolved in Part I of this opinion and will not be addressed again here. Therefore, in accordance with Part I, the judgment from which these appeals were taken is affirmed in part, vacated in part, and remanded with the directions set forth in Part I.C.(2), supra.

III. Cases 1950408 and 1950409 Intervention
The Pinto intervenors contend that both the Liability Phase and the Remedy Plan *883 must be vacated for reasons in addition to those we have addressed previously in this opinion. First, they contend that in Pinto v. Alabama Coalition for Equity, 662 So.2d 894 (Ala.1995), this Court granted the classes they seek to represent[4]"appellate class certification." Brief of Pinto Appellants, at 16 (emphasis added). This certification, they argue, necessarily renders the "Harper class,"[5] which was certified before the entry of the Liability Phase, invalid as being overbroad or insufficiently definite. The essence of this argument is that the invalidation of the Harper class retroactively invalidates the Liability Phase. In a second argument, which is similar to the first, they argue that because Pinto ultimately allowed them to intervene, the Remedy Plan, which was pending when they first sought to intervene, must be vacated.
Before discussing the merits of these arguments, we note that the Pinto intervenors, unlike the State parties, have not sought permission to appeal the interlocutory Remedy Order. We will, however, suspend the Rules of Appellate Procedure as to any procedural or technical impediment to the review of the issues they present, pursuant to Ala. R. App. P. 2(b), which provides: "In the interest of expediting decision, or for other good cause shown, an appellate court may suspend the requirements or provisions of any of these rules in a particular case ... on its own motion and may order proceedings in accordance with its direction...." We construe the Rules of Appellate Procedure in a manner "to assure the just, speedy and inexpensive determination of every appellate proceeding." Rule 2(b) committee comments.
The issues presented by the Pinto intervenors are inextricably linked with those presented by the State parties in their Rule 5 petition, which we have granted. Neither the interests of justice nor judicial economy would be promoted by dismissing the appeals of the Pinto intervenors, who may have miscalculated the efficacy of the trial court's Rule 54(b) certification. We will, therefore, proceed to address their arguments.

A. Certification and Validity of Liability Phase
The Pinto intervenors argue that this Court certified their three putative classes ex mero motu. Consistent with this view, they proposed to Judge Greenhaw that Pinto had rendered unnecessary a motion for class certification, and, consequently, that no findings or actions by the trial court were required. Harper Brief, at 38. The trial court rejected this argument and ordered the Pinto intervenors to file a motion for class certification. Id.
On October 3, 1995, the Pinto intervenors filed a motion for certification of the three classes for whom they sought intervention in Pinto. In their motion, they reiterated their argument that trial-court certification was unnecessary, and, moreover, "move[d] ... to reopen the class certification of the Harper class." The Harper class responded with a motion opposing certification of the putative Pinto classes.
Harper's motion challenged the Pinto intervenors' construction of this Court's holding in Pinto, stating:
"No order exists certifying the Pinto class[es] as required by Rule 23(c)(1). Indeed, prior to the Pinto decision, no motion was ever filed in either this court or the Supreme Court seeking certification. The Pinto appellants in the Supreme Court did not ask the court to certify their classes. Indeed, they expressly asked the Supreme Court to leave the question up to this court on remand. Even if under Rule 23 a class could be certified by implicationand it cannotit would be inappropriate for this court to conclude that the Alabama Supreme Court impliedly granted appellants relief beyond the relief sought.

*884 "The precise holding of the Supreme Court is that `Pinto and Anderton are entitled to intervene.' [662 So.2d at 900.] This holding does not even suggest, much less hold, that class certification is appropriate. Indeed, the Supreme Court's decision concerns Rule 24, not rule 23....
"The Supreme Court's opinion does contain some language about the desirability of hearing the views of the `classes' represented by Pinto. However, a fair reading of the opinion reveals that the Supreme Court was simply expressing its interest in ensuring that divergent views be heard. Given that the Pinto individuals will be represented, those views will be heard."
(Emphasis added.) The motion also opposed the certification of the putative classes on the grounds, among others, (1) that no facts were alleged or demonstrated as to the considerations of numerosity, commonality, or typicality required by Rule 23; (2) that representation by the same counsel of all three classes would result in a conflict of interest; and (3) that no showing had been made as to the resources or experience of the Pinto intervenors' counsel to represent the classes adequately.
On February 6, 1996, the trial court denied the Pinto intervenors' motion for certification, in an order stating in part:
"A motion to withdraw was filed on behalf of primary counsel for the Pinto Plaintiffs and co-counsel also filed a Motion to Continue regarding class certification on the ground that additional counsel needed to be retained. At the hearing the Pinto plaintiffs were given 30 days to associate new counsel, however, no further pleadings have been filed. Inasmuch as the requisites of Rule 23, A.R.C.P., Code of Alabama 1975, have not been met the Court cannot certify the classes the Pinto Plaintiffs seek to represent but will allow them to remain as individual ... plaintiffs.
"The attorney for the Anderton Plaintiffs-Intervenor[s] was not present at the hearing and has not filed a motion requesting class certification. It is without question that individual taxpayers have standing to bring an action on behalf of other taxpayers when state funds are involved and the Anderton Plaintiffs as previously stated will also be allowed to remain as individual ... plaintiffs in this matter."
(Emphasis added.)
On February 7, 1996, the Pinto intervenors moved for reconsideration of that order. Their motion stated that they had been successful in associating counsel experienced in class actions and requested "an opportunity to present evidence for class certification." On March 11, 1996, the trial court vacated its February 6, 1996, order to the extent that it denied class certification. The court reasoned that "the issue of class certification should not be considered until the matters pending on appeal [to this Court were] resolved."
As to whether this Court "certified" the Pinto intervenors' putative classes ex mero motu, Harper's interpretation of Pinto is correct. That case presented no issue as to whether the requirements of Rule 23 had been satisfied. In fact, the opinion is devoid of any reference to Rule 23. Instead, we focused solely on the abstract legal question of whether this action was of the genre of actions theoretically maintainable as class actions. We merely assumed, arguendo, of course, that the putative representatives could "establish all of the criteria set forth in Rule 23(a) and one of the criteria set forth in Rule 23(b)." Ex parte Gold Kist, Inc., 646 So.2d 1339, 1341 (Ala.1994).
Indeed, the scope and complexity of this litigation render such an approach particularly inappropriate here. The complexity and nature of this litigation raise, as Harper correctly observes, serious questions as to the experience and resources of any counsel selected to represent the Pinto intervenors' classes, as well as issues regarding potential conflicts of interest. The trial court was correct, therefore, in requiring the Pinto intervenors to comply with the mandates of Rule 23(a) and (b) in that forum.
On remand of this cause, should it ultimately become necessary for the trial court to proceed further with this action, it shall then make "a determination ... as to compliance with Rule 23(a) and (b)," Rule 23(c), *885 committee comments, guided not only by this Court's holding in Pinto, but also by the facts presented to it at that time. In other words, Pinto should not be understood as preempting all discretion in the trial court as to those matters committed to that court, First Alabama Bank v. Martin, 381 So.2d 32 (Ala.1980), such as the precise scope and contours of the classes. The outcome of this inquiry still turns on compliance with Rule 23 and is not compelled in its specific details by Pinto.

B. Invalidation of the Harper Class
One conclusion that is compelled by Pinto, however, is that the scope of the Harper and other classes must be reexamined in light of our holding in that case. The Pinto intervenors correctly observe that at various times throughout this litigation, it has been alleged that some, or all, of the individuals in their putative classes were included in the Harper class, or some other class. Pinto, 662 So.2d at 899 n.3. Not only does "logic dictate[]" that the interests of Alabama citizens would best be served through a larger number of smaller, discrete classes than the fewer, more inclusive classes initially certified in this action, id. at 899; it also dictates that those larger classes must be narrowed to exclude those individuals who will be included in the discrete classes ultimately certified. It is clear, therefore, that the ultimate certification of the Pinto classes will necessitate the modification of the Harper class and any other classes affected.
This result does not, however, compel the conclusion that the Harper class is ipso facto invalid, or that the class action was invalid ab initio, as the Pinto intervenors argue. The proper appellate remedy for class overbreadth is an order to narrow the class rather than an order to decertify the class action. Ex parte Central Bank of the South, 675 So.2d 403 (Ala.1996) (petition for a writ of mandamus denied to the extent it sought decertification of a class action; granted to the extent it sought narrowing of the scope of a class); Ex parte Gold Kist, Inc., 646 So.2d 1339 (Ala.1994) (petition for a writ of mandamus denied to the extent it sought decertification of a class action; granted to the extent it sought narrowing of the scope of a class). Thus, we hold that the scope of the Harper class does not invalidate the Liability Phase.

C. Wrongful Exclusion and Remedy Plan
The Pinto intervenors argue that "a reversal of a denial of intervention relates back to the time of application for intervention." Brief of Pinto Appellants, at 12. They further contend that "there should be broad participation in the development of the [Remedy] plan (including the presentation of expert testimony) in order to avoid omission or violation of rights," and they "hope to see removed some of the Remedy plan provisions that violate the rights of unrepresented students and parents." Id. at 16. They conclude that "[t]he circuit court's refusal to vacate the remedy orders denied the Pinto Appellants due process of law [guaranteed] under the United States and Alabama Constitutions." Id.
This argument is undermined by the fact that the Remedy Plan is still interlocutory in nature. See Pinto, 662 So.2d at 899. It envisions an "ongoing process," 662 So.2d at 900, namely, the process of "convert[ing] a system that failed to `offer equitable and adequate educational opportunities to the schoolchildren of the state' ... into a system that succeeds in doing so." Id. at 899 (emphasis in Pinto). The implementation of such a Remedy Plan would necessarily require "perennial revision and reassessment of the progress of [that] process." Id. (emphasis in Pinto).
That this process is "ongoing" and that it is long-term were, in fact, significant factors in our determination that the process could only benefit from the full party-participation of the Pinto intervenors. Id. at 900. We perceive no reason they cannot enjoy precisely the "broad participation" they seek "in the development of the [Remedy] plan." Brief of Pinto Appellants, at 12. Certainly, they, like any other party, are entitled to present expert testimony as to aspects of the Plan they deem objectionable. Thus, Harper is correct when she argues:
"[T]he proper procedure in resolving the substantive objections of the Pinto intervenors *886 is not to vacate the entire remedy order, including the portions to which all parties agree, without any evidence being heard. The proper procedure is for the Pinto intervenors to identify any particular section with which they disagree, for all parties to present evidence on that section, for the trial court to rule, and for [this Court to review that ruling pursuant to the proper procedural device]. This is also the answer to the Pinto intervenors' procedural objections that they have not been heard. They can still be heard."
Harper Brief, at 17-18 (emphasis added). This appeal does not involve such a challenge, that is, a challenge to any particular provision of the Remedy Plan, and we are unpersuaded by the arguments that the Remedy Plan is invalid in toto. The judgment of the trial court as it concerns the Remedy Plan is, however, vacated, and this cause is remanded with directions to stay the actionwhile retaining jurisdictionfor one year from the date of this Court's certificate of judgment.

IV. Case 1950917Petition for the Writ of Prohibition
In this case, the State parties seek a writ of prohibition directing the trial judge to "exercise no further jurisdiction" of this litigation during the pendency of these appeals. As we noted elsewhere in this opinion, after the notices of appeal in this case were filed, the trial judge, among other things, appointed "an independent monitor ... to oversee the implementation of the Remedy Plan." Our resolution of the substantive issues, as discussed above, obviates the need for the relief sought in this petition. The petition is, therefore, denied, subject to the conditions explained above, namely, that all proceedings in this case are to be stayed for one year from the date of this Court's certificate of judgment.
In summary, the petitions for permission to appeal (cases 1950030 and 1950031) are granted. In cases 1950030, 1950031, 1950240, 1950241, 1950408, and 1950409 the judgment is affirmed in part and vacated in part, and the cause is remanded with directions to stay all proceedings in the action for one year, with the court's retaining jurisdiction to implement its Remedy Plan if necessary. The petition for the writ of prohibition (case 1950917) is denied.
1950030 PETITION GRANTED; AFFIRMED IN PART; VACATED IN PART; AND REMANDED WITH DIRECTIONS.
1950031 PETITION GRANTED; AFFIRMED IN PART; VACATED IN PART; AND REMANDED WITH DIRECTIONS.
1950240 AFFIRMED IN PART; VACATED IN PART; AND REMANDED WITH DIRECTIONS.
1950241 AFFIRMED IN PART; VACATED IN PART; AND REMANDED WITH DIRECTIONS.
1950408 AFFIRMED IN PART; VACATED IN PART; AND REMANDED WITH DIRECTIONS.
1950409 AFFIRMED IN PART; VACATED IN PART; AND REMANDED WITH DIRECTIONS.
1950917 PETITION DENIED.
SHORES, KENNEDY, and INGRAM, JJ., concur.
ALMON, J., concurs specially, with opinion.
MADDOX, J., concurs in part and dissents in part, with opinion.
HOUSTON, J., concurs in the result in part and dissents in part, with opinion.
HOOPER, C.J., dissents, with opinion.
BUTTS, J., recuses.
ALMON, Justice (concurring specially).
It is clear beyond question that the Liability Order became final under traditional, well-established principles of law. The following parties chose not to appeal from the Liability Order: then Governor of Alabama Guy *887 Hunt;[6] Speaker of the House of Representatives James Clark; then State Finance Director Robin Swift; and then Superintendent of Education Wayne Teague; and the members of the State Board of Education. It makes no legal difference to the finality of that order that other persons, who may disagree with that decision not to appeal, now hold those offices.
I also agree that the implementation of any remedy by a court should be deferred until the Legislature has had an adequate opportunity to address the matters set out in the Liability Order.
I write specially to emphasize that I express no opinion as to the merits of the Remedy Plan or as to the proper scope of any remedy order that may ultimately be entered. Although the Liability Order declaring a right to equitable and adequate funding became final without an appeal, I would look closely at the scope of any remedy order that required "adequate" funding of education and proposed judicial oversight of such a requirement. Although the Liability Order is final, any serious constitutional questions, such as a separation of powers question, could be addressed to the extent that they apply to a remedy order.
MADDOX, Justice (concurring in part and dissenting in part).
This case involves an issue of the right of a child to a public education, a right included in every state constitution since Alabama became a state, but unfortunately a right that has become embroiled in a debate about the doctrine of separation of powers among coordinate, independent branches of state government.
The original question presented to the circuit court in this case was simple enough Does § 256 of the Alabama Constitution of 1901, as amended, require statewide parity of educational funding and of educational opportunities and resources? The original plaintiffs said that it did, and a circuit judge agreed with them. The original state defendants and the substituted defendants, for whatever reason, did not appeal the circuit judge's order within the time allowed for an appeal.
This Court's attention was officially called to the matter when the Alabama Senate asked the Justices then serving on this Court for an advisory opinion as to the Legislature's obligation to obey the order, and the Chief Justice and seven Justices then serving on the Court answered the question.[7]Opinion *888 of the Justices No. 338, 624 So.2d 107 (Ala.1993). The Justices did not directly address the basic legal questions that are now raised by this appeal and that are stated in the main opinion: (1) whether the judgment violated the separation of powers doctrine; (2) whether this action was sufficiently adversarial to make the controversy justiciable and give the trial court subject matter jurisdiction; and (3) whether the "campaign conduct of Judge Reese draws in question the impartiality of the entire judicial proceedings," the separation of powers issue, and the scope of the remedy order.[8]
In that advisory opinion, the Justices did recognize, however, not only the importance of the legal question presented, but also the duties and obligations of the other branches of government in resolving the basic dispute. The fact that the dispute still exists demonstrates not only the continuing nature of the public's interest, but also the complexity of the problems that have been created. These problems are exacerbated because the succeeding state defendants in the lawsuit appear to take a different position than the original state defendants on the continuing dispute over which branch of government has the power and obligation to carry out what has been declared to be the intent of the people of Alabama to guarantee to every school-age child an equal opportunity to public education. Unfortunately, the continuing dispute only delays the ultimate resolution of the basic questionwhat is to be done about providing what the trial court has declared to be constitutionally required?
Based on my review of what I believe to be the issues in this case, and being cognizant of the people's commitment to the extension of the opportunities and benefits of a public education equally to all school-age children in the State, I concur with the main opinion on what is called the "Liability Phase" of the case. My concurrence is based on what I believe the law says about the power and duty of a circuit court in a case involving a justiciable controversy, which I find to be present here, to interpret the Alabama Constitution, even if its interpretation necessarily involves duties and obligations that must be performed by the executive and legislative branches of state government. I concur also because I believe that the circuit court correctly concluded that the Alabama Constitution *889 does provide that school-age children in Alabama have a right to attend school in what the Alabama Constitution describes as a liberal system of public schools established, organized, and maintained by the state, which provide all children with substantially equal and adequate educational opportunities.
I cannot agree, however, with the main opinion's affirmance of the trial court's so-called Remedy Order in this case, even though the main opinion suspends its effective date. I do not believe that the plaintiffs' right to an adequate and equal educational opportunity, although a valuable constitutional right worthy of protection by the executive and legislative branches, is one of those basic, inalienable rights, such as the right to vote, or the right not to be discriminated against on the basis of race or gender, that would compel a court to use all of its extraordinary powers to guarantee its protection. Cf. San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), in which the United States Supreme Court rejected a challenge under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, because it did not involve a suspect classification, and, therefore, was not subject to strict scrutiny. Also, see, Committee for Educational Rights v. Edgar, 174 Ill.2d 1, 220 Ill.Dec. 166, 672 N.E.2d 1178 (1996), in which a majority of the Supreme Court of Illinois, interpreting a provision of the Illinois Constitution, held that equal educational funding was not a fundamental constitutional right, but rather posed a "political question." But see, Lee v. Macon County Board of Education, 267 F.Supp. 458 (M.D.Ala.1967), in which a Federal district court determined that the plaintiffs were being deprived of an equal educational opportunity because of race, issued specific remedy orders and retained jurisdiction of the case, and policed compliance with those orders.
As the main opinion points out, and as the Chief Justice's dissenting opinion, as well as the separate opinions filed by other Justices note, this lawsuit has had a long and somewhat tortuous history. During the pendency of this lawsuit, Alabama has had three Governors and two lieutenant governors. In addition, the composition of the Legislature and the composition of this Court have changed, but one thing has not changedneither the original state defendants nor the substituted state defendants appealed the liability phase order within the time allowed by law, and the constitutional duties and obligations assumed by the substituted responsible public officials remain the same.

The People's Commitment to Public Education
Anyone reading § 256, Ala. Const. of 1901, as amended, and the constitutional provisions that preceded it, could not help but observe that the people, from the time the first constitution was ratified in 1819, have directed the legislative branch to encourage and preserve public education in this state. In Alabama's first constitution, Article VI, the people declared the following:
"Schools, and the means of education, shall forever be encouraged in this state; and the general assembly shall take measures to preserve, from unnecessary waste and damage, such lands as are or hereafter may be granted by the United States for the use of schools in each township in this state, and apply the funds, which may be raised from such lands, in strict conformity to the object of such grant...."
After reading this provision, I find two things clear: (1) "schools" and "the means of education" were forever to be encouraged in this state; and (2) the Legislature was required to preserve the lands granted by the United States for the use of schools in each township, and to apply the funds accruing therefrom in strict conformity with the grant. The Constitutions of 1819, 1861, and 1865 included substantially similar provisions relating to public education.

Court Decisions Interpreting Various Constitutional Provisions Relating to Public Education
The system of what were called "common schools" in this state was founded on the grant by the United States of the 16th section in every township for the use of schools, as provided by the act for the admission of *890 the state into the Union. In Elsberry v. Seay, 83 Ala. 614, 3 So. 804 (1888), Justice Clopton, writing for the Court, stated:
"The principle of free elementary education is not of modern origin. Public schools were established for the education of the children of the community, in States which have long since perished; and in some European States, systems of popular education were created at an early period. In New England, common schools originated more than two centuries ago, and, with the spread of popular enlightenment, and the increase of material prosperity, have received in this country their most enlarged development; until a system of public schools has been established in every State of the Union, varying in details, but all preserving the leading feature and distinguishing characteristicthe extension of the opportunities and benefits of popular education to all the children of school age in the state."

83 Ala. at 617, 3 So. at 806 (emphasis added).
Justice Clopton further wrote: "[T]he diffusion of knowledge, at least elementary, is essential to the preservation of free government, and ... the extension of the opportunities and advantages of education throughout the various parts of the State [is essential]." 83 Ala. at 617-18, 3 So. at 806. Justice Clopton further stated: "The constitutional system of common schools must extend throughout the State, and must afford equal benefit to all the children thereof within the specified years." 83 Ala. at 816, 3 So. at 806 (emphasis added). Citing Schultes v. Eberly, 82 Ala. 242, 2 So. 345 (1887), he concluded that "the system of public schools, commanded to be established, organized, and maintained, was intended to operate upon, and in favor of, all the children equally, without special local privileges to any." 83 Ala. at 618, 3 So. at 807 (emphasis added).
I cite these old Alabama cases and judicial interpretations of predecessor provisions of the Alabama Constitution of 1901 relating to public schools to show that from the time Alabama was admitted into the Union its citizens have imposed a duty and obligation on the legislative branch to encourage and to provide a system of public schools, however characterized, "to operate upon, and in favor of all the children equally, without special local privileges to any." In essence, that is what the trial court declared the Alabama Constitution requires today.
This Court had another opportunity to address the question of the intent of the framers of the Constitution relating to public education in Vincent v. County Board of Education of Talladega County, 222 Ala. 216, 131 So. 893 (1931). In Vincent, the Court was asked to construe the same provisions of the Alabama Constitution that the trial court construed in this case. There, the plaintiffs claimed that § 467 and § 182 of the School Code of 1927, which permitted school trustees, "with the approval of the county board of education," to fix a reasonable incidental fee to be paid by pupils, were unconstitutional on the ground that they violated § 286 of the Alabama Constitution of 1901, which provided for a liberal system of public schools.
Justice Sayre, writing for the Court, said:
"The argument against the constitutional validity of [§ 467] proceeds upon the hypothesis that the Constitution establishes a system of free public schools. But the language of that instrument, as we have heretofore noted, imposed upon the Legislature the duty to establish, organize, and maintain `a liberal system of public schools.' It is quite evident that, if the framers of the Constitution had thought to impose upon the Legislature the duty to establish a system of free public schools, they would have used just that word. `Free' and `liberal' are by no means synonymous. They are both terms of varied meaning and application. The better part of three columns of Webster's New International Dictionary [is] devoted to definitions of the word `free'; but, as applied to schools, that authority defines a free school as a school where no charge is made for tuition. `Liberal' is also a word of varied meaning. As applied to the public school system we do not doubt that it intends a system as generous and bountiful as a just consideration of the limited power of taxation and the varied needs of the state will in reason justify. Necessarily something must be left to the enlightened discretion *891 of the Legislature which, within constitutional limits, levies taxes and apportions them to the various needs of the state. No doubt a liberal system of public education will be so framed as to give every child between the ages of seven and twenty-one years a chance, but, when details of school management are considered, something must be left to legislative discretion. And in Bryant v. Whisenant, 167 Ala. 325, 52 So. 525, 140 Am. St. Rep. 41, and again in Kennedy v. County Board of Education, 214 Ala. 349, 107 So. 907, this court gave its approval to the imposition of a reasonable incidental fee by which to raise funds for heating and lighting school rooms. We do not doubt that similar charges for other necessary incidental fees may be made when authorized by legislative act.
"The Constitution requires `a liberal system of public schools.' This means that the schools shall be liberally maintained, and that they should be open to common and general use. But details of management involving charges such as are involved in this appeal may be left to the school trustees in charge. They, of course, are bound to observe the policy disclosed by the Constitution and the statutethe School Codepassed in pursuance thereof and enacted for the purpose of effectuating the objects of the Constitution. But they act in an administrative capacity, as legislative agents, to provide the details of administration, and it cannot be said that such delegation of authority violates any principle of constitutional law, or that the administrative acts here in question do so. State ex rel. Crumpton v. Excise Commissioners, 177 Ala. 212, 59 So. 294, and the cases cited in 12 Corpus Juris, p. 847.
"Our conclusion therefore is that neither section 467 of the School Code, nor the regulations of the school trustees made in pursuance thereof violate any pertinent principle of constitutional law."
222 Ala. at 217, 131 So. at 894 (emphasis added). Based on what Justice Clopton wrote in Ellsberry v. Seay and what Justice Sayre wrote in Vincent, it appears to me that the people of this State have imposed on the legislative branch the duty to provide a "liberal system of public schools," established and maintained "in favor of all the children equally, without special local privileges to any." 83 Ala. at 618, 3 So. at 807.
Although I agree with the trial court's resolution in the Liability Phase, I believe that the trial judge went too far in his Remedy Order and encroached on the powers the people had delegated to the Legislature to establish and maintain "a liberal system of public education [that] will be so framed as to give every child between the ages of seven and twenty-one years a chance." Vincent, 222 Ala. at 217, 131 So. at 894 (emphasis added). The Legislature, in carrying out its responsibilities and fashioning its own remedy to correct what the trial court has determined to be constitutional deficiencies, might consider hearing witnesses, as the trial court did, or might study the transcript of the testimony already taken by the trial court.

Courts' Power to State What the Law Is
The power, and indeed the duty, of courts to state what the law is seem to be universally accepted. Chief Justice John Marshall, in Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803), interpreting the power of Federal judges to interpret the Federal Constitution, wrote:
"It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule."
That principle of judicial review stated by Chief Justice Marshall was cited in Opinion of the Justices No. 338. I believe it answers the state defendants' jurisdictional arguments, and I agree with the result reached on the Liability Phase of this case. I now specifically state the reasons for my disagreement with the conclusion reached in the main opinion that suspends the implementation of the Remedy Plan for a period of one year to allow the Governor and the Legislature to formulate a remedy of their own. Although the Legislature might during that year undertake to comply with the trial court's order, it appears to me that what Justice Sayre said in Vincent is instructive:

*892 "Necessarily something must be left to the enlightened discretion of the Legislature which, within constitutional limits, levies taxes and apportions them to the various needs of the state. No doubt a liberal system of public education will be so framed as to give every child between the ages of seven and twenty-one years a chance, but, when details of school management are considered, something must be left to legislative discretion."
222 Ala. at 217, 131 So. at 894.
If we were dealing with such fundamental rights as liberty of conscience, and other procedural democratic rights like the right to vote, which are inalienable in our constitutional democracy, I would consider affirming the Remedy Order, because I believe courts have the power to protect fundamental constitutional rights by every means possible. However, even assuming that the plaintiffs' rights in this case were fundamental, which I do not, I would question the necessity for so detailed a Remedy Order as the one issued here. As Justice Clopton said in Ellsberry v. Seay, "when details of school management are considered, something must be left to legislative discretion." 222 Ala. at 217, 131 So. at 894.
Traditionally, courts have been reluctant to issue orders to a coordinate and independent branch of government, and even though I recognize that similar plaintiffs in other states have successfully sought the same type of relief that the plaintiffs seek here, my core belief in the doctrine of the separation of powers is so strong that I believe that the Governor and the Legislature have the duty and the obligation to carry out what the judicial branch has declared to be their constitutional obligations, and if those branches of government carry out their responsibilities, a conflict between coequal and coordinate branches of government would never occur.

The Legislature is Aware of the Educational Problems
That the other branches of government are aware of the plight of public education in Alabama is plain from a reading of some addresses given by former Governors John Patterson and George Wallace and present Governor Fob James.[9] Based on my reading *893 of those addresses and after a cursory reading of some of the history of gubernatorial and legislative efforts to address what has been described as a continuing crisis in public education, I believe that the other two branches are not only aware of the crisis in public education but have proposed their own plans for solving it. Consequently, it would seem that the mere fact that the plaintiffs here sought the aid of the judiciary in addressing the problem should offer an opportunity for intergovernmental cooperation not create an interbranch conflict of such magnitude that attention becomes focused on the conflict rather than on solving the problem. In short, the fact that the plaintiffs have asked for a declaratory judgment should not be materially different from the procedure sometimes used by the Governor and the Legislature in seeking an advisory opinion from the Justices of this Court, as permitted by Ala. Code 1975, § 12-2-10.
There is another reason why I would not affirm the Remedy Order. This case does not involve a situation where the interbranch conflict is being played out between a superior and an inferior division of government. The interbranch conflict is between equals, and when the power to interpret the law the power, in the famous words Marbury v. Madison, "to say what the law is," conflicts with executive or legislative power, that conflict is between equals, and when the judicial interpretation of what the law is creates such a confrontation, a situation could develop where the executive branch says to the judicial branch, as President Jackson reportedly did, "John Marshall has made his decision, now let him enforce it."[10]

Courts are Reluctant to Issue Orders They May Not Be Able to Enforce
Courts, possessed of neither the purse nor the sword, are generally reluctant to issue orders they cannot enforce, and, frankly, I would apply that principle to this case, because the people have vested in the Governor the power and duty to see that the laws are faithfully executed, and in the Legislature the duty to provide a "liberal system of public schools" that is established and maintained "in favor of all the children equally, without special local privileges to any." As I have already pointed out, the Governor and the Legislature are aware, as their predecessors have been, of the plight of public education in this State. They represent the branches the people have designated to protect their constitutional rights. I would allow those branches of government discretion in determining how the constitutional rights of these plaintiffs will be protected.
*894 The Liability Phase order states what the Constitution requires, and I must assume that the other branches of government will perform their duties in guaranteeing these plaintiffs and others similarly situated their constitutional rights. The law says that all public officials are presumed to perform their duties, and I must assume that those branches will act expeditiously to guarantee what the Constitution requires and address what the people consider to be one of the state's major problems, without having a court order hanging over their heads.[11]
In fact, I personally believe that the cause of public education could be harmed if this power struggle and the interbranch conflict continues unabated. Continual debate on who has the power to solve the problem that everyone admits exists can only distract those who have the power to act from doing what they should do.

Conclusion
The plaintiffs have sought a resolution in a case involving a justiciable controversy. The trial court heard substantial evidence, interpreted the law, and decided the "case" or "controversy," not as a result of a constitutional assignment of a special competence or superiority of the judiciary vis-à-vis the other branches in this regard, but in the performance of a constitutional duty. It would appear that the state defendants would be bound by that judicial resolution, which has become final because the state defendants did not appeal. If these state defendants, or any other defendant, could decide, on a case-by-case basis, which decisions they will or will not obey, then we would have a government of men, which the Constitution forbids, rather than a government of laws. § 43, Ala. Const. 1901.
In conclusion, the Constitution is a species of law superior to legislative action or inaction. It appears to me that if the state defendants disagreed with the judicial interpretation, they should have appealed to this Court. Having failed to do so, they are bound by the declaration made in the Liability Phase, which states their duties in general terms. In performing their duties, however, I do not believe they should be bound by a specific plan, but should be free to exercise their discretion in protecting what has been judicially determined to be the constitutional rights of Alabama citizens. I personally believe that they will carry out their duties, and I would consider the role of the judicial branch to be at an end once it declared what those duties and responsibilities were.
Based on the foregoing, I concur in part and dissent in part.
HOUSTON, Justice (concurring in the result in part and dissenting in part).
I wish this Court could review the judgment on the Liability Phase of this action. See Pinto v. Alabama Coalition for Equity, 662 So.2d 894, 901-10 (Ala.1995) (Houston, J., concurring in the result). However, I am persuaded that we cannot now reach that aspect of this case without resorting to judicial activism, which I have heretofore avoided.
On October 18, 1996, the Supreme Court of Illinois dismissed a constitutional challenge to the method of funding Illinois school systems as violating (1) the state constitutional equal protection clause (that state constitution, unlike Alabama's, really has an equal protection clause); (2) the prohibition against special legislation; and (3) the education article. Committee for Educational Rights v. Edgar, 174 Ill.2d 1, 220 Ill.Dec. 166, 672 N.E.2d 1178 (1996).
Justice Freeman, who concurred in the equal protection holding, dissented from the holding that Illinois funding of the State School System did not violate the Illinois education article. Even so, in addressing any remedy, Justice Freeman wrote:
"If the trial court had ultimately entered judgment in favor of plaintiffs, then it would have been up to the legislative and executive departments of state government to re-create and reestablish a public school funding scheme that would comply with *895 the Illinois Constitution. The trial court could not have instructed the General Assembly to enact any specific legislation or to raise taxes. Likewise, the trial court could not have instructed the Governor how to implement or enforce any public school funding policy or plan. The trial court could not have retained jurisdiction of the case to enforce the court's orders.
"It is the duty of the judicial department of Illinois government only to determine what the Illinois Constitution requires. It is the duty of the legislative and executive departments to carry out that requirement. I am confident that they would have proceeded with their duty if they had been called to do so."
174 Ill.2d at 61, 220 Ill.Dec. at 194, 672 N.E.2d at 1206. (Citations omitted.)
I concur to remand for the trial court to vacate its judgment insofar as it concerns the Remedy Plan. I dissent from the remand with directions to retain jurisdiction for one year from the date of this Court's certificate of judgment or for any period. A trial court has declared the Alabama educational system unconstitutional. Circumstances have denied this Court the opportunity to review the trial court's liability order. Even so, it is the duty of the Judicial Department of Alabama government only to determine what the Constitution of Alabama requires. In my opinion, the Legislative Department and the Executive Department, and not the Judicial Department, have the power and duty to implement a plan that would make this system equitable (and hence, according to the trial court's liability order, constitutional). I trust that the Legislative Department and the Executive Department will proceed to exercise the power and perform the duty they have been called upon to exercise and perform to make Alabama's public educational system constitutional. The "Separation of Powers" provision of the Constitution of Alabama of 1901 (Art. Ill, § 43) prohibits me from doing more, without resorting to unconstitutional judicial activism, which I have heretofore avoided.
HOOPER, Chief Justice (dissenting).

I. Introduction
The issues in this case are perhaps the most important that this Court has ever reviewed or will ever review. Yet this Court has decided not to review some of those issues and to defer deciding others. I appreciate this Court's decision to allow the Legislature time to resolve this problem before the courts get too involved in crafting a remedy; that duty belongs solely to the Legislature and the Governor. However, enormous damage has been inflicted upon the political, legal, social, and economic life of this state by Judge Reese's liability order. This Court refuses to review this order, to the detriment of Alabama.
Judge Reese construed the word "liberal" as that word is used in the Alabama Constitution to require equitable funding for education. What is liberal education to me or to Judge Reese may be illiberal for someone with a different set of values and educational goals for their children. As a judge, I am constitutionally and morally restrained from imposing my idea of what is a liberal education upon the people of this state. The very idea that a judge would attempt to perpetrate such an egregious offense upon the people of this state cries out for a response from this Court! Yet, none issues, none but deferral of its responsibility to grant relief from this iron fist the orders of Judge Reese bring down upon Alabama.
Judge Reese's two orders, one assessing liability and one fashioning a remedy, would do several things. However, his orders will not make one child literate. They will not make one child learn math. They will not give one child a better chance at obtaining a job upon graduation. They cannot help one child receive a better education than he or she would have received before.[12] It would, however, mean the takeover by the State of the local education system. It would mean a lower quality education at an even higher price. It would mean a judge assuming powers that were never intended for him to assume. It would mean the ultimate ruin of *896 public education in the State of Alabama. Yet this Court has done nothing to address the flagrant legal abuses in Judge Reese's orders; it has merely delayed the implementation of the remedy order until the Legislature addresses the problem to the satisfaction of Judge Reese (or the judge to whom this case is now assigned).
As for the liability order, this Court says that it cannot review it. According to the main opinion, no one appealed from that order within 42 days and, therefore, whatever Judge Reese has said is now law. Never mind that Judge Reese single-handedly repealed a major portion of Alabama's Constitution dealing with public education. Never mind that most of what he repealed was in fact probably constitutional. Never mind that it is ultimately this Court's responsibility to declare what is and what is not constitutional. What if a circuit judge decided to declare that the office of Governor of the State of Alabama was unconstitutional? What if for some reason no one appealed within 42 days? Would this Court say it could not address the issue? Of course not. I use an absurd scenario to demonstrate the fact that this Court would, and should, act to review certain trial court decisions even if the time for filing an appeal has passed. In this case, the effects of Judge Reese's decision on the education system, which accounts for two-thirds of the budget of this state, could have as great an impact on this state's educational, financial, political, and social future as the abolition of the office of Governor. Perhaps Judge Reese's decision will have an even greater effect because it deals with the education of future generations of Alabamians.
I would like to discuss Rose v. Council for Better Education, Inc., 790 S.W.2d 186, 209 (Ky.1989), a Kentucky case, and Committee for Educational Rights v. Edgar, 174 Ill.2d 1, 220 Ill.Dec. 166, 672 N.E.2d 1178 (1996), an Illinois case. The Kentucky Supreme Court in Rose affirmed the trial court's declaration that the Kentucky school system was constitutionally deficient. But it did not do as we did in our case. It grappled with the order, the Kentucky Constitution, and the parties' arguments, and made a decision. No one reading that opinion can walk away wondering what Kentucky's highest appellate court's position on equitable funding of education is. In the same way, but with a different result, the highest court of the State of Illinois, in Edgar, declared that under its state constitution education was not a fundamental right and that the system in place was rationally related to the state's desire to retain local control of education. There is no question in the reader's mind as to where the Supreme Court of Illinois stands. It considered local liberty to be much more important than a dubious state-managed equitable funding scheme. I am afraid that a reader of this Court's opinion would walk away wondering just where this Court stands on the liability issue.
The plaintiffs argue that this case was not timely appealed. But look at what happened in this case. If the case was not a sham, it certainly has the appearance of one. Even though all the parties agreed to the order, the intervenors, who this Court agreed represented a legitimate class of people in Alabama, did not have the opportunity to appeal. Pinto v. Alabama Coalition for Equity, 662 So.2d 894, 900 (Ala.1995). They tried to take part in the remedy portion of the case, but Judge Reese would not allow it. The Pinto intervenors surely would have appealed the liability order had they intervened before it became final. But parties were realigning quickly that summer after Governor Hunt's criminal conviction. It is not surprising that the intervenors were unable to file an appeal before the liability order became final.
The state Senate also attempted to have this Court address the substantive issues of this case. Opinion of the Justices No. 338, 624 So.2d 107 (Ala.1993). This Court responded by saying that "[t]he Justices typically refuse to answer questions involving matters that are the subject of pending legislation." 624 So.2d at 108. This Court gave that answer on April 27, 1993. And it was an appropriate answer. But that answer is based on a certain principlethe right to appeal. The opinion went on to state: "Our opinion is that the order has the force of law unless modified by the trial court, until it is modified or reversed on appeal, and the Legislature, *897 like other branches of government, must comply with it." 624 So.2d at 109. What does that mean? That means this Court does not answer questions on pending litigation. The parties can always appeal later. An appropriate answer.
But combine that answer with the answer in the opinion this Court releases today, and you have a very bad answer: "You, the people of Alabama, who will be most affected by this decision by one circuit judge, have no access to the highest court of the State of Alabama. Constitutional issues, of the greatest import, pale in comparison to procedural niceties that preclude our having to address difficult questions we would rather not address. It does not matter whether certain state officers let you down by not appealing this order. We close our eyes to the matter and simply move on as if everything were in perfectly good order."
This case is not about two private parties who can simply decide whether their interests require an appeal. It has to do with the entire State of Alabama. An appellate court should not avoid the question of the constitutionality of the liability order. Does this state's constitution require equitable financing of public education? This Court's opinion does not say. Is education a fundamental right requiring strict scrutiny? This Court's opinion does not say. The only guidance the State of Alabama has is Judge Reese's opinion. Yet in the same opinion in which this Court says it cannot review the liability order, it says that if the Legislature does not do something within a year, it will allow Judge Reese's remedy order to be imposed. The remedy order, however, is invalid without the liability order. Why the reluctance to review the question of the validity of the liability order? Why can this Court not remove the doubt and say, "This Court agrees with Judge Reese's liability order" or "This Court disagrees with Judge Reese's liability order"?
This Court's handling of the trial court's liability order is a mirage. The majority says that under Rule 4(a), Ala.R.App.P., this Court cannot address the questions raised by the liability order, which overturns a major portion of the Alabama Constitution. If Judge Reese's liability order is an unconstitutional and activist decision by a lone circuit judge and this Court does nothing about it, has this Court not become activist by default? Consider the following scenario. Government official A does not like a certain aspect of state law and asks a constituent to file an action in the circuit court claiming the law is unconstitutional. (Legally, the parties must serve the attorney general with a copy of any complaint challenging the constitutionality of a provision of state law; that procedure allows the attorney general to intervene to defend the state law. However, historically there have been aberrations. For example, in the case of Odom v. Bennett [Montgomery Circuit Court, CV-94-2434], the 1994 absentee ballot controversy, the attorney general appeared in the Circuit Court of Montgomery County but did not attempt to defend the statutory requirement that absentee ballots be witnessed. See trial transcript in Odom.) By coincidence, government official A is the defendant. The circuit court grants the relief the constituent/plaintiff (the only plaintiff because the circuit court allowed no one else to intervene) requested. Defendant government official A does not appeal the decision to the Alabama Supreme Court. Voilà! Instant law changeno mess, no fuss, no recalcitrant legislature, no vote on a constitutional amendment, and no need to worry about the Alabama Supreme Court. This is a neat trickconstitutional amendment by circuit judge. But I do not think that the people of this state want to see such tampering with the laws and foundation documents of Alabama. So which is the activist court? The one that allows the circuit judge to single-handedly amend the Alabama Constitution? Or the court that decides to review the circuit court judge's decision in order to protect the laws and constitution of the state?
The United States Supreme Court has stated that local control is essential to the freedom of the people to control the education of their children. San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). The contradiction between equity and liberty has been well stated:

*898 "A guarantee of equal educational funding does not secure any particular level of quality. It does ensure a high level of equality and a low level of liberty. Liberty is curtailed because equalization of educational funding requires redistribution of resources from wealthy districts to poor ones, which can only be achieved through greater centralization of control over the public schools. Centralization reduces the freedom of localities and families to choose their own levels of educational spending."
R. Stark, "Education Reform: Judicial Interpretation of State Constitutions' Education Finance ProvisionsAdequacy vs. Equality," 1991 Annual Survey of American Law 609, 665-66.
As for the remedy order, this Court says that it will give the Legislature one year to correct the problem noted in the liability order. If the Legislature does not correct the problem, then Judge Reese's remedy order becomes the court-ordered sanction upon Alabamians for the Legislature's dilatoriness. The remedy order would not exist but for the liability order, and it is so monstrous that I am unable to concur in even a portion of the main opinion lest I lend any credibility to that order.
"[R]ulers are not a terror to good works, but to the evil.... For he is the minister of God to thee for good. But if thou do that which is evil, be afraid; for he beareth not the sword in vain: for he is the minister of God, a revenger to execute wrath upon him that doeth evil."[13] "[W]e know that the law is good, if a man use it lawfully; knowing this, that the law is not made for a righteous man, but for the lawless and disobedient, for the ungodly and for sinners...."[14] The state, i.e., civil government, wields the power of the sword to punish evil. It is difficult for an institution like the state, whose nature is one of power (the sword), to avoid seeking more power through propaganda. Education is not intended by the Alabama Constitution to be an organ of propaganda. The dispersion of control over education, especially at the local level, helps prevent the state from using public education for such a purpose.
The nature of civil government is to seek power because it wields the sword. The state's sword cannot threaten a child and make him or her learn. However, it can force more tax money from parents, and that seems to be the modern-day use of the sword by the statethe extraction of more money from those whom the state is supposed to serve. Just as the sword of the state cannot make a child learn, neither can more money make a child learn. That is why the Alabama Constitution wisely contains these words:
"It is the policy of the State of Alabama to foster and promote the education of its citizens in a manner and extent consistent with its available resources, and the willingness and ability of an individual student, but nothing in this Constitution shall be construed as creating or recognizing any right to education or training at the public expense, nor as limiting the authority and duty of the legislature, in furthering or providing for education, to require or impose conditions or procedures deemed necessary to the preservation of peace and order."
Alabama Constitution, Amend. 111, § 256 (ratified September 7, 1956) (paragraph 1). However, Judge Reese ruled that this provision was unconstitutional. I disagree.
As our system of government is set up giving responsibility for education to the civil governmentthe civil government must strive to educate children instead of propagandize them. If a circuit court judge takes it upon himself to decide education policy, how much more difficult will that task become? Will not the judge's personal views enter into the equation? The Alabama Constitution provides no description of what is an adequate and equitable education. Where did Judge Reese find his idea of what it should be? Given how difficult it is for the Governor and the Legislature and the different school boards to sort out the many competing education policies, I think it is impossible for a judge or even several judges to decide the best education policy to impose on *899 the schools of this state. In his orders, Judge Reese has wielded the State's sword in the form of a pen and has skewered the children, the parents, and the taxpayers of Alabama.
When I read Judge Reese's orders and compare them to the Alabama Constitution and the decisions of the courts of other states, I find it difficult not to be harsh. My view of his orders borders on contempt. When I read about the courts of other states broadening the language of their states' constitutions to reach judges' desired results, I am disturbed. But when I read Judge Reese's order interpreting the Alabama Constitution, which has none of the language that could even be remotely construed to justify a one-man takeover of the state's educational system, I am outraged.
How did Judge Reese come up with his remedy order? The parties brought in educational experts to testify. Whose experts? Who decided they were the most expert experts? The lawyers for the plaintiffs. What education experts will create the curriculum necessary to comply with Judge Reese's order? Were they some of the same experts who testified before Judge Reese as to what that curriculum should be? Will these education experts receive any compensation for providing this curriculum? Did these experts testify before the Legislature, where diverging viewpoints could be presented in a public debate that covers all the issues of concern to Alabamians? No. Did legislators, whose constituents might not respect a particular expert, have the opportunity to present their own expert? No. The lawyers for the parties to this lawsuit brought in their own experts to tell Judge Reese what his order should describe as a good education. How did Judge Reese know what was good educational policy and what was not? What voter constituency did he represent when he decided what was best for all the children of this state? When a party attempted to join this case as a representative of the parents of this state, Judge Reese rejected the attempt. Yet the parents who compose this party are the people who will pay for Judge Reese's system for "educational excellence." These are the people whose children will be subject to it. These are the people who not only have no choice in this matter because of this Court's decision, but whose elected representatives have one year to comply with Judge Reese's liability order or else be stuck with his tyrannical remedy order. At least the people can threaten to vote out of office representatives who create laws with which they disagree. The Legislature can then change the law. But a court is more difficult to harness. How can the people of Huntsville, for example, vote Judge Reese out of office when he is elected solely by the people of Montgomery County? Can we say that the voters of Montgomery County have determined the education policy for the entire state? Yet even the voters of Montgomery County can do nothing about Judge Reese's orders but hope and pray that a higher court reverses them. Based on today's decision, their prayers are in vain.
The total lack of any rational or legal basis for these orders causes me to question why the defendants in this case agreed so readily to these orders. They rolled over and joined the plaintiffs in the liability phase almost immediately, then they jumped back to the defendant side for the remedy order. When Judge Reese issued his remedy order, they accepted it as the Ten Commandments on the original tablets. It took a new Governor to attempt an appeal of the remedy order. (According to this Court, at the time of Governor James's inauguration it was too late to appeal the liability order.) This friendly agreement among the parties makes me wonder if this entire case is not a sham to help certain politicians "do something" about education without facing the consequences should things go wrong. They can always tell the voters: "The judge made me do it." Judge Reese is their scapegoat, and he went right along with the scheme, apparently thinking that it would help him fulfill his political ambitionsa spot on the Alabama Supreme Court. It did not.
I point out that the main opinion is in reality a combined majority opinion and plurality opinion. As to the liability order, there exists a majority. As for the remedy order, there appears to be a plurality. Justice Maddox, Justice Houston, and I dissent from *900 the portion of the main opinion dealing with the remedy order. Justice Butts recuses. And Justice Almon, in his special writing, declines to address that aspect of the opinion, saying, "I also agree that the implementation of any remedy by a court should be deferred until the Legislature has had an adequate opportunity to address the matters set out in the Liability Order." 713 So.2d at 887. I do not construe "an adequate opportunity" to be the equivalent of the one-year deferral the plurality gives the Legislature. That leaves only four votes to remand to the trial court with directions that that court retain jurisdiction for one year. Therefore, the declaratory judgment of the trial court as to liability has a majority of votes and must be complied with by the Legislature. The remedy portion is another matter altogether. However, I disagree in the most unequivocal terms with both Judge Reese's liability order and his remedy order; therefore, I must respectfully, but vehemently, dissent.

II. Separation of Powers
The founding fathers of this country considered the doctrine of the separation of powers one of the crown jewels of the United States Constitution. It was the first time in history that a nation had incorporated such a doctrine into its founding document. The Alabama Constitution also included the doctrine. The courts, both Federal and state, have sought to uphold the vital doctrine of the separation of powers against violations by any branch of government, including the judiciary. An egregious violation of this doctrine has occurred in this case. The circuit court and the main opinion cite a number of cases to support their position that the orders of the circuit court do not violate this doctrine. In reality, most of those cases do not support the orders of the trial court in this case, and some directly contradict them. In addition, the liability order of Judge Reese contains a questionable analysis of the Alabama Constitution.
The circuit court lacked authority to grant the relief it ordered, because the case involves a political question. Further, the defendants lacked the authority to comply with the circuit court's judgments. The circuit court's judgments violated the right to due process because the parties to the case did not represent 85% of the public school students, did not represent the parents of public school students in Alabama, did not represent the members of the Alabama Legislature, and did not represent the four-fifths of the public school systems that are not members of the Alabama Coalition for Equity.
The liability order discussed what Judge Reese considered to be a right to a "liberal system of public schools." The liability and remedy orders limit the authority of the Legislature in providing for education, a violation of Amendment 111 to the Alabama Constitution, which amended § 256 of the 1901 Constitution. Amendment 111 provides:
"It is the policy of the state of Alabama to foster and promote the education of its citizens in a manner and extent consistent with its available resources...."
(Emphasis added.) Conveniently, Judge Reese held Amendment 111 unconstitutional; doing so enabled him to later order massive renovation of Alabama's school system, a renovation inconsistent with the state's "available resources."
Judge Reese held in his liability order:
"[T]here can be no question that Alabama schoolchildren have an enforceable constitutional right to an education as guaranteed by § 256. This view is confirmed by the text of the 1956 constitutional amendment, recently struck down by this Court under the Fourteenth Amendment to the United States Constitution, which read: `[N]othing in this Constitution shall be construed as creating any right to education at public expense.' Ala. Const. Amendment 111 (1956). As the Alabama Supreme Court explained, `Amendment 111 modified the original educational provision to eliminate any implication that there is a constitutional right to public education in Alabama.' [Mobile, Alabama-Pensacola, Florida Bldg. & Constr. Trades Council v. Williams, 331 So.2d 647, 649 (Ala.1976).] This Court will not presume that the legislature and the people ratifying Amendment 111 did a futile act; clearly, they believed, and this Court agrees, that § 256 guaranteed Alabama schoolchildren a constitutional *901 right to an educationa guarantee which is now in effect."
Liability Order, March 31, 1993, pp. 82-83. Judge Reese explained in a footnote that "[t]his [amendment], of course, was done for racial reasons which compelled the invalidation of the amendment." Liability Order, March 31, 1993, p. 83 n. 41.
However, Mobile, Alabama-Pensacola, Florida Bldg. & Constr. Trades Council v. Williams, 331 So.2d 647 (Ala.1976), authored by Justice Shores, did not involve a question as to the constitutionality of Amendment 111. In Mobile, Alabama-Pensacola, Florida, this Court held that §§ 375(8) to 375(24), Title 26, Ala. Code of 1940 (Recomp. 1958), which set a minimum wage for employees who worked on public works contracts in excess of $2,000, applied to the Mobile Board of School Commissioners' contracts for the construction of schools. Amendment 111 was not challenged, and it was not struck down. There was no racial issue raised in that case.
In his liability order, Judge Reese proceeded to rewrite the constitutional provisions regarding education by selectively holding certain portions of those provisions unconstitutional. The foundation of the liability and the remedy orders of the circuit court is Judge Reese's ruling that Amendment 111, § 256, Alabama Constitution, is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. Such a ruling excises Amendment 111 and leaves § 256 of the Alabama Constitution as it was originallyunamended. The court then ruled the second and third paragraphs of the original version of § 256 unconstitutional under the Equal Protection Clause. But the ruling leaves intact the first paragraph of § 256. By performing this selective editing, the circuit court, by judicial fiat, held that the sole constitutional provision applicable to educational opportunities is the first paragraph of what was the original § 256. Thus, the following provision was created by the circuit court:
"The legislature shall establish, organize, and maintain a liberal system of public schools throughout the state for the benefit of the children thereof between the ages of seven and twenty-one years."
Ala. Const., Art. XIV, § 256.
All the plaintiffs moved for a partial summary judgment, asserting that Amendment 111 was unconstitutional under the Equal Protection Clause. They alleged that its purpose was to intentionally discriminate against blacks in Alabama. None of the plaintiffs demonstrated any injury from the allegedly unconstitutional racial intent behind Amendment 111.
The potentially racially discriminatory provision of Amendment 111, amending § 256, was paragraph 3, which reads:
"To avoid confusion and disorder and to promote effective and economical planning for education, the legislature may authorize that the parents or guardians of minors, who desire that such minors shall attend schools provided for their own race, to make election to that end, such election to be effective for such period and to such extent as the legislature may provide."
This provision is not presently used, and it was not being used when this action was filed, in any manner that would injure any of the plaintiffs. The offending portion should, of course, be struck from the Alabama Constitution, but it does not render the entire amendment unconstitutional.
Even though I may agree that this paragraph is unconstitutional, Judge Reese's order went too far. There are other paragraphs in Amendment 111 that are not offensive to the Equal Protection Clause. The United States Supreme Court has stated:
"The unconstitutionality of a part of an act does not necessarily defeat or affect the validity of its remaining provisions. Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law."
Champlin Refining Co. v. Corporation Comm'n, 286 U.S. 210, 234, 52 S.Ct. 559, 564-65, 76 L.Ed. 1062 (1932) (citations omitted).
*902 It is not at all clear that the remaining paragraphs of Amendment 111 are unconstitutional. For example, Amendment 111 provides that "[i]t is the policy of the state of Alabama to foster and promote the education of its citizens in a manner and extent consistent with its available resources." It goes on to say that the public education of children is realistically limited by "the willingness and ability of an individual student." These provisions are realisticnot unconstitutional. Yet, even if I agreed with Judge Reese as to the unconstitutionality of Amendment 111 in toto, I would not agree that the word "liberal" means that he can overhaul the entire education system of Alabama.
This Court is not bound by the determination of a circuit court on the constitutionality of Amendment 111. Further, the Pinto intervenors were not parties to the action when the circuit court held parts of Amendment 111 unconstitutional and issued its remedy order. Circuit courts do not have final authority to determine the constitutionality of statutes and constitutional provisions. The Alabama Supreme Court has the final authority as to the constitutionality of a state law or a constitutional provision. State v. Parrish, 242 Ala. 7, 13, 5 So.2d 828 (1941). The main opinion in effect holds that the decision of the circuit court as to the constitutionality of Amendment 111 is binding on this Court. By not addressing the trial court's ruling on the constitutionality of Amendment 111, this Court has effectively ratified that court's ruling without addressing the merits. The Alabama Supreme Court should not be bound by a trial court's determination as to the constitutionality of a statute or a constitutional provision merely because the parties to the action below do not appeal. By its inaction, this Court has allowed a circuit court judge to accomplish a massive overhaul of the entire education system of this state.

III. The Liability Order
The circuit court held that Alabama's public education system violated the constitutional mandate of Art. XIV, § 256, and Art. I, §§ 1, 6, 13, and 22 of the Alabama Constitution in that, it found, the system failed to provide equal and adequate educational opportunities to all schoolchildren. By issuing the liability order, the trial judge stepped into the policy-making role of the Legislature. The court then issued a remedy order to enforce its liability order. In the liability order, Judge Reese ordered that the "state officers charged by law with the responsibility for the Alabama public school system" establish a public school system "that provides equitable and adequate educational opportunities to all school-age children" and "provide[s] appropriate instruction and special services for students with disabilities aged three through twenty-one."

III. A. Political Questions
The state defendants and the Pinto intervenors challenge the circuit court's exercise of jurisdiction as violating the doctrine of the separation of powers because, they say, the state's method of funding public schools is an inherently political decision. In spite of the delay in appealing the liability order, this Court can consider whether the trial court's liability order violated the separation of powers doctrine of the Alabama Constitution. If it did, the trial court had no subject matter jurisdiction and the judgment is void. See Brown v. State, 565 So.2d 585 (Ala.1990); Ex parte Dison, 469 So.2d 662 (Ala.1984); Greco v. Thyssen Mining Constr., Inc., 500 So.2d 1143 (Ala.Civ.App.1986). "The lack of subject matter jurisdiction is not waivable and may be raised at any time by the suggestion of a party or by a court ex mero motu." Greco, 500 So.2d at 1146. Judgments entered without subject-matter jurisdiction can "be set aside at any time as void, either on direct or on collateral attack." International Longshoremen's Ass'n v. Davis, 470 So.2d 1215, 1217 (Ala.1985), aff'd, 476 U.S. 380, 106 S.Ct. 1904, 90 L.Ed.2d 389 (1986).
The Supreme Court of Illinois has found issues of law to be more important than procedural niceties: "[A] reviewing court may consider an issue not raised in the trial court if the issue is one of law and is fully briefed and argued by the parties. People ex rel. Daley v. Datacom Systems Corp., 146 Ill.2d 1, 27, 165 Ill.Dec. 655, 585 N.E.2d 51 (1991)." Edgar, 174 Ill.2d at 11, 220 Ill.Dec. *903 at 171, 672 N.E.2d at 1183. That court understood how important the case was and gave the plaintiffs every opportunity to have the case reviewed: "Furthermore, the questions presented are of substantial public importance, and we believe the public interest favors consideration of the merits. Accordingly, we will consider this argument, along with those issues properly preserved for review." Edgar, 174 Ill.2d at 12, 220 Ill.Dec. at 171, 672 N.E.2d at 1183.
In Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the United States Supreme Court set out guidelines on the proper bounds for judicial authority. Courts uphold and respect the separation of powers by leaving political questions to the political branchesthe legislative and executive. The courts may address only those questions that are essential for adjudication by the judicial branch. The Supreme Court set out six factors in cases dealing with political questions. The presence of any single factor may be sufficient to bar the case from justiciability. The six factors are:
"Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question."
Baker v. Carr, 369 U.S. at 217, 82 S.Ct. at 710. Each factor must be considered in light of the facts and issues of the case at hand. Baker v. Carr, 369 U.S. at 217, 82 S.Ct. at 710.
As to the first factor, Article III, § 42, Ala. Const. 1901, states:
"The powers of the government of the State of Alabama shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial to another."
Article III, § 43, Ala. Const. 1901, states:
"In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men."
Alabama's Constitution unequivocally separates the powers of the three branches, absolutely forbidding any branch from exercising the powers of the other two branches. Article III, § 72, Ala. Const. 1901, provides that no money shall be paid out of the treasury except upon appropriation, made by law, i.e., passed by the Legislature. And Article XIV, § 260, reads:
"The income arising from the sixteenth section trust fund, the surplus revenue fund, until it is called for by the United States government, and the funds enumerated in sections 257 and 258 of this Constitution, together with a special annual tax of thirty cents on each one hundred dollars of taxable property in this state, which the legislature shall levy, shall be applied to the support and maintenance of the public schools, and it shall be the duty of the legislature to increase the public school fund from time to time as the necessity therefor and the condition of the treasury and the resources of the state may justify; provided, that nothing herein contained shall be so construed as to authorize the legislature to levy in any one year a greater rate of state taxation for all purposes, including schools, than sixty-five cents on each one hundred dollars' worth of taxable property; and provided further, that nothing herein contained shall prevent the legislature from first providing for the payment of the bonded indebtedness of the *904 state and interest thereon out of all the revenue of the state."
Thus, the Legislature has the sole responsibility for deciding how much money to spend on education. The Legislature must do so in the context of the limited financial resources of this state and the other services the state must provide. If the principle of equitable funding applies to education, why should it not also apply to the provision of police and fire protection to each county? The police power of the state existed before the Alabama Constitution of 1901. The Legislature must make policy decisions as to how high taxes should be and what departments receive what resources. The courts cannot make these types of policy choices without becoming a "super legislature."
The Governor is president and an ex officio member of the State Board of Education. Ala. Code 1975, §§ 16-3-1, 16-3-2. The Governor holds the supreme executive power in the state, Ala. Const. 1901, Art. V, § 113, and is charged with the faithful execution of the laws, Ala. Const. 1901, Art. V, § 120. Judge Reese's attempt to order the Governor to establish a public school system that provides equitable and adequate educational opportunities encroaches upon the authority given to the Governor by the Alabama Constitution and statutory law.
As to the second factor, there are no clear judicial standards for resolving the question of how public education should be funded. This is a subject of endless political debate, and there are no judicial standards in the United States Constitution or the Alabama Constitution or in any caselaw for a court to apply. See San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).
Regarding the third factor, Judge Reese's detailed discussions of policy are evidence that Judge Reese made an "initial policy determination of a kind clearly reserved for nonjudicial discretion." Baker, 369 U.S. at 217, 82 S.Ct. at 710. Further, Judge Reese set forth in his liability order judicially enforceable standards for education with which the Legislature was to comply.
As to the fourth factor, Judge Reese expressed a lack of respect for the executive and legislative branches by attempting to force his own judgment on how to reform Alabama's education system upon those two branches. The executive and legislative branches are constitutionally vested with the authority to determine education policy.
Finally, the potential for embarrassment from multifarious pronouncements by different departments is present because the legislative and executive branches could enact a program that conflicts with Judge Reese's orders. In fact, the Governor and the Legislature passed an education plan in 1995 that could be construed as conflicting with Judge Reese's orders. That conflict has created a potentially embarrassing situation. Thus, in several respects Judge Reese's order improperly reaches political issues. Political questions are not proper subjects for adjudication by the courts.
The trial court had no judicially enforceable standards for resolving the issue of school equity funding. Nevertheless, the trial court adopted its own standardthat the schoolchildren have a right to an "equitable and adequate" education. What was "equitable and adequate" was left to the discretion of the circuit court. However, what constitutes a proper education or an "equitable and adequate" education is completely subjective. Certainly it is not a fixed right with clear judicial standards. The proper forum to debate what is an "equitable and adequate" education is the Legislature, not the courtroom. The legislative and executive branches have a difficult enough task trying to balance the competing educational philosophies vying for supremacy in Alabama. For Alabama to now defer to one circuit judge would be like a third-world country's deferring to a "strong man" dictator who coercively enforces one philosophy upon all the people.
The United States Supreme Court held in San Antonio Independent School District v. Rodriguez, supra, that the fact that there were inequalities in the funding of Texas public schools did not render the method of financing public schools in Texas unconstitutional. *905 The United States Supreme Court stated:
"This case represents far more than a challenge to the manner in which Texas provides for the education of its children. We have here nothing less than a direct attack on the way in which Texas has chosen to raise and disburse state and local tax revenues. We are asked to condemn the State's judgment in conferring on political subdivisions the power to tax local property to supply revenues for local interests. In so doing, appellees [plaintiffs] would have the Court intrude in an area in which it has traditionally deferred to state legislatures."
Rodriguez, 411 U.S. at 40, 93 S.Ct. at 1300 (footnote omitted).
The United States Supreme Court further stated:
"In addition to matters of fiscal policy, this case also involves the most persistent and difficult questions of educational policy, another area in which this Court's lack of specialized knowledge and experience counsels against premature interference with the informed judgments made at the state and local levels. Education, perhaps even more than welfare assistance, presents a myriad of `intractable economic, social, and even philosophical problems.' Dandridge v. Williams, 397 U.S. 471, 487, 90 S.Ct. 1153, 1162-1163, 25 L.Ed.2d 491 [(1970)]. The very complexity of the problems of financing and managing a statewide public school system suggests that `there will be more than one constitutionally permissible method of solving them,' and that, within the limits of rationality, `the legislature's efforts to tackle the problems' should be entitled to respect. Jefferson v. Hackney, 406 U.S. 535, 546-547, 92 S.Ct. 1724, 1731-1732, 32 L.Ed.2d 285 [(1976)]."
Rodriguez, 411 U.S. at 42, 93 S.Ct. at 1301. The United States Supreme Court concluded that "the ultimate solutions must come from the lawmakers and from the democratic pressures of those who elect them." Rodriguez, 411 U.S. at 59, 93 S.Ct. at 1310. The Supreme Court clearly held that the question of public school funding was a policy question and was not a proper question for adjudication. The Supreme Court's logic applies equally to Federal and state courts. The fact that the question is now before a state court does not make the question of public school funding any less a political and policy question.
If this Court chooses to ignore the political nature of this case and proceeds down the path traveled by the circuit court, it will enter a morass from which it will be difficult to disentangle. The absence of justiciable standards could engage the Court in decades of litigation like the Supreme Court of New Jersey became involved in. The Supreme Court of New Jersey has been attempting for over 20 years to define what constitutes a "thorough and efficient" education as that term is used in the New Jersey State Constitution. It begins with Robinson v. Cahill, 62 N.J. 473, 303 A.2d 273 (1973), and continues with Robinson v. Cahill, 63 N.J. 196, 306 A.2d 65 (1973); Robinson v. Cahill, 67 N.J. 35, 335 A.2d 6 (1975); Robinson v. Cahill, 67 N.J. 333, 339 A.2d 193 (1975); Robinson v. Cahill, 69 N.J. 133, 351 A.2d 713 (1975); Robinson v. Cahill, 69 N.J. 449, 355 A.2d 129 (1976); Robinson v. Cahill, 70 N.J. 155, 358 A.2d 457 (1976); Robinson v. Cahill, 70 N.J. 155, 358 A.2d 457 (1976); Robinson v. Cahill, 70 N.J. 464, 360 A.2d 400 (1976); Abbott v. Burke, 100 N.J. 269, 495 A.2d 376 (1985); Abbott v. Burke, 119 N.J. 287, 575 A.2d 359 (1990); and Abbott v. Burke, 136 N.J. 444, 643 A.2d 575 (1994). The New Jersey Supreme Court has been the self-appointed overseer of education in New Jersey for 23 years. This litigation has not yet ended. The reason the litigation has not ended is because the New Jersey Supreme Court entered into the realm of policy-making. Policy-making has no end; there are always new matters to be addressed. Further, there has never been and there never will be a fully equitable funding of any state public school system. It would require the forced equalizing of every single differentiating economic factor in every county of the state. Total economic equality is a characteristic of totalitarian communism, not American democracy. The standard of mandating equity in school funding is both nonjudicial and unrealistic.
*906 The majority of the highest courts of states that have heard claims that the state school system did not provide an equitable method of funding public schools has rejected those claims for constitutional reasons and on the basis that such funding issues are within the province of the state's legislature.

III. B. Other States
In City of Pawtucket v. Sundlun, 662 A.2d 40 (R.I.1995), the Supreme Court of Rhode Island held that the method for funding Rhode Island public schools was not unconstitutional. It stated that the question of how schools are funded was not a justiciable issue. The Supreme Court of Rhode Island held:
"Notwithstanding our personal dedication to education and our appreciation of its significance in the lives of people of all ages, it is clearly our duty to determine the law, not make the law. United States v. Nixon, 418 U.S. 683, 703, 94 S.Ct. 3090, 3105, 41 L.Ed.2d 1039, 1061 (1974). We have held ante that the task of designing a system of financing public education has been delegated to the General Assembly under article 12, not to the courts. Consequently, we refrain from scaling the walls that separate law making from judging, for `[w]ere the power of judging joined with the legislative ... the judge would then be the legislator.' The Federalist Papers, No. 47 at 303 (James Madison) (Clinton Rossiter ed., 1961). `[S]o long as the judiciary remains truly distinct from both the legislature and the executive ... the general liberty of the people can never be endangered from that quarter.' The Federalist Papers, No. 78 at 466 (Alexander Hamilton) (Clinton Rossiter ed., 1961).
"After reviewing cases of the United States Supreme Court on the separation of powers, Justice Powell concluded: `Functionally, the doctrine may be violated in two ways. One branch may interfere impermissibly with the other's performance of its constitutionally assigned function. Alternatively, the doctrine may be violated when one branch assumes a function that more properly is entrusted to another.' I.N.S. v. Chadha, 462 U.S. 919, 963, 103 S.Ct. 2764, 2790, 77 L.Ed.2d 317, 352 (1983) (Powell, J., concurring). In the case before us, plaintiffs have urged that we do both. First, they urged us to interfere with the plenary constitutional power of the General Assembly in education. Second, by urging that we order `equity' in funding sufficient to `achieve learner outcomes,' `plaintiffs have asked that the court take on a responsibility explicitly committed to the Legislature.'
"Moreover, plaintiffs have asked the judicial branch to enforce policies for which there are no judicially manageable standards. Absent such standards, we must determine whether the case is justiciable: `First, we must decide whether the claim presented and the relief sought are of the type which admit of judicial resolution. Second, we must determine whether ... the issue presented [is] a "political question"that is, a question which is not justiciable in ... court because of the separation of powers provided by the Constitution.' Powell v. McCormack, 395 U.S. 486, 516-17, 89 S.Ct. 1944, 1961, 23 L.Ed.2d 491, 514 (1969)."
662 A.2d at 57-58. (Emphasis added.) City of Pawtucket, which was cited in the main opinion as a case holding that school funding was not a political question, is very strong precedent for the opposite holding. It stands against judicial involvement in the debate over the funding of schools. It clearly holds that such matters are policy questions that the courts must leave to the legislature. The allocation of scarce funds is a matter that should be left to the Legislature, not to the judiciary.
The Supreme Court of Illinois recently held in Edgar, supra, that the State of Illinois's method of funding public schools did not violate that state's constitution by producing inequalities in the funding of public schools. The Illinois Supreme Court held:
"Historically, this court has assumed only an exceedingly limited role in matters relating to public education, recognizing that educational policy is almost exclusively within the province of the legislative branch. Section 1 of article VIII of the 1870 Constitution provided that `[t]he general *907 assembly shall provide a thorough and efficient system of free schools, whereby all children of this state may receive a good common school education.' Ill. Const. 1870, art. VIII, § 1. As discussed earlier, except in matters relating to school district boundaries, this court consistently held that questions relating to the efficiency and thoroughness of the school system were left to the wisdom of the legislative branch. This principle has likewise been applied with respect to the efficiency requirement in the 1970 Constitution. See Cronin v. Lindberg, 66 Ill.2d 47, 58, 4 Ill.Dec. 424, 360 N.E.2d 360 (1976) (law reducing state aid to schools that failed to operate for a school year of a specified minimum duration was not reviewable under the efficiency requirement).
"More generally, it has been stated that section 1 of article VIII of the 1870 Constitution was both `a mandate to the legislature and a limitation on the exercise of the [legislative] power. The mandate is to provide a thorough and efficient system of schools, and the limitations are that they shall be free to all children of the State and such that all children may receive a good common school education.' People ex rel. Leighty v. Young, 309 Ill. 27, 33, 139 N.E. 894 (1923); see also People ex rel. Hepfer v. Price, 310 Ill. 66, 73, 141 N.E. 409 (1923). Yet, while the requirement that schools provide a `good common school education' was explicitly recognized to be a limitation on the legislature's power to enact public school laws, that limitation was not among those held generally capable of judicial enforcement."
Edgar, 174 Ill.2d at 24-25, 220 Ill.Dec. at 177, 672 N.E.2d at 1189.
The Illinois Supreme Court further stated:
"The constitution provides no principled basis for a judicial definition of high quality. It would be a transparent conceit to suggest that whatever standards of quality courts might develop would actually be derived from the constitution in any meaningful sense. Nor is education a subject within the judiciary's field of expertise, such that a judicial role in giving content to the education guarantee might be warranted. Rather, the question of educational quality is inherently one of policy involving philosophical and practical considerations that call for the exercise of legislative and administrative discretion.
"To hold that the question of educational quality is subject to judicial determination would largely deprive the members of the general public of a voice in a matter which is close to the hearts of all individuals in Illinois. Judicial determination of the type of education children should receive and how it can be best provided would depend on the opinions of whatever expert witnesses the litigants might call to testify and whatever other evidence they might choose to present. Members of the general public, however, would be obliged to listen in respectful silence. We certainly do not mean to trivialize the views of educators, school administrators and others who have studied the problems which public schools confront. But nonexpertsstudents, parents, employers and othersalso have important views and experiences to contribute which are not easily reckoned through formal judicial factfinding. In contrast, an open and robust public debate is the lifeblood of the political process in our system of representative democracy. Solutions to problems of educational quality should emerge from a spirited dialogue between the people of the State and their elected representatives. In delegate Fogal's words, ... `let the citizens keep pushing for higher-quality education.' 2 Proceedings 767."
Edgar, 174 Ill.2d at 28-29, 220 Ill.Dec. at 179, 672 N.E.2d at 1191.
The Illinois Supreme Court went on to follow Rodriguez, saying that the right to equal educational funding was not a fundamental right for the purpose of the Equal Protection Clause. The Edgar court also said that equal funding of public education by the State of Illinois would conflict with both the concept of liberty and local control of schools.
"The concept of `local control' in public education connotes not only the opportunity for local participation in decisionmaking but also `the freedom to devote more money *908 to the education of one's children.' Rodriguez, 411 U.S. at 49-50, 93 S.Ct. at 1304-05, 36 L.Ed.2d at 52; see also Lujan v. Colorado State Board of Education, 649 P.2d 1005, 1023 (Colo.1982) (`[local] control is exercised by influencing the determination of how much money should be raised for local schools, and how that money should be spent')."
Edgar, 174 Ill.2d at 38, 220 Ill.Dec. at 184, 672 N.E.2d at 1196.
Many other states have come to the same conclusion. See Thompson v. Engelking, 96 Idaho 793, 537 P.2d 635 (1975) (holding that the educational funding system was not unconstitutional even though money was not distributed equally because to hold that money must be distributed evenly would be to enter the area of public education funding, which is the province of the legislature), followed in Idaho Schools for Equal Educational Opportunity v. Evans, 123 Idaho 573, 850 P.2d 724 (1993); Hornbeck v. Somerset County Bd. of Educ., 295 Md. 597, 458 A.2d 758 (1983) (concluding that the state constitutional requirements for a "thorough and efficient" system of education did not require equal funding and noting that responsibility for funding issues belongs to the legislature or to the people by means of a constitutional amendment); Britt v. North Carolina State Board of Education, 86 N.C.App. 282, 357 S.E.2d 432 (1987), dismissal allowed, rev. denied, 320 N.C. 790, 361 S.E.2d 71 (1987) (constitutional mandate that "equal opportunities shall be provided for all students" does not confer upon each student a right to substantially equal education); Fair School Finance Council of Okla., Inc. v. State, 746 P.2d 1135 (Okla.1987) (the state constitution places few restrictions on how the legislature provides a school system for the state, and as long as the legislature acts within its powers the actions of the legislature are constitutional; and there is no requirement of equal funding of public schools); Kukor v. Grover, 148 Wis.2d 469, 436 N.W.2d 568 (1989) (disparities in funding of local school districts does not violate the right to a public education; principle of local control is a constitutionally based and protected precept); and Richland County v. Campbell, 294 S.C. 346, 364 S.E.2d 470 (1988) (concluding that unequal funding does not violate the state's equal protection clause, noting that it is within the legislative duties to determine what is necessary to meet the constitutional duty to "maintain and provide public education").
Moreover, numerous courts have wholly rejected the notion that unequal funding of public schools violates certain provisions in state constitutions. See Milliken v. Green, 390 Mich. 389, 212 N.W.2d 711 (1973) (concluding that the state does not have a duty to provide equally funded education but is required only to provide an adequate education); Danson v. Casey, 33 Pa.Cmmw. 614, 382 A.2d 1238 (1978), affirmed, 484 Pa. 415, 399 A.2d 360 (1979) (constitutional mandate to provide for a "thorough and efficient system of public education to serve the needs of the Commonwealth" does not require absolute equality in educational services or expenditures, and the inequalities in funding public schools do not make the method of funding public schools unconstitutional); Shofstall v. Hollins, 110 Ariz. 88, 515 P.2d 590 (1973) (holding that the state constitutional provisions requiring a uniform system of public education are not violated merely because the funding is not ultimately equal); Skeen v. State, 505 N.W.2d 299 (Minn.1993) (education financing system did not violate state constitutional requirements for a "general and uniform" system of education because that phrase did not require full equalization of spending; the court will not substitute its judgment for that of the legislature); Olsen v. State, 276 Or. 9, 554 P.2d 139 (1976) (constitutional requirement for a uniform system of schools not violated by a system that permits the local districts to spend different amounts on education); Lujan v. Colorado State Bd. of Educ., 649 P.2d 1005 (Colo.1982) (finding that the present system of educational funding did not violate the state constitutional requirements for a "thorough and uniform" system of education, because that phrase did not require equal spending for all students).

IV. A. The Remedy Order
Judge Reese entered a lengthy order setting out components that must be put in place through legislation and public policies *909 to provide equitable and adequate educational opportunities for all schoolchildren. Remedy Order, Dec. 3, 1993, p.2. Each element of the order must be carried out in order for the State of Alabama to comply with the order. Remedy Order, p.2. This remedy order invaded the policy realm of the state legislature with respect to education in general. The appendix to this dissent reproduces the text of Judge Reese's December 3, 1993, Remedy Order. On October 6, 1995, after a de novo review, Judge Greenhaw modified that order somewhat, striking the last paragraph, in which the circuit court had retained jurisdiction. However, that action was insufficient to ameliorate its excessive intrusiveness.

IV. B. Alabama Caselaw
In Morgan County Commission v. Powell, 292 Ala. 300, 293 So.2d 830 (1974), the county commission refused to approve a salary schedule for circuit court judicial secretaries proposed by the circuit judges. The Alabama Supreme Court overruled the circuit judges' attempt to order the commissioners to approve the salary schedule. This Court held that the judges did not have the authority to order appropriations and that their order overreached the limits of the judges' inherent power.
The Court held that "[i]n the aspect of appropriating money from the county treasury, a county governing body must be deemed as exercising a legislative power." 292 Ala. at 305, 293 So.2d at 834. This Court also stated that "[n]o distinction is made therefore in our discussion of the powers and limitations of the functions of the three branches of government whether on the state level or county level." 292 Ala. at 305, 293 So.2d at 834.
This Court stated:
"Within their respective spheres each branch of government is supreme. State v. Stone, 224 Ala. 234, 139 So. 328 [(1932)]. Judicial power and legislature power are coordinate, and neither can encroach upon the other. Ex parte Huguley Water System et al., 282 Ala. 633, 213 So.2d 799 [(1968)]. The authority to determine the amount of appropriations necessary for the performance of the essential functions of government is vested fully and exclusively in the legislature. Abramson v. Hard, 229 Ala. 2, 155 So. 590 [(1934)]. Section 72, Alabama Constitution, provides: `No money shall be paid out by the treasury except upon appropriation by law.'"
292 Ala. at 306, 293 So.2d at 834. Thus, Morgan County Commission stands for the proposition that the judiciary may not encroach upon power given to the Legislature, and judicial officials cannot order legislative officials to take a particular policy course.
This Court, in State v. Reed, 364 So.2d 303 (Ala.1978), considered a quo warranto action brought by a voter challenging Thomas Reed's right to maintain his office as an Alabama legislator after Reed had been convicted of attempted bribery. The trial court had entered a summary judgment based on Reed's claims that §§ 51 and 53 of the Alabama Constitution gave the Legislature the sole right to judge the qualifications of legislators and to expel them from office. The question in the case was, therefore, whether § 51 and § 53, which give the Legislature exclusive power to expel members from the state legislature because of felony convictions, preclude the judiciary from enforcing § 60, Ala. Const.1901, which prohibits a person convicted of bribery, a crime of moral turpitude, from holding office.
This Court noted that this question was not a political one incapable of judicial resolution because § 51 and § 53 do not constitute a "textually demonstrable constitutional commitment of the issue to a coordinate political department." Reed, 364 So.2d at 305. Thus, it was a proper subject for judicial resolution. The Court quoted State v. Porter, 1 Ala. 688 (1840).
"[A]fter an election has been made, according to the forms of the constitution, there is no inhibition, either express or implied, upon the judiciary, which will prevent that department from inquiring, whether in the choice made, some feature of that instrument has not been violated, or an office conferred upon one, who was not eligible to its enjoyment." *910 Reed, 364 So.2d at 307 (citing Porter, 1 Ala. at 697-99).
In Brooks v. Hobbie, 631 So.2d 883 (Ala. 1993), this Court answered a question certified from the United States District Court for the Middle District of AlabamaWhether a circuit court had the power to change the state's legislative districts. This Court answered affirmatively, stating that the law in apportionment cases, because of cases like Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), had evolved to the point that the "political question" issue no longer barred judicial action. This Court further stated that, under the Alabama Constitution, the Legislature has the "initial responsibility" to act in redistricting matters. "However, in the event the legislature fails to act, the responsibility shifts to the state judiciary." Brooks, 631 So.2d at 890.
The standard for court intervention in cases that potentially involve a political question is unclear. At first glance, Brooks may seem to give broad authority for judicial intervention. However, Brooks follows Baker, which allowed intervention in reapportionment cases because the intervention did not violate the six-factor test set forth in Baker. There is also strong federal caselaw supporting judicial action in the area of reapportionment. In the area of equitable funding of education, however, not only is federal caselaw support lacking, but there is actually contrary federal precedent. See San Antonio Independent School District v. Rodriguez, supra.
Applying Alabama caselaw to the circuit court's liability and remedy orders, I believe that the orders violated the separation of powers doctrine. The orders violate Morgan County Commission because they encroach upon the authority of the legislative and executive branches over education and upon the legislative control of state funds. The remedy order encroaches upon constitutional authority by ordering the legislative branch to adopt legislative policies advocated by the circuit court. It also violates § 72 of the Alabama Constitution, which vests in the legislative branch sole authority for spending state funds.
The remedy order further violates Reed. Reed requires judges to uphold the constitution, but it does not authorize the judiciary to go beyond merely reviewing legislative action. Judge Reese could invalidate a legislative action that violated the state or federal constitution, but he cannot order the Legislature to adopt another in its place.
The remedy order also violates Brooks. Brooks allows judicial action within the limits of Baker, when the Legislature has refused to act. In the case at hand, the Legislature has not refused to act. If the education policy of Alabama is unconstitutional, then a declaratory judgment might be proper, but the remedy order, which mandates specific legislative action, goes too far. Indeed, the plaintiffs sought only a declaratory judgment. Judge Reese cites Marbury v. Madison, supra, to support his order. However, in Marbury the United States Supreme Court struck down § 13 of the Judiciary Act; it did not give a 20-page policy order to the executive branch. Marbury supports only a court's entering a declaratory judgment as to whether an action is unconstitutional.
As authority for his remedy order, Judge Reese cites Gilbreath v. Wallace, 292 Ala. 267, 292 So.2d 651, 655 (1974); State v. Skeggs, [State ex rel. Meyer v. Greene], 154 Ala. 249, 46 So. 268, 270 (1908); and Ballentyne v. Wickersham, 75 Ala. 533, 542 (1883).
Gilbreath, supra, was a will contest in which this Court held that a statute providing for a 6-member, rather than a 12-member, jury in the circuit court violated the right to trial by jury guaranteed under § 11 of the Alabama Constitution. This Court held that the Legislature may give rights in addition to those given by the constitution, but that it cannot take away a citizen's constitutional rights. Gilbreath, 292 Ala. at 271, 292 So.2d at 655. This court struck down only the application of the six-member-jury statute to will contests; it did not order the Legislature to adopt a new statute with court-ordered policies; it merely noted that if changes were necessary it was the duty of the Legislature to effectuate those changes either by constitutional amendment or by *911 legislative enactment. Thus, Gilbreath does not support Judge Reese's ordering the Legislature to adopt specific legislation.
Skeggs, supra, involved Act No. 53, 1907 Ala. Acts, providing that the sale of alcoholic beverages would be prohibited in all counties that voted for the proposition. The plaintiffs challenged the constitutionality of Act No. 53, alleging that it was unconstitutional in its enactment. The plaintiffs alleged that the statute was too vague as to when the prohibition was effective, and that the law was local, not general. This Court upheld Act No. 53, rejecting each of the plaintiffs' claims. The case stands for the right of state courts to review the constitutionality of legislative acts. Skeggs, 154 Ala. at 254, 46 So. at 270. However, the case does not support a circuit judge's ordering the Legislature to adopt a specific policy authored by the trial judge.
Ballentyne, supra, involved an action for malicious prosecution. The plaintiff claimed that he was maliciously brought before, convicted by, and sentenced by the inferior criminal court of Mobile. The plaintiff claimed that the court lacked jurisdiction to try the case or to issue a judgment because, he argued, the statute that created the court was unconstitutional. This Court held that the statute violated Article III, § 45, which requires that a bill contain only one subject, which shall be clearly expressed in its title. The Court found that the bill's title contained two subjects and that the bill itself contained three subjects. Ballentyne, 75 Ala. at 535. Ballentyne offers no support to a court's directing the Legislature to adopt policies and spend tax dollars.
Judge Reese states that his ruling in favor of the plaintiffs does not mean the court would improperly interject itself into the affairs of coordinate branches by ordering tax increases and setting priorities for government spending. Judge Reese stated:
"This misconstrues the judicial role. The court neither taxes nor spends, but simply decides the case before it, declares constitutional rights, and where necessary, enjoins their violation, as it must be in our constitutional system. Many (perhaps most) constitutional decisions in practice have budgetary implications, but the actual fiscal effects of such decisions are controlled not by the court but by policymakers, who establish budgetary and tax policy in the first instance, and who must weigh the potential cost of unconstitutional acts in that balance."
Liability Order, April 1, 1993, at 41. Judge Reese exceeded his own expression of the proper judicial rule when he ordered the Governor and the Legislature to establish an equitable and adequate education system that followed his specific policy requirements and findings and by requiring the establishment of a foundation fund for education. Judge Reese did not simply decide the case before the court and "declare constitutional rights" and "enjoin their violation." He could have stayed within his own expression of the proper role of the judiciary by granting the relief requested and entering a declaratory judgment. Judge Reese, in his broad sweeping order, went far beyond the relief requested in the complaint and far beyond his own statement of the proper judicial role.
Judge Reese cited Wyatt v. Aderholt, 503 F.2d 1305, 1314 (5th Cir.1974), as support for the proposition that judicial intervention does not violate policymakers' control of budgetary concerns and tax policy. Wyatt involved a class action alleging that Alabama's facilities designed to house and habilitate the state's mentally ill and mentally retarded were being operated in a constitutionally impermissible fashion. The Fifth Circuit Court of Appeals held that the United States Constitution guarantees persons civilly committed to mental institutions a right to treatment, and that these state institutions had violated this right by not providing the constitutionally required minimal standards of care.
However, the court did not require the state to reform the system in a particular way or to adopt new spending plans or to levy new taxes. The court simply reviewed the actions of the state and struck them down where unconstitutional. The Fifth Circuit stated:
"It goes without saying that state legislatures are ordinarily free to choose among various social services competing for legislative *912 attention and state funds but that does not mean that a state legislature is free ... to provide a social service in a manner which will result in the denial of individuals' constitutional rights."
503 F.2d at 1314-15. The court recognized that the trial court should defer to the Legislature, whose job it should be to develop minimal standards for these state institutions. Moreover, the court noted that only if and when the Legislature fails to act should the trial court do anything to remedy the violations of an individual's constitutional rights. Many states reacted to the type of judicial intervention of Wyatt by releasing their civilly committed mental patients, most of whom were ill-prepared to operate in society. Thus, there was a practical downside to the declaratory judgment in Wyatt. Yet, the intervention of the Fifth Circuit Court of Appeals in Wyatt was extremely conservative compared to the orders of the circuit court in this case. The negative consequences of Wyatt-type declaratory judgments should serve as an additional warning against the type of broad judicial intervention expressed in the Remedy Order in this case.

IV. C. Other States
Judge Reese also cited a number of cases from other states in support of his orders. Of course, such cases are not binding upon this Court, but I do consider them to be quite instructive. Judge Reese cited the following: Rose v. Council for Better Education, Inc., 790 S.W.2d 186, 209 (Ky.1989); Seattle School District No. 1 of King County v. State, 90 Wash.2d 476, 585 P.2d 71, 87 (1978); Helena Elementary School District No. 1 v. State, 236 Mont. 44, 769 P.2d 684, 685 (1989), opinion amended by Helena Elementary School Dist. No. 1 v. State, 236 Mont. 44, 784 P.2d 412 (1990); DuPree v. Alma School District No. 30, 279 Ark. 340, 651 S.W.2d 90, 94 (1983); Robinson v. Cahill, 62 N.J. 473, 303 A.2d 273 (1973); and Serrano v. Priest, 5 Cal.3d 584, 96 Cal.Rptr. 601, 487 P.2d 1241 (1971). The main opinion cites four of these cases and also cites the following additional cases: Tennessee Small School Systems v. McWherter, 851 S.W.2d 139 (Tenn.1993); Edgewood Independent School District v. Kirby, 777 S.W.2d 391 (Tex.1989); McDaniel v. Thomas, 248 Ga. 632, 285 S.E.2d 156 (1981); Board of Educ., Levittown Union Free School Dist. v. Nyquist, 57 N.Y.2d 27, 439 N.E.2d 359, 453 N.Y.S.2d 643 (1982), appeal dismissed, 459 U.S. 1138, 103 S.Ct. 775, 74 L.Ed.2d 986 (1983); Board of Education of the City School District of Cincinnati v. Walter, 58 Ohio St.2d 368, 390 N.E.2d 813 (1979), cert. denied, 444 U.S. 1015, 100 S.Ct. 665, 62 L.Ed.2d 644 (1980); State ex rel. Bd. of Educ. v. Manchin, 179 W.Va. 235, 366 S.E.2d 743 (1988); McDuffy v. Secretary of the Executive Office of Educ., 415 Mass. 545, 615 N.E.2d 516 (1993); City of Pawtucket v. Sundlun, 662 A.2d 40 (R.I.1995); Kukor v. Grover, 148 Wis.2d 469, 436 N.W.2d 568 (1989); Washakie County School Dist. No. 1 v. Herschler, 606 P.2d 310 (Wyo.1980), cert. denied, 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980); and Campbell County School Dist. v. State, 907 P.2d 1238 (Wyo. 1995). Because of the emphasis the main opinion places on these last two casesWashakie County and Campbell CountyI will discuss them first. While those two cases provide some support for the remedy order, most decisions of other states do not. See City of Pawtucket v. Sundlun, discussed supra; and see also Kukor v. Grover, discussed supra.
The main opinion calls the Washakie case "particularly instructive." In Washakie, the Wyoming Supreme Court held that Wyoming's method of funding public schools was unconstitutional. The Supreme Court entered a declaratory judgment only and remanded the case to the trial court, which it directed to retain jurisdiction until a constitutional body of legislation to solve the funding problem was enacted. The court made it clear that it was not seeking to set policy or to direct the legislature. "We have pointed up various potential solutions in this opinion only for the purpose of opening up areas of exploration for the legislature and not to specify any particular course." 606 P.2d at 337. Thus, this case does not support the policy-directing remedy order Judge Reese issued.
Following the 1980 Washakie decision, the Wyoming legislature enacted an interim method of funding to address funding inequities *913 until the matter could be studied fully and it could develop a permanent solution. However, no permanent legislation was ever enacted. Therefore, another action, Campbell County School Dist., supra, was filed. The complaint in that action alleged that the temporary solution itself had become unconstitutional. The trial court agreed. On appeal, the Supreme Court of Wyoming held that the existing structure for financing public schools in Wyoming was unconstitutional. The Wyoming Supreme Court stated: "The sense of Washakie was to require the legislature to examine the entire education system, including its funding, and reform it in order to provide an `equal opportunity for a quality education.'" 907 P.2d at 1263. The court asserted that where the legislature has failed to act when faced with constitutional violations, the court's "duty to protect individual rights includes compelling legislative action required by the constitution." 907 P.2d at 1264. However, the court refused to dictate the actions the legislature must take to remedy the educational system; it merely commanded the legislature to act and ordered compliance by July 1, 1997. The Wyoming Supreme Court did allow the trial court to retain jurisdiction until conforming legislation is enacted and implemented.
The Kentucky Supreme Court in Rose, supra, declared Kentucky's common school finance system unconstitutional and further declared that the General Assembly had not produced an efficient system of public schools throughout the state as required by the Kentucky constitution. Thus, the General Assembly was required to establish an efficient school system throughout the state. The court rejected a contention that the trial court's decision had violated the separation of powers doctrine:
"It is clear that the specifics of the legislation will be left up to the wisdom of the General Assembly. Clearly, no `legislating' is present in the decision of the trial court, and more importantly, as we have previously said, there is none present in the decision of this Court. We do not agree with appellants.
"However, we agree with appellants that the decision of the trial [judge] to require the appellants to report to him on their progress is a clear incursion, by the judiciary, [into] the functions of the legislature.
"The implications of such an open-ended judgment are very clear. The trial court retains jurisdiction and supervision of the General Assembly's effort to provide a constitutional system of common schools. Under such an order, the General Assembly, in theory if not in practice, would literally have to confer, report, and comply with the judge's view of the legislation proposed to comply with the order. The legislation would be that of the joint efforts of the General Assembly and the trial court, with the latter having the final word. This is, without doubt, the type of action that was eschewed when the framers of the four constitutions of this state placed the separation of powers doctrine in the organic law of this state."
Rose, 790 S.W.2d at 214.
Rose does not support Judge Reese's decision. Rose does offer support for requiring the legislature to create an "efficient" and equitable education system because the wording of § 183 of the Kentucky constitution specifically required that an "efficient" education be provided for children. Rose, however, does not support a remedy order that requires specific legislation. Yet, the Remedy Order in our case requires the creation of a Foundation Fund and sets education policy and school curriculum. It goes so far as to delve into the matter of toilet paper. Further, Judge Reese retained jurisdiction in the case and required the policy-makers to report to the circuit court. Thus, Judge Reese's order exceeds the standard for judicial action set forth in Rose. The main opinion ratifies the "open-ended" type of order issued by Judge Reese and eschewed by the court in Rose.
In Seattle School District No. 1, supra, the Washington Supreme Court held that the state's reliance on special excess levy funding for providing for the education of children was unconstitutional because the state did not follow the wording of the state constitution, which used the term "ample provision." The court entered a declaratory judgment for the plaintiffs, requiring the legislature to *914 make "ample provision" for the education of resident children. The court did not direct the legislature to pass specific legislation or to set up a fund to support education, as Judge Reese ordered. In fact, the Washington Supreme Court modified the trial court's judgment, which had sought to retain jurisdiction over the case. The trial court retained jurisdiction to ensure that the legislature did its job properly. On appeal, the Washington Supreme Court refused to specify what relief would be appropriate if the legislature failed to act. The most the court would say was that "after a judicial determination therein, the legislature must subsequently act within the confines of the judicial interpretation." 90 Wash.2d at 505, 585 P.2d at 88. However, the Seattle order was a declaratory judgment only. It did not reach as far as Judge Reese's order reaches. Thus, the Seattle case does not support Judge Reese's broad order.
The Supreme Court of Montana, in Helena Elementary School District No. 1, supra, held that the state system of funding public schools violated the state constitutional guarantee of equal educational opportunity. The court entered a declaratory judgment but specifically declined to "spell out the percentages which are required on the part of the State" to be spent in funding education. 236 Mont. at 55, 769 P.2d at 691. The court stated that control of state education funds was primarily the province of the legislature. The court also declined to establish accreditation standards. 236 Mont. at 55, 769 P.2d at 691. Thus, Helena does not support Judge Reese's order, which went far beyond a declaratory judgment.
The Supreme Court of Arkansas, in DuPree v. Alma School District No. 30, supra, held that the financing system for Arkansas public schools was unconstitutional because of the great disparity in funding among the school districts. The decision was declaratory only. The trial court did not attempt to implement a remedy, and the Arkansas Supreme Court noted that the legislature had the task of developing a solution. Moreover, in a concurrence, Justice Hickman stated, "It is my respectful judgment that this court has no intention of intervening in a legislative or executive matter. Nor do we intend to supervise [the legislature's] work." 279 Ark. at 353, 651 S.W.2d at 97 (Hickman, J., concurring). The DuPree decision thus does not support Judge Reese's broad judicial intervention.
The Supreme Court of New Jersey, in Robinson v. Cahill, supra, held that the New Jersey system of financing public education, which relied mainly on local taxation, violated the New Jersey state constitutional mandate for equal educational opportunity. In a subsequent remedy phase, Robinson v. Cahill, 69 N.J. 133, 351 A.2d 713 (1975), cert. denied, 423 U.S. 913, 96 S.Ct. 217, 46 L.Ed.2d 141 (1975), the Supreme Court of New Jersey limited the implementation of court-ordered remedies to a provisional remedy for the 1976-77 school year only, because of its reluctance to become involved in the legislative process. Judge Reese's order, on the other hand, is without any prescribed limits. Thus, Judge Reese's order steps too far into the legislative realm, something the Robinson court consciously avoided. As my discussion of the New Jersey situation demonstrates, however, the New Jersey Supreme Court was not successful in its attempt to avoid being swallowed up by the process of supervising New Jersey's education system.
Judge Reese cited only the original Serrano decision, 5 Cal.3d 584, 96 Cal.Rptr. 601, 487 P.2d 1241 (1971) (Serrano I), which held that the facts alleged in the complaint were sufficient to support a claim that the financing scheme for California schools was unconstitutional. The court in Serrano I also noted that if the facts alleged in the complaint were true, then the system must be held to be unconstitutional. The Serrano I court then stated that the trial court, if it subsequently found the system to be unconstitutional, could enforce the judgment and the ensuing transitional period as courts have done in the school desegregation cases and in the legislative reapportionment cases.
However, in Serrano v. Priest, 18 Cal.3d 728, 135 Cal.Rptr. 345, 557 P.2d 929, cert. denied, 432 U.S. 907, 97 S.Ct. 2951, 53 L.Ed.2d 1079 (1977) (Serrano II), the Supreme Court of California held that the state's public school financing system, which *915 relied on local property taxes, invidiously discriminated against the poor and violated the Equal Protection Clause of the Fourteenth Amendment. The court granted declaratory judgment relief only. Moreover, unlike the court in Serrano I, the Serrano II court asserted that its decision was not to be "construed to require adoption of any particular system of school finance." 18 Cal.3d at 750, 135 Cal.Rptr. 345, 557 P.2d at 940. Therefore, because of the subsequent Serrano II decision, Serrano I does not support Judge Reese's broad implementation orders.
The Tennessee Supreme Court, in Tennessee Small School Systems v. McWherter, supra, reversing the judgment of the Court of Appeals and upholding the trial court's judgment, held that the disparities in the educational opportunities provided by the state's public school system caused the system to violate the constitutional mandate that the "General Assembly shall provide for a system of free public schools guaranteeing to all children of school age the opportunity to obtain an education." 851 S.W.2d at 140. The court also stated: "The means whereby the result is accomplished is, within constitutional limits, a legislative prerogative. Consequently, the trial court's holding that the appropriate remedy should be fashioned by the General Assembly is affirmed." 851 S.W.2d at 156. The court entered a declaratory judgment only and refrained from going any further. The Tennessee court subsequently approved a plan proposed by the state legislature to incrementally meet constitutional requirements, and specifically left it to the legislature to decide the source of the funds necessary to implement the plan. Tennessee Small School Systems v. McWherter, 894 S.W.2d 734 (Tenn.1995). Thus, the Tennessee Small School Systems cases do not support Judge Reese's broad order.
The Texas Supreme Court, in Edgewood Independent School District, supra (hereinafter Edgewood I), held that the state school financing system violated a state constitutional provision requiring the maintenance of an "efficient" system of education. The court granted declaratory relief only. The court stated: "Although we have ruled the school financing system to be unconstitutional, we do not now instruct the legislature as to the specifics of the legislation it should enact; nor do we order it to raise taxes. The legislature has primary responsibility to decide how best to achieve an efficient system. We decide only the nature of the constitutional mandate and whether that mandate has been met." Edgewood I, 777 S.W.2d at 399. Later, in a companion case, Carrollton-Farmers Independent School District v. Edgewood Independent School District, 826 S.W.2d 489, 522-23 (Tex.1992), the court set a June 1993 deadline for the Texas Legislature to comply with Edgewood I. The Texas Legislature then passed education financing reform; however, the reform required voter approval, and the voters did not approve it. The court did nothing in response. In Edgewood Independent School Dist. v. Meno, 917 S.W.2d 717 (Tex.1995) (Edgewood III), the Texas Supreme Court again addressed the constitutionality of the funding of the Texas public schools and upheld the manner of funding, even though it had changed little from the time of the Edgewood I decision in 1989. The Texas Supreme Court held:
"This Court's role under our Constitution's separation of powers provision should be one of restraint. We do not dictate to the Legislature how to discharge its duty. As prominent as this Court's role has been in recent years in this important issue, it is subsidiary to the constitutionally conferred role of the Legislature. The people of Texas have themselves set the standard for their schools. Our responsibility is to decide whether that standard has been satisfied, not to judge the wisdom of the policy choices of the Legislature, or to impose a different policy of our own choosing."
917 S.W.2d at 726. Thus, Edgewood I and its progeny highlight the hazards of judicially mandated equity in school funding. It was a political decision for the voters of Texas to make, and, I would argue, it is a political decision for the Alabama Legislature, the Governor, and the voters of Alabama to make.
In McDaniel v. Thomas, supra, the Georgia Supreme Court held that Georgia's method *916 for funding public schools did not violate the state's equal protection clause because a constitution is designed to set the minimum protections afforded to society. The court acknowledged that the current system was flawed, but said it was the task of the legislature to implement a new system. Moreover, in discussing whether the court could address the constitutionality of the funding of public schools, the court stated:
"Neither the trial court nor this court has been called upon to decide whether, as a policy matter, a particular financing scheme is `better' than another. We have been asked to determine whether the existing method of financing public education in this state meets constitutional requirements."
McDaniel v. Thomas, 248 Ga. at 633, 285 S.E.2d at 157. Judge Reese's liability and remedy orders go beyond merely determining whether the educational system meets constitutional requirements; those orders attempt to settle many policy questions.
In Board of Educ., Levittown Union Free School Dist. v. Nyquist, supra, the Court of Appeals of New York upheld New York's method for funding public schools, against a constitutional challenge. In addressing the role courts play in the funding of schools, the Court of Appeals stated:
"The determination of the amounts, sources, and objectives of expenditures of public moneys for educational purposes, especially at the State level, presents issues of enormous practical and political complexity, and resolution appropriately is largely left to the interplay of the interests and forces directly involved and indirectly affected, in the arenas of legislative and executive activity. This is the very essence of our governmental and political polity. It would normally be inappropriate, therefore, for the courts to intrude upon such decision-making (see Matter of Board of Educ. v. City of New York, 41 N.Y.2d 535, 538, 394 N.Y.S.2d 148, 362 N.E.2d 948; Matter of Anderson v. Krupsak, 40 N.Y.2d 397, 402-403, 386 N.Y.S.2d 859, 353 N.E.2d 822; New York Public Interest Research Group v. Steingut, 40 N.Y.2d 250, 257, 386 N.Y.S.2d 646, 353 N.E.2d 558; cf. James v. Board of Educ. 42 N.Y.2d 357, 397 N.Y.S.2d 934, 366 N.E.2d 1291). With full recognition and respect, however, for the distribution of powers in educational matters among the legislative, executive and judicial branches, it is nevertheless the responsibility of the courts to adjudicate contentions that actions taken by the Legislature and the executive fail to conform to the mandates of the Constitutions which constrain the activities of all three branches. That because of limited capabilities and competences the courts might encounter great difficulty in fashioning and then enforcing particularized remedies appropriate to repair unconstitutional action on the part of the Legislature or the executive is neither to be ignored on the one hand nor on the other to dictate judicial abstention in every case. In the discharge of our judicial responsibility in this case, recognizing the existence of the very real disparities of financial support as found by the lower courts, we nonetheless conclude that such disparities do not establish that there has been a violation of either [the] Federal or [the] State Constitution."
57 N.Y.2d at 38-39, 439 N.E.2d at 363-64, 453 N.Y.S.2d at 648 (footnote omitted). The Court of Appeals of New York clearly stated that a court should abstain from implementing remedies and only rarely should address the constitutionality of the method of funding schools. Thus, this case gives no support to Judge Reese's broad liability and remedy orders.
In Board of Educ. of the City School Dist. of Cincinnati v. Walter, supra, the Supreme Court of Ohio held that the method for funding public schools in Ohio was not unconstitutional. The Supreme Court of Ohio stated that the trial court could decide in the declaratory judgment action whether the method for funding public schools in Ohio was constitutional. That court noted that, as announced in Marbury v. Madison, it is the court's duty to review the constitutionality of legislation, provided, however, that the court's scope is limited to review of the statute. In this present case, Judge Reese is limited to reviewing the constitutionality of *917 the legislation; his order went beyond what is constitutionally permissible.
The Supreme Court of Appeals of West Virginia, in State ex rel. Bd. of Educ. v. Manchin, supra, addressed the issue whether a statutory provision designed to achieve salary equity among teachers was constitutional based on an earlier determination in Pauley v. Kelly, 162 W.Va. 672, 255 S.E.2d 859 (1979), that education was a fundamental right. The West Virginia Supreme Court of Appeals in Manchin conceded that it is the job of the legislature to take corrective action. Although Judge Reese cites Manchin, the Pauley decision appears to be more applicable to this case in that it addresses the fundamental right to an education. The Pauley court held that the trial court had incorrectly dismissed the case, stating that the current system of educational funding did not meet the state constitutional guarantees of a "thorough and efficient" system of education; the Supreme Court of Appeals reversed the trial court's judgment and remanded for the trial court to determine if the minimum standards were being met. Therefore, these cases do not support Judge Reese's broad remedy order.
In McDuffy v. Secretary of the Executive Office of Educ., supra, the Supreme Court of Massachusetts held that Massachusetts's system of funding public schools was unconstitutional. The court granted declaratory relief only. Today's main opinion of this Court quotes footnote 92 from McDuffy:
"We have concluded the current state of affairs falls short of the constitutional mandate. We shall presume at this time that the Commonwealth will fulfil its responsibility with respect to defining the specifics and the appropriate means to provide the constitutionally-required education."
McDuffy, 415 Mass. at 619 n. 92, 615 N.E.2d at 554 n. 92. The main opinion cites McDuffy for the proposition that "the judiciary has the power to fashion specific remedies if action by the other branches of government is ineffective, where deference is made to the legislature with a caveat." 713 So.2d at 881. However, in footnote 92, the Supreme Court of Massachusetts, in discussing the actions of state courts that have declared state educational systems unconstitutional, stated: "Ultimately, however, these courts left the task of defining the specifics of their State's educational systems to their legislative ... bodies." McDuffy, 415 Mass. at 619 n. 92, 615 N.E.2d at 554, n. 92. The note then discussed the Seattle and Edgewood cases and concluded:
"As did these courts, we have declared today the nature of the Commonwealth's duty to educate its children. We have concluded the current state of affairs falls short of the constitutional mandate. We shall presume at this time that the Commonwealth will fulfil its responsibility with respect to defining the specifics and the appropriate means to provide the constitutionally-required education."
McDuffy, 415 Mass. at 619 n. 92, 615 N.E.2d at 554 n. 92. Thus, footnote 92 indicates that the Supreme Court of Massachusetts followed the lead of other courts and decided not to intrude into policy questions. Moreover, that court concluded: "[T]hus we leave it to the magistrates [officials of the executive branch, e.g., the governor] and the Legislatures to define the precise nature of the task which they face in fulfilling their constitutional duty to educate our children today, and in the future." 415 Mass. at 620 n. 16, 615 N.E.2d at 555 n. 16. The opinion gives no support for the orders of Judge Reese.

IV. D. Denying Judicial Restraint
The majority opinion states that "[m]oreover, despite the American judiciary's understandable preference for restraint in this complex area of litigation, it routinely does in addressing the constitutionality of state statutory schemesformulate guidelines of varying specificity within which it essentially requires the legislature to operate." 713 So.2d at 881. However, the reason for judicial restraint is not solely the complexity of the case. More importantly, the courts lack the legislative authority to make policy decisions that have been constitutionally assigned to the executive and legislative branches. The problem is that the courts are not elected, nor are they appointed, to write legislation. The majority fails to deal with this fundamental tenet of our constitutional democracy. *918 Merely delaying the implementation of an unconstitutional court order for a year does not make that order any more constitutional. In fact, that very delay is a de facto retention of review by the circuit court of the act of the legislature. In other words, it is an attempt to hold the remedy order over the other two branches of government as a latent threat. Such a retention by the court of an "open-ended" "final word" is exactly what the Kentucky Supreme Court found objectionable in Rose.

V. Lack of Justiciability Because of the Absence of Truly Adverse Parties

V. A. The Facts
The majority claims that the fact that among the parties in this case were elected representatives of both the legislative branch and the executive branch of state government means that the interests represented were "inherently adverse" to each other. This is a gratuitous and unsupported assumption. How could their interests be "inherently adverse" when they so quickly agreed with each other? The interests of these different officials do not inherently conflict. Further, proper justiciability requires that the parties sufficiently represent the conflicting interests in the equity suit. A simple review of the procedural history of this case demonstrates that the parties did not adequately represent opposing interests.
The consolidated lawsuits were brought on May 3, 1990, by Alabama Coalition for Equity, Inc. (ACE), comprised of 25 school systems and a number of individual parents and schoolchildren. Plaintiffs Mary Harper, et al., a group of public schoolchildren, filed a complaint on January 19, 1991. The circuit court consolidated these cases. On April 21, 1992, the circuit court certified in the Harper action a statewide class of all children presently enrolled or to be enrolled in those public schools that provide less than a "minimally adequate education."
John Doe, a disabled student, and the Alabama Disabilities Advocacy Program moved to intervene, on August 3, 1990, and the circuit court granted this motion on January 9, 1991. On July 24, 1992, the circuit court certified a plaintiff subclass of all schoolchildren in Alabama with identified disabilities.
The named defendants were then Governor Guy Hunt, then State Director of Finance Robin Swift, then Lieutenant Governor James Folsom, Speaker of the House of Representatives James Clark, then State Superintendent of Education Wayne Teague, and the members of the Alabama State Board of Education (SBOE). However, Speaker Clark, Lieutenant Governor Folsom, State Superintendent Teague, and the SBOE moved in May and June 1990 to be realigned as plaintiffs, indicating that they agreed with the plaintiffs' claims. The circuit court granted these motions and the parties were so realigned.
On April 22, 1993, Governor Hunt was convicted of a felony and was removed from office. Lieutenant Governor Folsom became Governor. Governor Folsom appointed James White finance director, to replace Robin Swift. At this point, there were no true defendants left in the action. On May 28, 1993, Speaker Clark, State Superintendent of Education Teague, and the SBOE moved to be realigned as defendants. On June 8, 1993, Governor Folsom moved to be substituted as a defendant in the place of Governor Hunt.
On June 9, 1993, these parties jointly moved the trial court to certify as final the liability phase order. On that day the trial court certified the order as final and granted the motions for substitution, realignment, and certification. No appeal was taken from this final judgment. How could there have been? At that point there was not a single adverse party left in the action who was opposed to the plaintiffs' claims.
The trial court ordered the defendants, in cooperation with the plaintiffs and with Dr. J. Wayne Flynt, a court-appointed "facilitator," to develop a "single comprehensive Remedy Plan for the purpose of ensuring full and complete compliance with" the liability phase of the judgment. On July 14, 1993, the plaintiffs moved the court to substitute as a party defendant the presiding officer of the Senate, Senator Ryan deGraffenreid, who, pursuant to Ala. Const. 1901, § 51, and Amendment 57, had assumed the duties formerly *919 performed by Lieutenant Governor Folsom. The motion was granted on July 19, 1993.
On October 1, 1993, "defendants" Folsom, deGraffenreid, Clark, and White submitted a proposed "Remedy Plan" for the trial court's consideration. On October 22, 1993, the trial court issued an order incorporating the Remedy Plan, subject to notice to the class and subclass. The trial court scheduled a November 18, 1993, "fairness hearing," during which it proposed to entertain arguments from class counsel and from the parties relating to the fairness, reasonableness, and adequacy of the proposed Remedy Plan.
Two days before the scheduled "fairness hearing," Walter Anderton and others, purporting to represent "taxpayers and citizens" of Alabama, filed a "Motion for Leave to Intervene" in the action. Also, by a letter addressed to Judge Reese and by appearance of counsel at the fairness hearing, Joyce Pinto and others notified the trial court of their intent to intervene on behalf of "parents and public school students who had not been represented." The Pinto intervenors filed a "Complaint in Intervention" on December 8, 1993. On December 3, 1993, the trial court had issued an order that approved a modified form of the Remedy Plan. Judge Reese denied the Anderton and Pinto classes' motions to intervene. Pinto and Anderton appealed to this Court. In Pinto v. Alabama Coalition for Equity, 662 So.2d 894 (Ala.1995), this Court held that the Pinto intervenors were entitled to intervene as a matter of right in the remedy phase of the case.
The Pinto classes were certified by this court in its decision in Pinto:
"For example, few contemporary issues affect the citizens of Alabama as directly or as personally as the educationat taxpayers' expenseof future generations. It is undisputed that the persons who are presently parties to these actions have not identified the individuals Pinto and Anderton attempt to represent as constituting the distinct classes Pinto and Anderton have described. Thus, notwithstanding the protestations of the appellees, logic dictates that to allow these individuals to represent their respective classes could, and would, much more adequately serve their interests, as well as those of all Alabama citizens in this extraordinary litigation than would the present parties."
662 So.2d at 899. Pinto and Anderton cannot serve their interests or those of all Alabama citizens unless they are allowed "to represent their respective classes." For the sake of judicial economy, a reviewing court may determine whether the record supports the alleged class, and that is what this Court did in Pinto. See Caldwell v. Craighead, 432 F.2d 213, 216 (6th Cir.1970), cert. denied, 402 U.S. 953, 91 S.Ct. 1617, 29 L.Ed.2d 123 (1971) (based upon complaint); Locke v. Board of Public Instruction of Palm Beach County, 499 F.2d 359, 365 (5th Cir.1974) (based upon complaint); Johnson v. Mathews, 539 F.2d 1111, 1125 n. 23 (8th cir.1976); and Murphy v. Hiniker, 261 N.W.2d 836, 841 (Minn.1978). Thus, this Court itself certified the Pinto class in the earlier appeal, instead of remanding the case to the trial court for that determination.
While the earlier appeal was pending, Fob James was elected Governor; he took office on January 16, 1995. Governor James sought a writ of prohibition from this Court directing Judge Reese to vacate his orders and to exercise no further jurisdiction in this case. On April 10, 1995, this Court denied the petition, but noted that in regard to the remedy order the issues raised in the Governor's petition could be presented on appeal following the entry of a final order.
Circuit Court Judge Greenhaw took over the case after Judge Reese recused on August 23, 1995. Judge Greenhaw denied the appellants' request to overturn Judge Reese's order. However, she did so on the basis of this Court's response to the Legislature's request for an advisory opinion as to whether the Legislature was required to follow Judge Reese's order. I do not understand this Court's response to have addressed the substantive question. This Court simply said that a trial court's decision is legal until an appellate court modifies, stays, or overturns it. This Court did not consider whether the order violated the separation of powers doctrine. Opinion of the Justices No. 338, 624 So.2d 107 (Ala.1993.)
*920 This Court has not considered the substantive legal issues involved in this case. On February 24, 1995, the petitioners appealed Judge Reese's liability order to this Court. On April 10, 1995, this Court declined to hear the appeal. This Court denied review of the trial court's March 31, 1993, liability order, claiming there was no timely appeal. Judge Greenhaw made the remedy orders of October 22, 1993, and December 3, 1993, final on October 6, 1995. The Governor filed a timely appeal from those orders.
A case or controversy ceased to exist when Governor Hunt was removed as a defendant 22 days after the liability order was issued. He was replaced by operation of lawthe plaintiff/Lieutenant Governor became defendant/Governor. All of the other defendants had been previously aligned as plaintiffs. Thus, the requisite adverseness required for justiciability was lacking, and the trial court could take no further action until a new defendant entered the case. The trial court refused attempts by valid partiesPinto and Andertonto intervene.
There was not a justiciable controversy before the circuit court, because there was no true defendant. The court should look at what the party is in reality, not what the party has been styled in the court proceedings. Blanchard v. Beach Co., 150 N.J.Super. 277, 375 A.2d 675, 685, cert. denied, 75 N.J. 528, 384 A.2d 507 (1977). A party may be a plaintiff in reality even though styled as a defendant. Sanders v. Fuller, 45 Cal. App.3d 994, 119 Cal.Rptr. 902 (1975). "The word `defendant' as used in legal controversies implies an attitude of defense; such person need only stand and repel assaults of [an] adversary." Henderson v. Applegate, 203 S.W.2d 548, 552 (Tex.Civ.App.1947). See also Latta v. Wiley, 92 S.W. 433, 437 (Tex. Civ.App.1906).
Under Alabama caselaw, a judgment is void if the court that rendered it lacked jurisdiction of the subject matter, or of the parties, or if the court rendered a judgment inconsistent with due process. Smith v. Clark, 468 So.2d 138, 141 (Ala.1985). The Circuit Court of Montgomery County lacked personal jurisdiction over the members of the Alabama Legislature, who, as a body, are the only ones with the constitutional authority to correct any deficiencies in Alabama's public school system. The lieutenant governor and the speaker of the house do not have authority to act on their own and alter the system of government of the State of Alabama. The circuit court also lacked jurisdiction over 85% of the affected students and almost all of the parents of school students whom the Pinto intervenors represent. The circuit court further lacked jurisdiction over the 100 + public school systems that are not a part of the Alabama Coalition for Equity, but that are clearly affected by this litigation.

VI. The Appearance of Judicial Bias
Judge Reese recused himself from further consideration of this case after the Alabama Judicial Inquiry Commission determined that his use of the case in a campaign for a seat on this Court created the appearance of a conflict of interest. While I believe that the decisions of Judge Greenhaw have ratified the decisions of Judge Reese and thereby removed any taint from his orders, the sequence of events is too important for understanding the outcome in this case not to retell them.
A case that has a direct application to Judge Reese's conduct is United States v. Cooley, 1 F.3d 985 (10th Cir.1993). In Cooley, a federal judge had issued an injunction against defendants blocking abortion clinics. The defendants continued to block abortion clinics and were convicted in that federal judge's court for interfering with the performance of United States marshals, who were attempting to keep the clinic open. The circuit court reversed the convictions on the grounds that the district judge had disqualified himself by making remarks on Nightline, a television news program. The program aired after the defendants had been arrested and before their trial. The court stated that under 28 U.S.C. § 455(a): "A judge has a continuing duty to recuse before, during, or, in some circumstances, after a proceeding, if the judge concludes that sufficient factual grounds exist to cause an objective observer reasonably to question the judge's impartiality." 1 F.3d at 992. (Emphasis added.)
*921 The conduct of Judge Reese went far beyond going on television and commenting on the case before him. Judge Reese's campaign commercials and literature in his race for a Supreme Court seat stated that he was a "judge for education reform" and that he was a "tough judge" who "became famous for ruling Alabama's education system unconstitutional and telling a Governor and the Legislature to fix the problem." Judge Reese's commercials stated that he had the courage to "stand up to a Governor and rule Alabama's education system unconstitutional" and that he "order[ed] the Legislature back to work when they wanted to delay education reform."
The campaign conduct of Judge Reese draws into question the impartiality of the entire judicial proceedings in this case. In its opinion of August 18, 1995, the Judicial Inquiry Commission of the State of Alabama concluded that the campaign conduct of Judge Reese "indicat[ed] a reasonable basis for the appearance of partiality," and that his disqualification was required.
One of the ways the main opinion avoids the issue of Judge Reese's judicial bias is by stating that the Liability Phase and the Remedy Phase were not accompanied by conduct evidencing actual bias. However, Judge Reese repeatedly refused to allow the Pinto class to intervene, and it was this refusal that created the circumstance of having no adverse parties before the trial court after Governor Folsom replaced Governor Hunt. Judge Reese denied the Pinto class the opportunity to present evidence at the fairness hearing on the Remedy Plan held on November 18, 1993. The Pinto class was a party that has indicated it would have directly challenged Reese's order.
He also appeared at an event at which he was publicly honored for his ruling. The event was sponsored by a party to the pending litigation. In 1993, prior to the entry of the Remedy Order, Judge Reese attended the Alabama PTA 1993 annual convention in Huntsville. Dr. Wayne Teague, a party defendant/plaintiff and State Superintendent of Education, introduced Judge Reese, read excerpts from his Liability Order, and praised both to a standing ovation.
The Birmingham News article reporting the event stated:
"`I feel like I'm giving a book review before the author,' Teague told Reese who, in an unusual move for a presiding judge in an ongoing case, had agreed earlier in the week to appear before the convention as its honored guest.
"Then Teague proceeded to read aloud passages from the ruling, stopping along the way to praise particular sections as well as Reese.
"Twice the crowd of about 300 parents broke applause for not only a certain passage but for an increasingly uncomfortable-looking, although grateful Reese.
"When Teague was finished he asked the audience to show its appreciation for the ruling and for Reese. They enthusiastically responded with a standing ovation which visibly moved the judge but also made him visibly uneasy."
Birmingham News, April 17, 1993, p. 1A. The PTA actively campaigned for the implementation of the proposed remedy plan. Judge Reese campaigned and commented on this case during the 1994 race, at the same time he was overseeing this litigation. This created the appearance that this case was a political tool Judge Reese manipulated to his advantage.
The main opinion explains away Judge Reese's use of this case as a campaign tool by saying that the motion for recusal was not made until after the campaign activities. However, the only reason a recusal motion was not made earlier was Judge Reese's refusal to allow a truly adverse party to intervene in this case. Once adverse parties appeared before Judge Reese, they moved for recusal. The lack of a motion for recusal is evidence of his bias, not an excuse for absolving him of his improper conduct in this case.
Judge Reese issued his liability order on March 31, 1993, and his remedy order on December 3, 1993, before his campaign commercial was aired. This does not mean that his campaign conduct was irrelevant. If not for Judge Greenhaw's ratification of the orders, his conduct would still taint them because *922 it is reasonable to believe that he used the case for a planned future campaign. The commercial, viewed by any reasonable person, gives the appearance that his motive in issuing the orders was to aid him in his planned race for the Alabama Supreme Court. The orders were tainted by the fact that it appears he was campaigning for office when he issued his orders and by the manner in which he issued them.

VII. Conclusion
There are other problems with this case. In order not to make this writing any longer, I will not discuss them fully. There was an improper certification of the classes, because the trial judge failed to comply with Rowan v. First Bank of Boaz, 476 So.2d 44 (Ala. 1985). At a minimum, the order should identify each of the four elements of Rule 23(a), Ala.R.Civ.P., and explain how the proponents of the class have met their burden of proving those elements.
The Remedy Plan mandates that one education methodology be uniformly implemented throughout the StatePerformance-Based Education or Outcome-Based Education. The Pinto intervenors argue that this method would decrease the quality of the education students are now receiving and thereby violate the parental right to direct the education of their children and students' rights to adequate educational opportunities. The Alabama Legislature has twice rejected such an experimental, psychology-oriented methodology. It is the right of parents, not one trial judge, to direct the upbringing of their children.
Rule 4.3(d)(3), Ala.R.Civ.P., requires that a proposed settlement of a class action be published at least once a week for four successive weeks. The trial court did not follow this procedure. In this case, notice of the proposed settlement was published three times in only nine days. This publication schedule goes against the spirit and the letter of the rule. The first publication date was Sunday, October 31, 1993. The second notice was published on Thursday, November 4, 1993. The third notice was published only four days later on Monday, November 8, 1993. At best, publication of the notice took place over a two-week period.
The trial court fashioned a broad and far-reaching remedy plan that included directing the State of Alabama's spending on education, directing the means of obtaining financial support for that spending, and directing the education policies of the State of Alabama. The Remedy Plan goes far beyond anything any other court in this nation has done or has attempted to do and is without any basis in law or precedent. In fact, the Constitution of Alabama, the caselaw of Alabama, the caselaw of other states, and federal caselaw all clearly forbid such broad intervention into the policy-making roles of the legislative and executive branches.
The majority attempts to make an unconstitutional court order constitutional by delaying its implementation for a year. Mere time will not legitimate the trial court's Remedy Plan. What will the circuit court and this Court do if the legislative and executive branches fail to meet the compliance deadline of one year? The courts cannot make policy and arbitrarily dictate obedience by the legislative and executive branches. This Court fails to do its duty if it does not address these fundamental legal and constitutional questions. The legal questions presented by this case are far too important to be left unanswered.
The courts must maintain public confidence in the judicial system. The moral authority of courts is an essential part of the foundation upon which the American legal system operates. Courts do not enact laws; they do not command a police force. A court's word, without accompanying coercion or force, must command obedience by legal, moral, and logical suasion, or it loses its authority. The judicial misconduct and abuse of authority that have taken place in this case undermine public confidence in the judicial system. I understand the desperation many people feel about the quality of Alabama's educational system. However, considering all the problems surrounding this case and the serious errors of these orders, how could anyone believe that these orders will result in anything but chaos and perhaps *923 outright revolt? "A good tree cannot bring forth evil fruit, neither can a corrupt tree bring forth good fruit. Every tree that bringeth not forth good fruit is hewn down, and cast into the fire."[15] The citizens of Alabama will be forced to eat that fruit, fruit that the judiciary has foisted upon them.
I am shocked at the brazen dictatorial statement of these orders and the suspicious procedure by which this case, of such great import to this state, was adjudicated. I question whether one can say that it was adjudicated. The circuit court's orders strike a blow against so many fundamental tenets that they threaten the rule of law itself. One trial court judge cannot and should not attempt to rule the state's education system. The legal questions in this case will not go away. Once the trial court attempts to enforce its will upon the legislative and executive branches, this case will surely come before this Court again. I am highly disappointed that this Court decided not to settle the legal questions presented by this case. For the above-stated reasons, I must dissent.

APPENDIX TO CHIEF JUSTICE HOOPER'S DISSENT:

THE REMEDY ORDER, DECEMBER 3, 1993
"The defendants, acting through appropriate State officers, officials, commissions and agencies are hereby ordered to implement the following plan to remedy the Constitutional and statutory deficiencies in the system of public education in the State of Alabama. This plan operates from the following assumptions:
"a. All Alabama students can learn at significantly higher levels.
"b. The knowledge exists to help all Alabama students learn at significantly higher levels.
"c. The diversity, including racial and ethnic, that parents, teachers, and students bring to Alabama's education system must be respected, and all education must be provided in an atmosphere free from prejudice of whatever variety.
"d. All learning environments in the state must be safe, sanitary, conducive to learning, and have adequate resources.
"e. Teachers, provided with necessary support, are key to school success.
"f. All special education needs, including the needs of students with disabilities, must be addressed.
"g. A partnership among educators, students, families, businesses, and communities is necessary for students to achieve educational success.
"Any Commission, Task Force or similar entity established or given authority to develop or implement this Order shall be representative of the State population in terms of race, gender and geography, and shall include members with knowledge of and sensitivity to the needs of students with disabilities.
"The system must include the following components in order to provide equitable and adequate educational opportunities for all Alabama school children. Each of the following components must be put into place through the development and implementation of specific plans, legislation and policies adopted to fulfill the requirements of this Order. Such plans, legislation, and policies set forth pursuant to this Order shall be subject to the monitoring procedures of this Order.

"I. THE PUBLIC SCHOOL SYSTEM MUST BE PERFORMANCE BASED.

"A. Student Performance Standards

"The public school system must enable students to develop the capacities that are the products of an adequate education. Students with disabilities who need special education services shall be provided with the opportunity to acquire the same capacities identified herein. This system shall be performance-based and must equip the students with at least the following capacities.
"Sufficient oral and written communication skills to function in Alabama and at national and international levels.

*924 "Sufficient mathematical and scientific skills to function in Alabama and at national and international levels.
"Sufficient knowledge of economic, social and political systems generally, and of the history, politics, and social structure of Alabama and the United States specifically, to enable the students to make informed choices.
"Sufficient understanding of governmental processes and of basic civic institutions to enable the student to understand and contribute to the issues that affect his or her community, state, and nation.
"Sufficient self-knowledge and knowledge of principles of health and mental hygiene to enable the student to monitor and contribute to his or her own physical and mental well-being.
"Sufficient understanding of the arts to enable each student to appreciate his or her cultural heritage and the cultural heritage of others.
"Sufficient training, or preparation for advanced training, in academic or vocational skills, and sufficient guidance to enable each child to choose and pursue life's work intelligently.
"Sufficient levels of academic or vocational skills to enable public school students to compete favorably with their counterparts in Alabama, in surrounding states, across the nation, and throughout the world in academics or in the job market.
"Sufficient support and guidance so that every student feels a sense of self-worth and ability to achieve, and so that every student is encouraged to live up to his or her full human potential.
"These standards apply to all students including students with disabilities. The methods of instruction for such students may differ and appropriate modifications in a student's Individualized Education Plan (IEP) may require some modifications in the application of these standards to students with significant cognitive disabilities.
"Student learning goals reflecting the capacities listed above shall be developed and student performance objectives, based on these learning goals, shall be established in order to enumerate more specifically what each Alabama student needs to know and be able to do in terms that will be measurable. The learning goals and student performance objectives shall be completed and submitted to the Court no later than six months from the date of this Order. Parties shall have 60 days from the submission of these goals and objectives to file objections with the Court.
"Within six months of the promulgation of statewide learning goals and performance objectives, the principal and staff of each school, in consultation with parents, students and other community members, shall develop a school level plan for teaching their students what they must know and be able to do, consistent with the statewide goals and objectives. Assistance in developing these plans shall be available from the State Department of Education and local systems and the plans shall be updated periodically.
"Student learning goals and student performance objectives shall be translated into courses of study which will identify what students should know and be able to do, but not how they will be correlated with the student performance objectives described hereinabove. The learning goals, performance objectives, and courses of study called for in this Plan shall be re-examined no less frequently than once every six years to update them as appropriate.
"The learning goals and performance objectives shall also include curriculum and learning experiences designed to prepare secondary students for future education, career opportunities and active citizenship. A state-wide long range plan shall be developed for secondary education which incorporates a high level common core academic curriculum for all students. The state plan shall not require that schools be held to any one model, but the performance objectives shall be clearly defined and become the focus of each school's program.
"The secondary program shall ensure that all secondary students are provided with a high-level common core academic curriculum, including academically rigorous material in science, mathematics, English, foreign languages, the arts, social studies, and work preparation skills throughout the secondary *925 years, and support to stay in school and take advantage of that curriculum. In addition, the secondary program shall ensure that students have access to advanced courses and learning experiences in enriched arts and sciences and high skill occupationally oriented fields. Schools shall not track students, relegate particular students to a general track of undemanding courses or design course work that forecloses educational and occupational options. Programs shall not result in de facto tracking and shall include safeguards to ensure that factors such as socioeconomic status, race, gender, and disability do not limit or determine students' post-high school pursuits.
"Defendants shall provide transition services and supports for each student with a disability in the State of Alabama. To implement this requirement, a transition plan shall be immediately developed for each student with a disability age 16 or older, and younger students if necessary, as part of their IEP. Transition services shall be provided, when appropriate, until a student receives a high school diploma or reaches age 21. Students with disabilities shall have an opportunity, consistent with their IEP, to acquire specific skills within appropriate community settings and to generalize skills to a variety of home and community settings in which the skills typically would occur. Nothing in this order requiring transition services to be community-based shall be interpreted as eliminating a student's participation in general education classes and school activities during the middle and high school years. Students with disabilities shall have access and regularly structured opportunities to interact with age-appropriate peers throughout the program day in pursuing their transition goals. Students with severe cognitive disabilities who meet their IEP goals shall be permitted to participate in graduation without affecting their eligibility for post-high-school transition services.
"For students with cognitive disabilities, secondary schools shall provide appropriate transition services and life skill services in order to ensure meaningful post-secondary educational and vocational opportunities. Such transition services shall be consistent with the transition services described hereinabove. Students with cognitive disabilities shall be taught economic, social, and self-help skills in environments which are the same as those in which they shall perform those skills. Students with disabilities must be part of the comprehensive education process in this Plan.
"Defendants shall submit a secondary program plan to the Court within 18 months from the date of the Court's remedy order. Parties shall have 60 days from its submission to file objections with the Court.
"Assessment strategies which are related to the student performance objectives and which are performance based shall be developed to measure whether students are attaining the capacities set forth herein. In developing these assessment strategies, accommodations may be necessary to allow all students, including students with disabilities, to demonstrate their competence. The new assessment system shall be developed on a timeline in which assessment strategies are implemented as they become available. The assessment system shall be completed no later than six years from the date of the Court's remedy order.
"The assessment strategies shall not be used in such a way as to reward schools for drop-outs, for unwarranted retentions, suspensions, or expulsions or for inappropriate special education placements and shall be monitored for validity, reliability and absence of racial, cultural and gender bias.
"Graduation and promotion criteria for students shall be examined and standards established based on the acquisition of the nine capacities described herein. The new graduation and promotion requirements for students will be phased in as this plan is implemented, and as schools receive adequate resources to make such requirements appropriate. Defendants shall submit these new graduation and promotion requirements to the Court no later than 24 months from the date of this Court's Order. Parties shall have 60 days from the submission of these requirements to file objections with the Court.

*926 "B. Educator Performance Standards

"Educator performance standards shall be established and these standards shall form the basis for pre-service education, certification, and in-service education. The educator performance standards will define what educators need to know and be able to do to succeed with all students. These educator standards shall be related to and based upon the student performance standards.
"The standards shall reflect high expectations of educators, including the expectation that educators must be able to effectively deliver services to students from widely diverse groups and with differing learning styles, ability levels and individual needs, including students with disabilities, and the expectation that educators must understand and respect the diverse racial, ethnic, and cultural backgrounds of Alabama's children. Defendants shall submit these educator standards to the Court no later than 18 months after student learning goals have been adopted. Parties shall have 60 days from the submission of these standards to file objections with the Court.
"The policies currently utilized to grant waivers for teachers not certified must be reviewed to ensure that waivers are not awarded in the place of diligent and exhaustive efforts to locate and employ properly certified teachers. This review must include an analysis of the current imposition of fines and sanctions relating to waivers and include recommendations to increase the effectiveness of those fines and sanctions.
"Appropriate performance-based assessment strategies shall be developed based on the educator performance standards described herein. These strategies shall be in place as soon as possible, but no later than five years following the identification of the educator performance standards.

"II. THE SYSTEM MUST INCORPORATE MECHANISMS TO ENSURE ACCOUNTABILITY AT ALL LEVELS.
"A system of school rewards for successful performance and assistance and penalties for unsuccessful performance shall be established for successful and unsuccessful school performance. Schools shall be provided with adequate resources and with the authority necessary to achieve the results for which they are to be held accountable. Rewards, assistance and penalties shall be determined based upon the increasing or decreasing proportion of successful students within a school and the progress of students toward successful performance. School success shall be defined in terms of the student achievement of the student learning goals and student performance objectives described hereinabove. Students with disabilities, including students with cognitive disabilities, shall participate fully in the assessment and accountability systems so that schools will have a strong incentive to increase the success of these students. Other components of school success shall be appropriate non-cognitive indicators such as graduation rate, drop-out rate, unwarranted retentions, suspensions and expulsions, and other similar factors. The accountability system shall also incorporate an assessment of the school's implementation of the components of this plan.
"The accountability system shall be designed in such a way that all schools have the opportunity to succeed and will not involve comparisons of one school with another. For accountability purposes the system shall recognize that schools begin from different starting points and face different challenges. Expectations of school performance shall be rigorous and shall increase every year. Achievement thresholds shall reflect the anticipation of both an increase in the proportion of satisfactorily performing students and a decrease in the proportion of lowest performing students. The accountability system shall take account of the special needs of at-risk students to ensure that they are part of the increasing proportion of successful students. The accountability system shall be monitored to ensure that it rewards performance, rather than wealth or any other non-performance factors. The accountability system shall be designed to provide schools that fail to meet their performance thresholds with appropriate technical assistance and support, and to include a reasonable time for local school boards and superintendents to assist schools in correcting performance problems prior to any state takeover of a school, along with a mechanism for local school boards to petition the State Board of *927 Education to return a school to local control after a reasonable period.
"The system of accountability shall require accountability of, and include mechanisms to assure adequate performance by, all levels of Alabama's public education system including the State Department of Education, local systems, schools, and educators, consistent with the authority and responsibility assigned to each level.
"Defendants shall submit an accountability system to the Court within 12 months from the date of the Court's remedy order. Parties shall have 60 days from the submission of the accountability system to file objections with the Court.

"III. PRINCIPALS, TEACHERS AND PARENTS MUST HAVE A MAJOR ROLE IN INSTRUCTIONAL DECISIONS.
"Principals, teachers and parents shall have the authority to participate in school-based decision-making relating to curriculum and instructional practices. An opportunity shall also be provided for input from the public and private sector, including students. Principals, teachers, and parents shall have significant input into the selection of faculty and staff and budgetary decisions.
"Plans for involvement of school staff and the community at large in the decision-making process shall be developed at the local school level. The implementation and effectiveness of those plans will be one of the factors considered in determining school success or failure for accountability purposes as set forth in section II hereinabove.
"Defendants shall submit specific guidelines governing these local plans to the Court within six months of the date of the Court's remedy order. Parties shall have 45 days from the date of the submission of these guidelines to file objections with the Court. These guidelines shall require that all schools receive appropriate training in school-based decision-making and shall provide that any school shall participate in school based decision-making when 60% of voting certificated school staff vote to do so and have received appropriate training. After five years from entry of this Order, any school shall participate in school based decision-making when 51% of voting certificated school staff vote to do so, and have received appropriate training. All voting provided for herein shall be by secret ballot. No school or school board shall subject school staff to direct or indirect coercion to vote for or against school-based decision-making. The guidelines shall establish the voting procedures contemplated by this section. All schools in Alabama shall be subject to all of the provisions of the accountability system created herein or created by the defendants' implementation of this Order.
"The State Department of Education shall restructure itself consistent with this Plan's emphasis on decentralization of authority, regulatory relief, and a primary focus at the state level on leadership and service rather than governance. Regulatory relief shall include reduction in paperwork at all levels in the statewide system.

"IV. SCHOOL STAFF MUST BE PROVIDED WITH STAFF DEVELOPMENT OPPORTUNITIES, INSTRUCTIONAL SUPPORT AND REASONABLE COMPENSATION.
"This plan contemplates substantial additional staff development; accordingly, a coordinated staff development program shall be planned and implemented. This staff development shall incorporate training for teachers, for principals, administrators and others in leadership roles in the systems. The training programs shall be of the intensity and duration necessary for educators and others to meet the new standards and shall reflect new management and organization practices such as high performance management and total quality management to produce high performance schools and systems.
"With respect to students with disabilities, such training initiatives shall require training for regular education teachers, special education teachers, teachers' aides, principals, administrators, and shall make training available for parents and students, on the topic of instruction in the regular classroom, collaborative teaming and problem solving including positive behavioral support strategies, among other topics more specifically described in the special education section of this document.
*928 "Defendants shall submit a staff development and leadership training plan to the Court within six months from the date of the Court's remedy order. Defendants shall develop and implement a plan under which an increasing proportion of funds for staff development and leadership training goes directly to schools and school systems. Parties shall have 45 days from the submission of the plan to file objections with the Court.
"Sufficient extra staff days shall be provided to enable educators to meet the new responsibilities required of them under this Section. Schools shall be permitted flexibility in determining how these extra days are used. Defendants shall submit a plan for providing educators with extra staff days to the Court no later than 12 months after student learning goals have been adopted. Parties shall have 60 days from the submission of the plan to file objections with the Court.
"Compensation shall be provided to Alabama teachers at levels sufficient to attract and retain persons capable of effectively helping students reach high levels of achievement. To that end, a compensation study shall be undertaken to consider emerging approaches to compensation, interdistrict inequities and the adequacy of compensation from a regional and a national perspective.
"All students shall be provided with adequate instruction and instructional support, including, but not limited to, appropriate student teacher ratios, adequate guidance, health, and library services and adequate clerical and other support staff. Minimum standards shall be set consistent with appropriate national or regional standards.
"Defendants shall submit the standards they develop to the Court within six months of the date of the Court's remedy order. Parties shall have 45 days from their submission to file objections with the Court.
"Schools shall also implement special programs to assist beginning teachers such as teacher mentoring programs and other similar efforts. In addition, in order to provide all teachers with additional support, a core group of knowledgeable and effective in-house staff shall be used in each school to provide support and assistance to a teacher and/or a parent confronted with a child having significant learning problems. These teacher assistance teams will provide a building-based support system for teachers and parents. Defendants shall submit the plan covering these areas to the Court within six months from the date of the Court's remedy order. Parties shall have 45 days from its submission to file objections with the Court.
"Other required instructional services and support to be provided will include extended structured learning opportunities for students who are experiencing difficulty achieving the student performance objectives. In addition, targeted compensatory assistance to provide or expand effective instructional programs to improve student performance, prevent drop-outs, and prepare graduates for work or higher education shall be provided. These programs are intended for students at the secondary level who have previously been denied the knowledge and skills necessary for college, other post-secondary education or career path employment. All at-risk* [fn. *: `At-risk' as used herein means students eligible for free or reduced priced meals.] students in grades K-3 and at-risk students failing to meet the student performance objectives in grades 4-12 shall be provided with effective educational programs with a research basis confirming their success in bringing such students to high levels of achievement, e.g., Success for All, Reading Recovery. Defendants shall submit a plan for providing extended structured learning opportunities, targeted compensated programs, and effective educational programs to the Court within six months of the date of the Court's order. Parties shall have 45 days from submission of this plan to file objections with the Court.

"V. SIGNIFICANT NON-SCHOOL BARRIERS TO LEARNING MUST BE ADDRESSED AND MINIMIZED.
"Barriers to learning resulting from student health needs and family dysfunction shall be minimized. Schools, working with relevant segments of the community, shall identify the particular barriers to learning that affect their school population and the best ways to minimize those barriers. State *929 and local interagency strategies shall be developed and implemented to provide identified health and social services whenever possible. A state plan shall be developed and implemented that minimizes the degree to which health problems, malnutrition, abuse and neglect, and lack of basic necessities (e.g. housing, clothing) interfere with students' access to an adequate and equitable education. The state plan shall include funding to assist students in elementary and secondary schools and to provide an operating budget and staffing based on the number of at risk students in the school. Defendants shall submit the plan for minimizing non-school learning barriers to the Court one year from the date of this Order. Parties shall have 60 days from the plan's submission to file objections with the Court.
"All schools which are eligible for a school breakfast program shall implement one. Individual schools may file a request with the State Department of Education to be exempted from this requirement. Any requested exemption for any school from this requirement may be submitted to the Court, at its discretion, by the SDE, and the parties shall have the opportunity to object.
"Parental involvement programs shall be established in all schools and parental education programs shall be provided for parents of disadvantaged students in grades K through 3.

"VI. EARLY CHILDHOOD PROGRAMS MUST BE PROVIDED FOR CERTAIN POPULATIONS.
"An early childhood education development program shall be developed and implemented to supplement Head Start to provide services to disadvantaged four-year olds. At a minimum, all children who meet the eligibility criteria for `Head Start' or `Even Start' programs shall be served by this program. Defendants shall submit a plan for implementing this program to the Court within six months of the date of the Court's remedy order. Parties shall have 45 days from the plan's submission to file objections with the Court.
"Preschool services for three to five year olds shall be provided for children with disabilities. These services may be provided in a variety of settings including, but not limited to, existing day care, `Head Start,' and the public or private preschool programs.

"VII. THE SYSTEM'S INFRASTRUCTURE MUST BE SOUND.

"A. Buildings

"All students in the state shall be provided with school facilities that are conducive to an effective teaching and learning environment. School buildings shall be safe and shall have adequate space, heating and air conditioning.
"All instruction, including instruction for special education students, shall occur in classrooms or other appropriate instructional spaces that are of suitable size and format for the instruction that occurs in them. Schools shall have adequate science laboratories, and facilities and equipment for computer and foreign language instruction; administrative offices; sick rooms or infirmaries; auditoriums; gymnasiums; cafeterias; athletic facilities and playgrounds, as age-appropriate; music, art, and drama facilities; and vocational facilities. Schools shall have school libraries and media spaces that are appropriate in size, equipment, lighting and materials for the number and age range of their students.
"Schools shall have appropriate maintenance services that provide for systematic repair and care of the site, buildings and equipment. School buildings and grounds shall be clean, safe and sanitary. Bathroom supplies, including soap, paper towels and toilet paper shall be available in adequate supply at all schools.

"B. Transportation

"All students who meet reasonable State distance requirements shall be provided with free transportation, without regard to whether the student attends school in a city or county system. Transportation shall be in buses that are safe and well-maintained, and shall bring students to school in time for the beginning of their educational day, including the school breakfast program, and not require them to leave before the day is concluded. Regulations shall be developed and implemented establishing reasonable maximum travel time for students, travel distance *930 limitations, and provision for waiver of state distance requirements in cases involving health or safety concerns. Bus transfers shall take place only at schools or other supervised sites. Provision shall be made for accessible transportation for students with disabilities to ensure that these students have equal access to services, programs, and activities provided by the local school system as students without disabilities. The requirements and regulations referenced above shall be submitted to the Court within six months of the date of the Court's remedy order. Parties shall have 45 days from their submission to file objections with the Court.
"All buses now in use that were built before 1977 shall be replaced immediately. State funds shall be provided for this purpose. In addition a schedule of replacement shall be developed to replace buses as appropriate each year thereafter so that the school bus fleet continues at a minimum to meet Department of Transportation safety standards. Provisions shall also be made for adequate ongoing maintenance and repair of the buses in each system.

"C. Textbooks, Instructional Materials and Supplies

"All students in the state shall be provided with adequate textbooks and other instructional supplies for use in their education. As used herein, the term instructional supplies includes library books and media resources, science equipment, classroom furniture, audiovisual equipment, maps and globes, blackboards, art and music supplies, related aids and services, including adaptive devices and assistive technology devices and other educational materials. For textbooks to be adequate, every student must have his or her own copy of any assigned textbook of reasonable age and condition. Schools shall be free to use money allocated for textbooks for other appropriate kinds of books, software and other technology-related materials, and other curricular materials.
"In meeting these requirements, the State shall provide an infusion of catch-up funds to bring school systems up to a level of adequacy in all of these areas. Priority shall be given to those schools and school systems with the greatest needs. Defendants shall submit a plan for the distribution of catch-up funds within 12 months of the date of this Court's order. Parties shall have 60 days from the submission of the plan to file objections with the Court. It should not be necessary for teachers to make personal expenditures to provide books and instructional materials and supplies. Fundraising shall not be conducted during the school day.

"VIII. TECHNOLOGY SHALL BE USED TO RAISE STUDENT AND TEACHER PRODUCTIVITY AND EXPAND ACCESS TO LEARNING.
"A comprehensive integrated plan shall be developed and implemented which focuses on the use of technology for classroom learning, assistive technology, a sound information management system, distance learning, staff development purposes, software development, support for information access, and computer exchange of information. The plan shall also address training for teachers to use technology for instructional purposes, software applications and the maintenance implications of large increases in technology. This plan shall be submitted to the Court within six months of the date of the Court's remedy order. Parties shall have 45 days from its submission to file objections with the Court.

"IX. SPECIAL EDUCATION SHALL BE A PART OF AN INCLUSIVE SYSTEM OF EDUCATION.
"Defendants shall establish and implement a system of special education services and supports for students with disabilities which: provides for instruction and services in a variety of instructional environments (including those outside the school), and provides for modifications of those environments when necessary; supports the provision of special and regular instruction in the regular class with supplementary aids and services in the school the student would normally attend if not disabled unless the services required in the IEP cannot be provided in that environment; carries out modifications and adaptations in curriculum, program of study, and assessments to accommodate identified needs; makes available the assistive technology necessary to assist students in attaining their educational goals; makes *931 available special education administrative expertise to ensure the implementation of necessary services at the building level, while assuring that the accountability for provision of those services is assigned to the school; ensures that students with cognitive disabilities are taught academic, economic, social and self-help skills in appropriate environments (i.e. those that provide the opportunity for the student to perform these skills in age appropriate settings, including job sites, community-based instructional settings, and recreation and social settings); and makes available training for regular education teachers, special education teachers, teachers' aides, principals, administrators, parents and students, on the topic of instruction in the regular classroom, including positive behavioral support strategies.
"The State Department of Education (SDE) shall be enabled to carry out its responsibilities and held accountable for doing so. The SDE shall have sufficient staff, resources and authority to perform properly the functions assigned to it. The Defendants shall review every method of administration used by the SDE to provide program support including, but not limited to, monitoring and enforcement, investigation and resolution of complaints, preparation and selection of due process hearing officers, provision of technical assistance, comprehensive system of personnel development, support of transportation of students with disabilities, facilities planning, review of local applications, and administration of funds.
"SDE staff shall receive the training to provide the leadership and support necessary to carry out the new roles and responsibilities in this Order. Training shall include activities and materials sufficient to acquire knowledge and skills in all substantive areas covered in this Order. Communicating this Order will require the acquisition of many new skills and roles. Training shall include at a minimum assessments, instructional support, curriculum adaptation, inclusion and new methods of administration. SDE staff shall be involved in determining training needs.
"With respect to the provision of education to students with disabilities, such training will be provided by individuals who have experience, qualifications and expertise in the following areas: (1) the operation and administration of schools which provide services to students in integrated instructional environments including scheduling to support collaborative teaming, building-wide leadership, related staff training, and appropriate [health] and safety policies; (2) the rationale and benefits of inclusive education; and (3) training teachers and staff in the strengths and weaknesses of persons with disabilities, the methods for supporting instruction to children with disabilities in the regular classroom, strategies for developing and implementing collaborative service delivery, providing related services in integrated environments, developing community based instruction and school to work transitions, and positive support strategies and functional assessment of problem behavior.
"Special education is an integral part of all activities in this plan. Because of the unique challenges confronted by students with disabilities and the professionals who serve them, several specific activities shall be carried out. The SDE is responsible for exercising supervisory authority over all special education programs administered with the state. In order to ensure that each student with a disability receives an appropriate education which meets all state and federal standards, the following responsibilities shall be carried out: the establishment and implementation of policy, program evaluation, the review and approval of Local Education Agency (LEA) applications, the investigation and resolution of complaints, the dissemination and adoption of promising practices, the provision of technical assistance, the correction of identified deficiencies, the dissemination of information on program requirements, the utilization of appropriate methods to administer funds, the enforcement of all legal obligations and the implementation of a comprehensive system of personnel development for administrators, teachers and related service personnel.
"The comprehensive system of personnel development shall include at a minimum: the rationale and benefits of inclusive education, the strengths and weaknesses of persons *932 with disabilities, the methods for supporting instruction to children with disabilities in the regular classroom, strategies for developing and implementing collaborative service delivery, providing related services in integrated environments, community based instruction and transition to work strategies, and positive support strategies and functional assessment of problem behavior.
"The Defendants shall develop a plan to prevent incorrect designation of students as needing, or as not needing, special education programs, and to prevent the misclassification of students within special education programs and categories, with special attention to ensuring that race is not a factor in identification and classification decisions.
"The SDE shall undertake a statewide training and technical assistance initiative to eliminate any unnecessary identification of students as being in need of special education. In carrying out this initiative, the State shall: Identify any school systems identifying greater than 12% as part of their annual child count, review the records of identified students in the schools to determine whether or not assessments are appropriate, complete and meet state standards. On the basis of this determination, the SDE shall provide training for all relevant staff designed to remedy the problems identified. At a minimum the training shall include: the proper and effective use of teacher assistance teams and mentor staff, and procedures and methods for assisting teachers in providing appropriate and specialized instruction prior to referral for special education. The training shall also include the process of making eligibility determinations including specific consideration of the student who has one or more disabilities, situations where one or more of the disabilities adversely affects educational performance, and situations where the adverse effect on educational performance cannot be effectively addressed if the student is provided with special education and/or related services.
"Defendants shall ensure that in developing its LEA plan for special education, each school system shall design and implement, in consultation with parents, a comprehensive system of educational services that will result, to the maximum extent possible, in all students, including students with disabilities, participating in the regular classroom. At the building level, services shall be used to avoid inappropriate use of special education resources.
"A school system has complied with this LEA plan requirement if it has carried out the requirements of this Order and the plan meets the following criteria: the system follows all state eligibility standards for special education; the system provides early education services to all eligible children with disabilities from the age of three; the system makes every possible effort to identify and serve children with disabilities in the early grades and to provide appropriate services before more serious problems develop; the system employs and trains regular classroom teachers who can teach children with a wide variation in learning styles and individual strengths and weaknesses; the system makes use to the greatest extent possible of instructional support resources designed and implemented to accommodate children in the regular classroom; the system has provided for on-site consultation, technical assistance and inservice training when necessary; the system ensures that the individualized education plan for each child with a disability removed from a regular class environment includes goals and objectives designed to move that child into a less restrictive environment at the earliest appropriate opportunity; and the system includes in its plan all additional policies and procedures required by the State Department of Education.
"Defendants shall develop a comprehensive plan for the implementation of the special education services required in this Order. The plan shall comply with the standards and requirements in this Order and the Order of March 31, 1993. This plan shall be incorporated into the state plan for special education that is required by federal law, and shall be binding on all programs administered within the state. The plan will be completed no later than six months after the effective date of this Order and will be submitted to the Court. Parties will have 45 days to file objections to the plan with the Court.

*933 "X. PUBLIC SCHOOL FUNDING MUST BE EQUITABLE AND ADEQUATE.
"The system of public education in the State of Alabama shall be funded sufficiently to enable all public schools to fully achieve constitutional and statutory standards of educational equity and adequacy, including all components of this Court Order. The quality of a child's education shall not be dependent upon where the child lives and attends school. The State shall institute a public school funding system which shall ensure an adequate, equitable and appropriate education for all students, and which shall be governed by the following principles:

"A. General Funding Program

"The State shall establish a foundation program that shall operate to assure all children an adequately funded education. Sufficient funding to provide an adequate education shall be phased in through the foundation program over a period not to exceed six years from the entry of this Court's order.
"School funding, both among school systems and among schools within school systems, shall be equitable. The funding system shall minimize educational disadvantages due to social or economic deprivation.
"The foundation program shall require a uniform local tax effort equalized by the State so that every school child shall receive an adequately funded educational opportunity regardless of factors such as local indifference, low aspirations, or other conditions unrelated to educational need.
"Locally collected taxes used as a means of financing public education shall be levied in school taxing districts that are co-extensive with entire local school systems.
"Authorization for local school system taxes (rates permitted, kinds of taxes authorized, etc.) shall be uniform, so that all school systems have equal access to their respective tax bases, and sufficient taxing authority to participate fully in the State funding system developed for the public education system.
"Defendants shall develop a method for determining what level of funding is necessary to provide an adequate education in Alabama, and the state shall ensure that this level of funding (and any additional funding based on weighing for special-needs students) is provided in every school system in the state. Defendants shall submit this proposed method to the Court within six months of the date of this Court's order. The method developed necessary to provide an adequate education may change over time. Parties shall have 60 days from the submission of this method to file objections with the Court.
"School systems shall distribute all resources among the schools within each system in an equitable manner, reflecting the school population and educational needs of each school in the system.
"A method shall be developed for tracking resources to the school level to ensure that resources are equitably allocated. This method shall be submitted to the Court within six months of the date of the Court's remedy order. Parties shall have 45 days from its submission to file objections with the Court.
"The system of fringe benefits for state and local school employees currently paid on behalf of local school systems by the State shall be equalized by incorporation into the foundation program. Fringe benefits shall be funded by the current equalized revenues of local school systems and paid directly to the appropriate State agency rather than being paid on behalf of local systems by the State.
"The funding system shall direct relatively greater resources to children with measurably greater needs. In order to do this, the system shall use the pupil, rather than the teacher unit, as the unit for measuring the funding needs of local school systems and allocating funds to address those needs.
"A weighting system shall be developed for special education, at-risk, vocational education, and other students whose education is demonstrably more expensive, that reflects the additional cost of providing those students with an adequate education. Special education funds shall be distributed so that no school system receives a financial incentive to place a child with a disability in a *934 segregated setting or to diagnose or classify a child in any one category of disability. Pupil weights shall be submitted to the Court no later than six months from the date of the Court's remedy order. Parties shall have 45 days from this submission to file objections with the Court.
"The funding system shall take into consideration high cost factors, such as sparsity and geographical isolation, which cause expenditures to vary and affect the quality of educational services.
"The funding system shall not result in any local school system receiving less combined state and local revenue on a per student basis than was received in the fiscal year ending September 30, 1993,** [fn. **: This provision excludes special appropriations for catastrophic events such as floods and major fires.] provided that this paragraph shall have no force and effect after September 30, 1994, unless the State has fully implemented a funding system which complies with all provisions of this Order.
"With respect to students with disabilities, distribution of funds will assure that no school system expends less that it spent the previous year for the education of these students, consistent with Federal laws and regulations.
"Defendants shall submit to the Court within six months of the date of the remedy order a report on the funding system to be utilized. The parties shall have 45 days to file objections to the system with the Court.

"B. Transportation Funding

"Children shall have adequate, safe and efficient public transportation. Transportation shall be funded as an item separate and apart from other operational expenditures and outside the foundation program taking into account the costs of efficiently managed services. The allocation to each school system must be based on an efficiency determination using actual operating costs of each school district (including costs of bus purchases), density of pupil population, the number of pupils transported, and the other requirements set forth in this Order. The State shall pay the full cost as determined by the allocation formula.

"C. Facilities Funding

"Funds shall be provided outside the foundation program that will eliminate identified deficiencies in school facilities within five (5) years of the Court's approval of the plan to remedy its deficiencies. Funds shall also be provided for the on-going soundness and adequacy of educational facilities in Alabama. The funding system for eliminating deficiencies in facilities and for new construction shall be equitable and shall take into account: the current state of buildings, the existing capital debt services and tax capacity of local systems. Fund allocations for facilities shall not be made on a per capita basis, but rather shall be made according to priorities based upon need as determined by a needs assessment to be conducted by Defendants. Within twelve months of this Court's order, Defendants' assessment instrument shall be submitted to the Court. Parties shall have 45 days to file objections to the instrument with the Court. When the needs assessment is completed, Defendants shall submit it to the Court along with their plan for construction and renovation to eliminate identified deficiencies. Parties shall have 45 days to file objections with the Court to its findings.

"D. Periodic Review

"The Defendants shall annually review all aspects of the school funding system, including the levels of adequacy and equity that it achieves, and including a report on the level of disparity created, if any; shall identify impediments that interfere with its success; and shall assure that State school revenues are raised and distributed fairly. Defendants shall report to the Court and the parties on these subjects on an annual basis. Parties shall have 45 days to file objections with the Court as to the operation of the funding system.

"XI. GENERAL PROVISIONS.
"A. RepresentativenessAll committees and other entities established by Defendants to implement this plan shall be representative of the state by race, gender, and geography, and shall include one or more individuals who can ensure that the needs of children with disabilities are represented and considered. In addition, all councils, committees and other entities established *935 by schools to implement this plan, including entities that are advisory or consultative in nature, shall be representative on the basis of race and gender and shall include one or more individuals who can ensure that the needs of children with disabilities are represented and considered.
"B. MonitoringThe parties shall meet to agree upon a procedure for monitoring the implementation of this Remedy Plan. Defendants shall submit a procedure no later than three months after the date of this Order. Parties shall have 45 days from the submission of this procedure to file objections with the Court. Defendants shall bear all costs and expenses of monitoring the remedy plan including all the costs and expenses of plaintiffs' experts, consultants and plaintiffs' attorneys' fees.
"C. Continuing ObligationIf the provisions of this plan, and the implementation thereof, do not remedy the Constitutional and statutory deficiencies identified in the Courts' order of March 31, 1993, Defendants have a continuing obligation to remedy these deficiencies and plaintiffs may bring any failure to do so to the Court's attention.
"D. Continuing Cooperation and Consultation Among the PartiesIn areas where this document calls for Defendants to make a submission to the Court and provides all parties with an opportunity to file objections, Defendants are encouraged to meet with all parties in advance of the submission to minimize objections and cooperate in providing information as required.
"E. Objections to SubmissionsObjections to filings shall be based upon a reasonable belief that the submission does not advance the principles of this Court's Orders.
"F. Retention of JurisdictionThe Court hereby retains jurisdiction of this matter and will issue such further orders [as] may be required to secure the implementation of its orders."

On Applications for Rehearing
COOK, Justice.
The applications for rehearing are overruled. The judgment in the Liability Phase is affirmed. The judgment in the Remedy Phase is vacated and the cause is remanded with directions to the trial court to retain jurisdiction. The parties may petition the trial court to reopen the case if within a reasonable time the coordinate branches of government have not formulated an educational system that complies with the judgment in the Liability Phase.
APPLICATIONS FOR REHEARING OVERRULED; JUDGMENT OF JANUARY 10, 1997, MODIFIED.
MADDOX, ALMON, SHORES, HOUSTON, KENNEDY, and SEE, JJ., concur.
HOOPER, C.J., concurs specially.
SEE, J., files statement addressing motion to recuse.
BUTTS, J., recuses himself.
HOOPER, Chief Justice (concurring specially).
I have not changed my position as to the judgment in the Liability Phase. I would rather this Court reach its own conclusion than have it bound by the ruling of one trial judge. I do believe, however, that today's ruling is reasonable and that it gives the legislature a reasonable opportunity to address the problem dealt with in the Liability Phase judgment. I therefore concur in today's action denying rehearing and modifying the January 10, 1997, judgment.
SEE, Justice (addressing motion to recuse).
The Harper Appellees assert that I should recuse myself, because the outcome of this litigation (the "Equity Funding Case") could have a financial effect on a named plaintiff, the Alabama Disabilities Advocacy Program ("ADAP"). The Harper Appellees argue that because ADAP might be impacted by the outcome of this case; because the ADAP clinical program is affiliated with the University *936 of Alabama School of Law; and because my wife and I are associated with the Law School, this litigation could have a substantial effect on me that requires my recusal.[1] I disagree.
ADAP describes itself as "a statewide, independent program established to protect the rights of persons with disabilities ranging from developmental disabilities, manifesting themselves in childhood, to mental illness." 2 Airmail: Alabama Disabilities Advocacy Program, October 1997, at 2. As I understand it, a large majority of ADAP's funding comes from the federal government, and a small portion comes from a state appropriation to the University. ADAP is administered through the Law School's clinical program and is under the administrative direction of the dean of the Law School. Because ADAP is an unincorporated program, it is, in a sense, an agency of the University.[2]
ADAP is a party to this litigation and may receive some portion of the legal fees, or other award, in this case. However, as I understand it, ADAP's continued viability depends on its continued federal funding, not the outcome of this Equity Funding Case. Moreover, I understand that to the extent ADAP receives any legal fees from this litigation, those fees will not go to any other program of the Law School, including the payment of salaries for professors or for contract employees, such as legal writing instructors.
After being elected to the office of Associate Justice, I left a position as a tenured professor of law at the Law School and received a one-year leave of absence, which expires on December 23, 1997. I previously informed the dean of the Law School that I would not return, and I will not seek to renew or extend this leave of absence. In my current status as a professor on leave from the Law School, I do not attend faculty meetings or vote on faculty matters, nor do I receive any compensation or benefits. Any financial impact this litigation has on ADAP could not have a substantial effect on me. Therefore, my status as a professor on leave does not require my recusal. See Canon 3 C(1)(c), Ala.Can.Jud.Eth.; North Carolina Mut. Life Ins. Co. v. Holley, 533 So.2d 497, 504 (Ala.1987) (Adams, J., concurring specially) (stating that he was not required to recuse because of an insubstantial pecuniary interest in one of the parties); see generally In re Drexel Burnham Lambert Inc., 861 F.2d 1307, 1313 (2d Cir.1988) (stating that a judge's impartiality is not brought into question when his interest in the litigation is remote, contingent, or speculative), cert. denied, 490 U.S. 1102, 109 S.Ct. 2458, 104 *937 L.Ed.2d 1012 (1989); cf. Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986) (stating that the failure of a Justice of this Court to recuse violated due process where his interest in the litigation was direct, personal, substantial, and pecuniary in nature).
My wife, Brenda Childs See, is a full-time contract employee of the Law School, serving as the director of legal writing.[3] She receives compensation from the Law School for her services. With respect to a similar situation in which a judge was to rule on a case involving the municipal employer of the judge's spouse, the Judicial Inquiry Commission stated:
"A judge is not disqualified to preside over a case in which the city is named as a party merely because the judge's spouse is employed as the library director for the city-county public library and is paid as a city employee. The judge would be disqualified if the judge's spouse, by virtue of the spouse's employment, had an `interest that could be substantially affected by the outcome of the proceeding.'"
Ala. JIC Op. 92-462. Accord Richard E. Flamm, Recusal and Disqualification of Judges § 8.6 (1996). It is my understanding that the impact of this litigation on ADAP, for the reasons set out above, will not have a substantial financial effect on the Law School or its compensation of my wife as a contract employee in the legal writing program. Thus, this employment relationship does not require my recusal.
In short, even if the outcome of this litigation has a financial impact on ADAP, the Harper Appellees have failed to demonstrate that such an impact would or even could, in turn produce a financial impact on the Law School that, in its turn, could have any substantial financial effect on me or my wife. Because there is no basis for my recusal, I do not recuse.
NOTES
[1] The effect of this action of the trial court will be discussed more fully in Part I infra.
[2] We have already referred to the fact that, in ¶ XI(F), the trial court expressly "retain[ed] jurisdiction of this matter [in order to] issue such further orders as [would] be required to secure the implementation of its orders."
[3] That review of specific orders implementing specific provisions might be obtained was the sense of this Court's order denying Governor James's petition for a writ of prohibition in Ex parte James (no. 1940679), which order stated:

"[I]ssues regarding other orders may be raised on appeal in accordance with the Alabama Rules of Appellate Procedure when such orders become final." Pinto, 662 So.2d at 898 n.2.
[4] In Pinto, we considered the Pinto intervenors' arguments for intervention "on behalf of [the following] three classes of persons involved with Alabama public schools": (1) a "Gifted-Student class," (2) a "General-Student class," and (3) a "Parent Class." 662 So.2d at 898.
[5] The Harper class was described at the time of certification as consisting "of all children who are presently enrolled or will be enrolled in public schools in Alabama that provide less than a minimally adequate education." 662 So.2d at 895.
[6] Governor Guy Hunt publicly announced his intent not to appeal from the Liability Order. "Hunt: No appeal of school ruling," Montgomery Advertiser, April 6, 1993, at 1A. Cited supra, 713 So.2d at 877. His successor, Governor Jim Folsom, also declined to appeal.
[7] In Opinion of the Justices No. 338, 624 So.2d 107 (Ala.1993), the Alabama Senate requested the Chief Justice and the Associate Justices to render an advisory opinion as to whether the Legislature was required to comply with the circuit court's order and provide schoolchildren with substantially equitable and adequate educational opportunities. In that opinion, the Chief Justice and Associate Justices then serving, "[b]ecause the question [was] one of great public interest, and because the question raise[d] a question of fundamental constitutional law relating to the separation of powers of government," elected to express their opinion on the question the Senate had asked, but cited Opinion of the Justices No. 289, 410 So.2d 388, 391-92 (Ala. 1982), and pointed out, "as we did on another occasion when the Legislature asked for the opinion of the Justices on the constitutionality of pending legislation while the basic constitutionality of the same Act was being raised on appeal in an adversary setting: `[T]he procedure, as well as the advisability, of rendering advisory opinions is not without difficulty, particularly in view of the fact that the questions are presented outside the normal adversary system wherein pertinent facts from the record of a trial court would be presented, and the issues would be briefed by attorneys and most times orally argued before the Court.'" The Justices also quoted the following from Opinion of the Justices No. 289:" `It is also instructive to note that advisory opinions are not binding precedents as are decisions on appeal to this Court.'" 410 So.2d at 392. In their opinion to the Senate, the Justices said:

"With those principles [that advisory opinions are not binding precedents] firmly in our minds, we now express our opinion on your request, that is, whether the Legislature is required to comply with the order of the circuit court in the consolidated cases. Our opinion is that the order has the force of law unless modified by the trial court, until it is modified or reversed on appeal, and the Legislature, like other branches of government, must comply with it.
"Under our State constitution, `[t]he powers of the government of the State of Alabama [are] divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another.' Art. III, § 42.
"The executive and legislative branches of the State have broad powers and responsibilities in the area of public education, but the powers of each branch of government are bounded by the mandates and restraints of the constitution of the State of Alabama. This principle of separation of powers of government that is now included in the Alabama constitution was first decided in the famous case of Marbury v. Madison, 5 U.S. (1 Cranch) 137, 176-77, 2 L.Ed. 60 (1803). It is the province and duty of the judicial branch of government to interpret the constitution and to say what the law is, and an order issued by a court of competent jurisdiction that interprets the constitution is binding upon the Legislature unless the order is stayed or overturned by a higher court.
"Under the provisions of Amendment 328, Section 6.04, `[t]he circuit court shall exercise general jurisdiction in all cases except as may otherwise be provided by law.' Included within the general jurisdiction of the circuit court is the power to decide whether the actions of the executive or legislative branches are consistent with the requirements of the fundamental law of the peopletheir constitution. In short, the circuit court has the power, and indeed the duty, when requested to do so in cases involving justiciable controversies, to interpret the constitution, and its interpretation, unless changed by a competent court having the power to overturn it, must be accepted and followed. See, 21 C.J.S. Courts § 3, pp. 11-12 (1940).
"Your inquiry, as we understand it, is whether the Legislature is required to follow the order of the Circuit Court of Montgomery County in the consolidated cases referenced above. Our answer, based upon the principles set out herein, is yes."
624 So.2d at 109-10.
[8] It appears to me that in Opinion of the Justices No. 338, the Justices then serving on this Court addressed the first two issues raised by the State defendants. I joined in that opinion, and my opinion on the law relating to the jurisdiction of the circuit court and the adversarial nature of the case has not changed. Indeed, the separation of powers question involving the power of the Legislature in fulfilling the constitutional requirement of free public education was addressed in an early Alabama case. See Elsberry v. Seay, 83 Ala. 614, 3 So. 804 (1888).
[9] On June 24, 1959, then Governor John Patterson called the Legislature into special session for the express purpose of passing "Legislation to provide for the necessary revenue and appropriations to meet the existing emergency in education in the State of Alabama." In his address to a joint session of the Legislature, he said that "[n]o state can build higher than its school system." 1 House Journal of Alabama 3 (Second Special Session 1959).

On May 7, 1963, then Governor George C. Wallace said that "[a]s a matter of principle I am against additional taxes but let me say clearly whatever it takes to solve the educational problems, I am for." He further said: "I pledge my administration will take whatever measures are necessary to correct deficiencies in the present system of education in Alabama and prepare a foundation for an educational system of unequalled excellence.... Whatever it takes to bring us out of educational crises, it will be done." 1 House Journal of Alabama 19-20 (Regular Session 1963).
On August 4, 1981, then Governor Fob James called the Legislature into extraordinary session, in part for the purpose of enacting "Legislation to make appropriations for the support of public education in the State of Alabama." 3 House Journal of Alabama 3 (First Extraordinary Session 1981). He called the Legislature into a third extraordinary session on November 3, 1981, for the purpose of adopting legislation "to make appropriations for the support and encouragement of educational and industrial activities involving basic and applied scientific research and development." 3 House Journal of Alabama 4 (Third Extraordinary Session 1981).
While this case was pending, in an address to a joint session of the Legislature, on April 18, 1995, Governor Fob James said, in part, that "not once in more than 12 years has any direct action been taken to identify and remedy the defects of a failing school system," and that "[w]e are charged tonight with a genuine `sense of urgency' to rescue thousands of students who will depart their schools with less than eighth-grade learning abilities and/or suffer the tragedy of functional illiteracy. We have begun by expanding the use of Stanford Achievement Tests from testing grades four and eight to testing grades three to 11." The Governor then stated what he described as "[t]he seven fundamentals of a good school," and said that they were "inseparable." Among those "fundamentals," he listed the following:
"Establish a core curriculum in academics that requires basic subject matter courses such as arithmetic ... reading ... geography ... English ... history ... math and science.
"Implement a grading system that accurately measures a student's knowledge of a given subject and reports progress to parents on a report card. [Footnote cont'd.]
"Hold superintendents and principals accountable for measured improvement in SAT scores using 1995 test scores as a benchmark. Replace management that shows no progress after two full years of intensive guidance and support.
"Adopt a Foundation Program for funding and operations of local schools that meets Southern Association of Colleges and Schools accreditation standards for classroom size ... libraries and personnel."
He then stated:
"Our goal is clear. We must provide the opportunity for every student in Alabama public schools to achieve academic excellence according to his or her ability and desire to do so.
"Tonight I ask you to `help me help the children.' We all want two things[:] 1) Schools where our children are safe and 2) schools where our children achieve to the highest levels of their ability.
"....
"Our K-12 programs are in crisis. We lose one-third of our students as dropouts. Those who graduate and enroll in college face academic difficulties. Some reports have stated that as much as 35 percent of our college course work involves remedial education."
1 House Journal of Alabama 99-100 (Regular Session 1995).
[10] There is some historical evidence (albeit disputed and of an anecdotal nature) that President Jackson believed that he had the power to decline to enforce judicial decrees. President Jackson disagreed with the Marshall Court's decision in Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832), which held that Federal treaties with the Cherokee Nation ousted Georgia's legislative jurisdiction over whites living in Cherokee territory and that a state criminal conviction accordingly must be set aside. President Jackson reputedly said, "John Marshall has made his decision, now let him enforce it." See G. Edward White, The Marshall Court and Cultural Change, 1813-1835, 737 (1988). But President Jackson was never called on to enforce the decree; the Governor of Georgia pardoned the defendant. Id. at 737-39.
[11] I believe that I can take judicial notice that numerous polls show that the people of Alabama consider education one of the most important issues facing the state, and that many candidates for public office run on platforms that promise to address this problem.
[12] For example, Macon County is in the top 10 counties of the state in per pupil spending on education. Yet, Macon County ranks in the bottom 10 counties in quality of education.
[13] Holy Bible, Romans 13:3-4 (King James Version).
[14] Holy Bible, I Timothy 1:8-9 (King James Version).
[15] Holy Bible, Matthew 7:18-19 (King James Version).
[1] Canon 3C.(1), Ala.Can.Jud.Eth., provides:

"(1) A judge should disqualify himself in a proceeding in which his disqualification is required by law or his impartiality might reasonably be questioned, including but not limited to instances where:
"...
"(c) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding."
(Emphasis added.)
"Financial interest" is defined by Canon 3C.(3)(c) as:
"[O]wnership of a legal or equitable interest, however small, or a relationship as director, advisor, or other active participant in the affairs of a party, except that:
"(i) Ownership in a mutual or common investment fund that holds securities is not a `financial interest' in such securities unless the judge participates in the management of the fund;
"(ii) An office in an educational, religious, charitable, fraternal or civic organization or institution is not a `financial interest' in securities held by the organization or institution...."
Neither my wife nor I own a "legal or equitable interest" in ADAP, nor does either of us serve "as director, advisor, or other active participant in [its] affairs."
[2] Although ADAP may be an agency of the University, its interests are separate and distinct from those of the University, as shown by each entity's attempt to intervene in this Equity Funding Case. ADAP's motion to intervene on behalf of its disabled clients was granted by the trial court. The University's motion to intervene was denied. I note that the Harper Appellees stated in their Brief in Opposition to Motion to Intervene of the Board of Trustees of the University of Alabama and Auburn University, that any interests the University has in this litigation "are not `direct,' they are not `substantial,' and they are not `legally protectable.'"
[3] My wife was the attorney for ADAP for the approximate period mid-1979 through mid-1981. Although this employment is alluded to in the "Affidavit of Martha Irene Morgan," the Harper Appellees do not suggest that this employment, which terminated more than a decade before the initiation of this litigation, bars me from hearing this case.